**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**NORTHERN DIVISION**

NAUTILUS INSURANCE COMPANY,    )
       )
    Plaintiff,    )
       )           **FILED: JULY 17, 2008**
    vs.    )  Case No.  **08CV4079**
       )           **JUDGE DER-YEGHIAYAN**
CHICAGO BULK CARRIERS, INC. d/b/a    )           **MAGISTRATE JUDGE ASHMAN**
ILLINOIS DISPOSAL COMPANY,    )           **RCC**
CHICAGO TRANSIT AUTHORITY,    )
KARRY WILLIAMS, and ELIZA WILLIAMS,    )
       )
    Defendants.    )
       )

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Nautilus Insurance Company ("Nautilus"), by and through its counsel of record, Bollinger, Ruberry & Garvey, and for its Complaint against Defendants Chicago Bulk Carriers, Inc. d/b/a Illinois Disposal Company ("Bulk"), Chicago Transit Authority ("CTA"), Karry Williams and Eliza Williams, alleges, states and avers:

## JURISDICTION

1.    Plaintiff Nautilus is an Arizona insurance company, with its principal place of business at 7233 East Butherus Drive, Scottsdale, Arizona 85260.

2.    Defendant Bulk is a dissolved Illinois corporation, with its principal place of business located at 12100 S. Marshfield, Calumet Park, IL 60827.

3.    Defendant CTA is an Illinois governmental agency, with its principal place of business at 567 W. Lake St., Chicago, IL 60661.

4.    Defendant Karry Williams is an Illinois citizen, whose primary residence is located at 7743 South Calumet, Chicago, Illinois 60619.

5.     Defendant Eliza Williams is an Illinois citizen, whose primary residence is located at 7743 South Calumet, Chicago, Illinois 60619.

6.     Defendants Karry Williams and Eliza Williams have claimed damages in excess of $75,000.

7.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332 based on diversity of citizenship of the parties and the matter in controversy exceeds $75,000.

## WILLIAMS LAWSUIT

8.     On March 23, 2007, a Fourth Amended Complaint ("Complaint") was filed in the Circuit Court of Cook County, Illinois bearing the caption, *Karry Williams, et al. v. Ferro and Ferro d/b/a Ferro Construction Co., et al.*, Case No. 05 L 1539 (the "Williams Lawsuit").  A true and correct copy of the Fourth Amended Complaint filed in the Williams Lawsuit is attached hereto as Exhibit "A".

9.     Bulk was served in the Williams Lawsuit on August 21, 2006.

10.     Count III of the Williams Lawsuit includes the following allegations against Bulk:

a.     That on or about and before November 2, 2004, the Defendant, individually and by and through agents, servants and employees, owned, was in charge of, and/or control of a backhoe being used in the erection, construction, excavation, repairs, alteration, removal, and/or replacement of the column bases or other structure located at approximately 5912 S. State, in the City of Chicago, County of Cook, and State of Illinois.

b.     That at the aforementioned time and place, there was, in force and effect, a contract between the Defendant and Chicago Transit Authority.

c.    That at the aforementioned time and place, the Plaintiff was employed by Chicago Transit Authority on said premises in the furtherance of the aforesaid work.

d.    That the aforesaid Defendant had a duty to exercise reasonable care for the safety of the Plaintiff.

e.    That the aforesaid Defendant was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

1.    Failed to operate the said backhoe in a safe, suitable and proper manner so as to give proper and adequate protection to the life and limb of any person or persons employed, engaged and/or passing near or by the same;

2.    Failed to provide, locate or place the aforementioned backhoe in a safe suitable and proper manner so as to give adequate protection to the plaintiff and others similarly situated on or about said backhoe, or passing near or by the same;

3.    Failed to provide, erect or place flagging, barricades and/or signs in a safe suitable and proper manner so as to give adequate protection and/or warning to the plaintiff and others similarly situated on or about the said backhoe, or passing under or by the same;

4.    Placed debris and obstructions around said backhoe which created a hazard to Plaintiff and others working thereon or passing under or by the same, thereby failing to give adequate protection to those situated on or about said backhoe or passing near or by the same;

5.      Failed to warn of the danger of working around an operating backhoe;

6.      Failed to maintain the aforementioned backhoe in a condition that was reasonably safe;

7.      Failed to maintain the work area around the aforementioned backhoe in a condition that was reasonably safe;

8.      Failed to provide a "safety watchman" to signal the backhoe operator when it is safe to swing the backhoe;

9.      Failed to have a policy requiring a "safety watchman" to signal the backhoe operator when it is safe to swing the backhoe;

10.     Failed to adequately train to correct; maintain and/or prevent the aforementioned; and

11.     Failed to have an adequate policy to correct, maintain and/or prevent the aforementioned.

f.      That at said time and place, Plaintiff, Karry Williams, was struck by the backhoe.

g.      That one or more of the aforesaid acts or omissions constituting legal misconduct of the Defendant was a proximate cause of said occurrence and Plaintiff personal injuries as hereinafter mentioned.

h.      That as a direct and proximate result of one or more of the aforesaid acts and/or omissions of the Defendant, the Plaintiff then and there sustained severe and permanent injuries, both internally and externally, and was and will be in the future hindered and prevented in whole or in part from attending to his

usual duties and affairs, and has lost and in the future will lose the value of that time, and has suffered a loss of earning capacity, as aforementioned. Further, that the Plaintiff also suffered great pain and anguish both in mind and body, and will in the future continue to so suffer; the Plaintiff further expended and became liable for and will in the future expend and become liable for large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

11.    Count IV of the Williams Lawsuit includes the following allegations against Bulk:

a.    That as a direct and proximate result of one or more of the aforesaid acts and/or omissions constituting legal misconduct of the Defendant, Plaintiff's spouse, KARRY WILLIAMS, then and there sustained severe and permanent injuries, both externally and internally, and has been and will be in the future hindered and prevented from attending to the duties and affairs in which Plaintiff's spouse has usually been engaged.

b.    That on and prior to November 2, 2004, the Plaintiff was the lawfully wedded spouse of Karry Williams.

c.    That as a direct and proximate result of one or more of the aforesaid acts and/or omissions constituting legal misconduct of the Defendants, Plaintiff, ELIZA WILLIAMS, has been deprived, and is reasonably certain to be deprived in the future, of the services, society, support, companionship and conjugal relationship with the Plaintiffs lawfully wedded spouse. Further, the Plaintiff, ELIZA WILLIAMS, has and will in the future incur great

medical expenses endeavoring to care for and receive treatment for the injuries suffered by Karry Williams.

12.　　On March September 14, 2007, Bulk filed a Third-Party Complaint against CTA. A true and correct copy of the Third-Party Complaint is attached hereto as Exhibit "B".

13.　　CTA was served in the Williams Lawsuit on or around October 19, 2007.

14.　　Count I of the Third Party Complaint includes the following allegations:

a.　　That upon information and belief, plaintiff was employed by the Chicago Transit Authority at the time of the occurrence alleged in the fourth-amended complaint.

b.　　That upon information and belief, plaintiff was working under the direction, supervision and control of the CIA at the time stated in the aforesaid complaint at law on the date and at the time of the occurrence.

c.　　That upon information and belief, the employee of this defendant was directed by a CTA foreman to move the bucket of the backhoe when the plaintiff was injured.

d.　　That at all relevant times in the aforesaid complaint at law, plaintiff's employer, the CTA, was under a duty to exercise reasonable care in regard to the safety of the plaintiff.

e.　　At all relevant times in the aforesaid complaint at law, plaintiff's employer was under a duty to this defendant/third-party plaintiff to provide reasonably safe conditions for work to be done by its employees.

f.　　Notwithstanding said duties, plaintiff's employer was guilty of one or more of the following negligent acts and/or omissions:

1.     Negligently, carelessly and improperly training its employees on the jobsite;

2.     Negligently, carelessly and improperly failing to supervise its employees on the jobsite which caused injury to the plaintiff; and

3.     Was otherwise careless or negligent.

g.     That one or more of the foregoing negligent acts and/or omissions of plaintiff's employer, the CTA, was the sole proximate cause of the occurrence and injuries alleged in the aforesaid complaint at law by the plaintiff.

h.     If this defendant/third-party plaintiff is found liable to plaintiff under plaintiffs fourth-amended complaint at law, which liability has been and continues to be specifically denied, then this defendant/third-party plaintiff is entitled to contribution from plaintiff's employer, the CTA, in the amount of any judgment entered against this defendant/third-party plaintiff in excess of its pro rata share of liability pursuant to the Joint Tortfeasor Contribution Act.

15.     Count II of the Third Party Complaint includes the following allegations:

a.     That the damages and injuries alleged by plaintiffs in their fourth-amended complaint at law were the sole proximate result of an agent of the CIA directing the back-hoe operator to operate the equipment in the manner being used at the time of plaintiffs injury and by negligently directing the back-hoe operator so that the plaintiff was struck by the back-hoe.

## **BULK WORK CONTRACT**

16.     In June 2002, Bulk and CTA entered into a contract for the rental of heavy construction equipment ("Bulk Work Contract").  A copy of the Bulk Work Contract is attached hereto as Exhibit "C".

17.     The Bulk Work Contract includes the following indemnity provision:

> Construction Contracts:  The Contractor [Bulk] shall indemnify and hold harmless to the maximum extent permitted by law the Authority [CTA], its agents, officials and employees against all injuries, death, losses, damages, claims, suits, liabilities, judgments, costs and expenses which may in any manner accrue against the Authority as a consequence of the award or performance of this Contract.  This indemnity applies: (a) whether any loss for which the Authority seeks indemnity shall be caused or contributed to by the sole or partial negligent act or omission of the Contractor or Contractor's employees; and (b) whether any of the losses for which the Authority seeks indemnity shall be caused or contributed to by the sole or partial negligence or omission of the Contractor's subcontractors or their employees.  The Contractor shall, at Contractor's own expense, appear, defend and pay all charges of attorneys and all costs and other expenses arising in connection with this indemnity.  If any judgment shall be rendered against the Authority, the Contractor shall at Contractor's own expense satisfy and discharge the judgment.  If indemnity pursuant to this subparagraph shall not be permitted by the applicable law, then, to the maximum extent permitted by law, the Contractor shall make full contribution to the Authority for its percentage share of any liability that is attributable to the Contractor's acts or omissions.  Contractor expressly waives any legal limitations on its liability to the Authority for contribution, including but not limited to limitations related to the payment of workers compensation benefits.  The Contractor expressly understands and agrees that any performance-payment bond or insurance protection required by this Contract or otherwise provided by the Contractor, shall in no way limit the responsibility to indemnify and defend the Authority pursuant to this Section.  The indemnifications contained herein shall survive the termination of this Agreement.

18.     The Bulk Work Contract contains the following provision with respect to insurance:

> 1.     The Contractor must provide the Chicago Transit Authority ("CTA") with certificates of insurance showing the CTA as certificate holder as well as certified copies of all insurance policies listed below in these Insurance Requirements within ten (10) days of the date of the award of the contract.  The Contractor shall not commence work under this contract until the Contractor has received written approval of the required insurance by the CTA.

2.    The CTA must be named as an additional insured and certificate holder on the Commercial General Liability, Automobile Liability and Umbrella Liability policies. The policies shall stipulate that the insurance afforded to the CTA as additional insured shall be primary insurance.

\*\*\*

14.    The Contractor agrees to procure, provide and maintain during the performance of this contract, the insurance listed below with the minimum policy limits specified below:

\*\*\*

B.    Comprehensive, or Commercial, General Liability C.T.A. must be named as an Additional Insured via (I.S.O. Form B C.G. 2010)

$2,000,000    General Aggregate (Per Location)

$1,000,000    Products/Completed Operations Aggregate

$1,000,000    Personal Injury and Advertising Injury

$1,000,000    Per Occurrence

The Commercial General Liability policy shall include, without limitation: (i) Broad Form Contractual Liability, (ii) Products/Completed Operations to be maintained in full force and effect for a period of two (2) years following final completion of the work under the Contract, (iii) Independent Contractor's Protective Liability, (iv) Premises/Operations, including deletion of explosion, collapse and underground (XCU) exclusions, (v) Broad Form Property Damage, including Products/Completed Operations, (vi) Personal Injury Liability, with employee and contractual exclusions deleted, (vii) Severability of Interest and Cross Liability endorsement, (viii) Contractor expressly agrees to waive, and will require its insurer to waive, its rights, benefits and entitlement under the "Other Insurance" clause of its Commercial General Liability policy with respect to the CTA.

## NAUTILUS POLICY

19.    Nautilus issued Policy No. NC375330 to Bulk (the "Nautilus Policy"). A true and correct copy of the Nautilus Policy is attached hereto as Exhibit "D".

20.    The Nautilus Policy is effective from October 1, 2004 through October 1, 2005.

21.    The policy limits are $1,000,000 Each Occurrence and $2,000,000 General Aggregate.

22.    The Nautilus Policy contains the following insuring agreement:

    1.    Insuring Agreement

        a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

        b.    This insurance applies to "bodily injury" and "property damage" only if:

           (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

           (2)    The "bodily injury" or "property damage" occurs during the policy period;

23.    The Nautilus Policy contains the following Additional Insured Endorsement:

SCHEDULE

Name of Person or Organization:                Premium $ 250

CHICAGO TRANSIT AUTHORITY

Address:
PO BOX 3555
CHICAGO, IL  60654-0555

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule and only for liability arising out of your negligence and only for occurrences or coverages not otherwise excluded in the policy to which this endorsement applies.

Your policy is primary in the event of an occurrence caused by your sole negligence as respects the job described below:  (MUST BE COMPLETED)

Job Description:          [Blank]

Address:                  [Blank]

24.     The Nautilus Policy contains the following Employee Exclusion:

AMENDATORY ENDORSEMENT – EMPLOYEE EXCLUSION

Exclusion e. Employer's Liability of Paragraph 2. Exclusions under SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY is replaced by the following:

e.      Employer's Liability

"Bodily injury" to:

(1)     An "employee" of the insured arising out of and in the course of:

(a)     Employment by the insured; or

(b)     Performing duties related to the conduct of the insured's business; or

(2)     The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1)     Whether the insured may be liable as an employer or in any other capacity; and

(2)     To any obligation to share damages with or repay someone else who must pay damages because of the injury.

As respects this endorsement only, the definition of "Employee" in DEFINITIONS is replaced by the following:

"Employee" shall include, but is not limited to, any person or persons hired by, loaned to, leased to, contracted for, or volunteering services to the insured, whether or not paid by the insured.

25.     The Nautilus Policy contains the following Contractual Liability Exclusion:

b.      Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

    (1)    That the insured would have in the absence of the contract or agreement; or

    (2)    Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

    (a)    Liability to such party for, and for the cost of, that party's defense has also been assumed in the same "insured contract"; and

    (b)    Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

26.    The Nautilus Policy contains a Contractual Liability Limitation endorsement, which includes the following provision:

An "insured contract" does not include that part of any contract or agreement:

1.    That indemnifies any person or organization for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing….

27.    The Nautilus Policy contains the following Supplementary Payments section:

2.    If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

    a.    The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

    b.    This insurance applies to such liability assumed by the insured;

    c.    The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

    d.    The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist

between the interests of the insured and the interests of the indemnitee;

e.  The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f.  The indemnitee:

   (1)  Agrees in writing to:

      (a)  Cooperate with us in the investigation, settlement or defense of the "suit";

      (b)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

      (c)  Notify any other insurer whose coverage is available to the indemnitee; and

      (d)  Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

   (2)  Provides us with written authorization to:

      (a)  Obtain records and other information related to the "suit"; and

      (b)  Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will by paid as Supplementary Payments.  Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury and Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a.  We have used up the applicable limit of insurance in the payment of judgments or settlements; or

   b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## **GROUNDS FOR DECLARATORY JUDGMENT**

28. Additional Insured coverage for CTA under the Nautilus Policy is limited to "liability arising out of your [Bulk's] negligence."

29. As reflected in the Third-Party Complaint, CTA's liability in the Williams Lawsuit does not arise out of the negligence of Bulk.

30. As a result, there is no actual or potential coverage for the claims against CTA in the Williams Lawsuit.

31. Karry Williams was an employee of CTA acting within the course and scope of his employment with the CTA when he was allegedly injured.

32. The "Employee Exclusion," therefore, applies to exclude any coverage or potential coverage for CTA in the Williams Lawsuit.

33. Williams' injuries arose out of construction repair work being performed pursuant to the Bulk Work Contract.

34. The indemnity provision in the Bulk Work Contract purports to indemnify CTA for its own sole negligence, in violation of 740 ILCS 35/1, and, therefore, precludes any duty to indemnify Bulk for payments made to CTA under the Bulk Work Contract.

35. Furthermore, the "Contractual Liability" exclusion and "Contractual Liability Limitation" endorsement excludes any duty to indemnify Bulk for payments made to CTA under the Bulk Work Contract.

36. Conditions precedent necessary to trigger Nautilus' obligations under the Supplementary Payments section have not been, and cannot be, satisfied, precluding any duty to defend CTA pursuant to said section.

37.    Nautilus has no duty to defend CTA in connection with the Williams Lawsuit.

WHEREFORE, Plaintiff, Nautilus prays:

A.    That this Court determine and adjudicate the rights and liabilities of the parties hereto with respect to the Nautilus Policy.

B.    That this Court find and declare that the Nautilus Policy does not potentially or actually cover any portion of the claims against CTA in the Williams Lawsuit.

C.    That this Court find and declare that Nautilus has no duty to defend CTA in connection with the Williams Lawsuit.

D.    That this Court grant such other and further relied as it deems proper under the evidence and circumstances.

Respectfully submitted,

NAUTILUS INSURANCE COMPANY

_____/s/ Perry M. Shorris_____
One of Nautilus' Attorneys

Perry M. Shorris, Esq.
Bollinger, Ruberry & Garvey
500 West Madison Street, Suite 2300
Chicago, IL  60661-2511
(312) 466-8000
(312) 466-8001 – Fax

# EXHIBIT A

17804

ATTORNEY CODE # 04771

STATE OF ILLINOIS          )
                           ) SS:
COUNTY OF COOK             )

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

KARRY WILLIAMS,                              )
ELIZA WILLIAMS,                              )
                                             )
          Plaintiffs,                        )
                                             )
v.                                           )   NO. 05L1539
                                             )
FERRO AND FERRO D/B/A FERRO CONSTRUCTION     )
COMPANY;                                     )
FERRO AND FERRO INC.;                        )
CHICAGO BULK CARRIERS, INC.,                 )
                                             )
          Defendants.                        )
                                             )

## FOURTH AMENDED COMPLAINT AT LAW

### COUNT I

NOW COMES the Plaintiff, KARRY WILLIAMS, by his attorneys, HORWITZ, HORWITZ

AND ASSOCIATES, LTD., and complaining of the Defendants, FERRO AND FERRO

D/B/A FERRO CONSTRUCTION COMPANY, FERRO AND FERRO INC., alleges as

follows:

1. That on or about and before November 2, 2004, the Defendants, individually and by and

   through agents, servants and employees, owned, was in charge of, and/or control of a

   backhoe being used in the erection, construction, excavation, repairs, alteration, removal,

   and/or replacement of the column bases or other structure located at approximately 5912

   S. State, in the City of Chicago, County of Cook, and State of Illinois.



2. That at the aforementioned time and place, there was, in force and effect, a contract between the Defendant and Chicago Transit Authority.

3. That at the aforementioned time and place, the Plaintiff was employed by Chicago Transit Authority on said premises in the furtherance of the aforesaid work.

4. That at the aforesaid time and place and prior thereto, the Defendants, individually and through agents, servants and employees, were present during the course of such erection, construction, excavation, repairs, alteration, removal, and/or replacement. Further, the Defendants, individually and through agents, servants and employees, participated in coordinating the work being done and designated various work methods, maintained and checked work progress and participated in the scheduling of the work and the inspection of the work, and were likewise responsible for the work being performed pursuant to Section 1926.16 of the Occupational, Safety & Health Administration. In addition thereto, at that time and place, the Defendants, individually and through agents, servants and employees had the authority to stop the work, refuse the work and materials and order changes in the work, in the event the work was being performed in a dangerous manner or for any other reason. Furthermore, at that time and place, the Defendants, individually and through agents, servants and employees, had supervision and control of the work, retention of the right to supervise and control the work, constant participation in ongoing activities at the construction site, supervision and coordination of subcontractors, responsibility for taking safety precautions at the job site, authority to issue change orders, the right to stop work, ownership of the equipment at the job site, familiarity with construction customs and practices and had been in a position to assure worker safety or alleviate equipment deficiencies or improper work habits.

5.  That at the aforesaid time and place, and prior thereto, the Defendants, individually and

    through agents, servants and employees, placed or operated, or caused to be placed or

    operated certain excavation machinery commonly known as a backhoe, to facilitate and

    be used in the aforesaid erection, construction, excavation, repairs, alteration, removal,

    and/or replacement.

6.  That the aforesaid Defendants had a duty to exercise reasonable care for the safety of the

    Plaintiff.

7.  That the aforesaid Defendants were then and there guilty of one or more of the following

    careless and negligent acts and/or omissions:

    a)  Failed to operate the said backhoe in a safe, suitable and proper manner so as to
        give proper and adequate protection to the life and limb of any person or persons
        employed, engaged and/or passing near or by the same;

    b)  Failed to provide, locate or place the aforementioned backhoe in a safe suitable
        and proper manner so as to give adequate protection to the plaintiff and others
        similarly situated on or about said backhoe, or passing near or by the same;

    c)  Failed to provide, erect or place flagging, barricades and/or signs in a safe suitable
        and proper manner so as to give adequate protection and/or warning to the
        plaintiff and others similarly situated on or about the said backhoe, or passing
        under or by the same;

    d)  Placed debris and obstructions around said backhoe which created a hazard to
        Plaintiff and others working thereon or passing under or by the same, thereby
        failing to give adequate protection to those situated on or about said backhoe or
        passing near or by the same;

    e)  Failed to warn of the danger of working around an operating backhoe;

    f)  Failed to maintain the aforementioned backhoe in a condition that was reasonably
        safe;

    g)  Failed to maintain the work area around the aforementioned backhoe in a
        condition that was reasonably safe;

    h)  Failed to provide a "safety watchman" to signal the backhoe operator when it is
        safe to swing the backhoe;

i)   Failed to have a policy requiring a "safety watchman" to signal the backhoe operator when it is safe to swing the backhoe;

j)   Failed to adequately train to correct, maintain and/or prevent the aforementioned; and

k)   Failed to have an adequate policy to correct, maintain and/or prevent the aforementioned.

8.   That at said time and place, Plaintiff, Karry Williams, was struck by the backhoe.

9.   That one or more of the aforesaid acts or omissions constituting legal misconduct of the Defendants was a proximate cause of said occurrence and Plaintiff personal injuries as hereinafter mentioned.

10.  That as a direct and proximate result of one or more of the aforesaid acts and/or omissions of the Defendants, the Plaintiff then and there sustained severe and permanent injuries, both internally and externally, and was and will be in the future hindered and prevented in whole or in part from attending to his usual duties and affairs, and has lost and in the future will lose the value of that time, and has suffered a loss of earning capacity, as aforementioned.  Further, that the Plaintiff also suffered great pain and anguish both in mind and body, and will in the future continue to so suffer; the Plaintiff further expended and became liable for and will in the future expend and become liable for large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

WHEREFORE, the Plaintiff demands judgment against the Defendants in a dollar amount to satisfy the jurisdictional limitation of this Court, and in such additional amounts as the Court shall deem proper, plus the costs of this action.

## COUNT II
### Loss of Consortium

NOW COMES the Plaintiff, ELIZA WILLIAMS, by her attorneys, HORWITZ, HORWITZ

AND ASSOCIATES, LTD., and complaining of the Defendants, FERRO AND FERRO

D/B/A FERRO CONSTRUCTION COMPANY, FERRO AND FERRO INC., alleges as

follows:

1-9. Plaintiff adopts Paragraphs 1-9 of Count I, above, and re-alleges them as Paragraphs 1-9 of

Count II.

10. That as a direct and proximate result of one or more of the aforesaid acts and/or omissions

constituting legal misconduct of the Defendants, Plaintiff's spouse, KARRY WILLIAMS,

then and there sustained severe and permanent injuries, both externally and internally, and

has been and will be in the future hindered and prevented from attending to the duties and

affairs in which Plaintiff's spouse has usually been engaged.

11. That on and prior to November 2, 2004, the Plaintiff was the lawfully wedded spouse of

Karry Williams.

12. That as a direct and proximate result of one or more of the aforesaid acts and/or omissions

constituting legal misconduct of the Defendants, Plaintiff, ELIZA WILLIAMS, has been

deprived, and is reasonably certain to be deprived in the future, of the services, society,

support, companionship and conjugal relationship with the Plaintiff's lawfully wedded

spouse. Further, the Plaintiff, ELIZA WILLIAMS, has and will in the future incur great

medical expenses endeavoring to care for and receive treatment for the injuries suffered by

Karry Williams.

WHEREFORE, the Plaintiff demands judgment against the Defendants in a dollar amount to satisfy the jurisdictional limitation of this Court, and in such additional amounts as the Court shall deem proper, plus the costs of this action.

## COUNT III

NOW COMES the Plaintiff, KARRY WILLIAMS, by his attorneys, HORWITZ, HORWITZ AND ASSOCIATES, LTD., and complaining of the Defendant, CHICAGO BULK CARRIER alleges as follows:

1. That on or about and before November 2, 2004, the Defendant, individually and by and through agents, servants and employees, owned, was in charge of, and/or control of a backhoe being used in the erection, construction, excavation, repairs, alteration, removal, and/or replacement of the column bases or other structure located at approximately 5912 S. State, in the City of Chicago, County of Cook, and State of Illinois.

2. That at the aforementioned time and place, there was, in force and effect, a contract between the Defendant and Chicago Transit Authority.

3. That at the aforementioned time and place, the Plaintiff was employed by Chicago Transit Authority on said premises in the furtherance of the aforesaid work.

4. That at the aforesaid time and place and prior thereto, the Defendant, individually and through agents, servants and employees, were present during the course of such erection, construction, excavation, repairs, alteration, removal, and/or replacement. Further, the Defendant, individually and through agents, servants and employees, participated in coordinating the work being done and designated various work methods, maintained and

checked work progress and participated in the scheduling of the work and the inspection

of the work, and were likewise responsible for the work being performed pursuant to

Section 1926.16 of the Occupational, Safety & Health Administration. In addition

thereto, at that time and place, the Defendant, individually and through agents, servants

and employees had the authority to stop the work, refuse the work and materials and

order changes in the work, in the event the work was being performed in a dangerous

manner or for any other reason. Furthermore, at that time and place, the Defendant,

individually and through agents, servants and employees, had supervision and control of

the work, retention of the right to supervise and control the work, constant participation

in ongoing activities at the construction site, supervision and coordination of

subcontractors, responsibility for taking safety precautions at the job site, authority to

issue change orders, the right to stop work, ownership of the equipment at the job site,

familiarity with construction customs and practices and had been in a position to assure

worker safety or alleviate equipment deficiencies or improper work habits.

5. That at the aforesaid time and place, and prior thereto, the Defendant, individually and

through agents, servants and employees, placed or operated, or caused to be placed or

operated certain excavation machinery commonly known as a backhoe, to facilitate and

be used in the aforesaid erection, construction, excavation, repairs, alteration, removal,

and/or replacement.

6. That the aforesaid Defendant had a duty to exercise reasonable care for the safety of the

Plaintiff.

7. That the aforesaid Defendant was then and there guilty of one or more of the following

careless and negligent acts and/or omissions:

a) Failed to operate the said backhoe in a safe, suitable and proper manner so as to give proper and adequate protection to the life and limb of any person or persons employed, engaged and/or passing near or by the same;

b) Failed to provide, locate or place the aforementioned backhoe in a safe suitable and proper manner so as to give adequate protection to the plaintiff and others similarly situated on or about said backhoe, or passing near or by the same;

c) Failed to provide, erect or place flagging, barricades and/or signs in a safe suitable and proper manner so as to give adequate protection and/or warning to the plaintiff and others similarly situated on or about the said backhoe, or passing under or by the same;

d) Placed debris and obstructions around said backhoe which created a hazard to Plaintiff and others working thereon or passing under or by the same, thereby failing to give adequate protection to those situated on or about said backhoe or passing near or by the same;

e) Failed to warn of the danger of working around an operating backhoe;

f) Failed to maintain the aforementioned backhoe in a condition that was reasonably safe;

g) Failed to maintain the work area around the aforementioned backhoe in a condition that was reasonably safe;

h) Failed to provide a "safety watchman" to signal the backhoe operator when it is safe to swing the backhoe;

i) Failed to have a policy requiring a "safety watchman" to signal the backhoe operator when it is safe to swing the backhoe;

j) Failed to adequately train to correct, maintain and/or prevent the aforementioned; and

k) Failed to have an adequate policy to correct, maintain and/or prevent the aforementioned.

8. That at said time and place, Plaintiff, Karry Williams, was struck by the backhoe.

9. That one or more of the aforesaid acts or omissions constituting legal misconduct of the Defendant was a proximate cause of said occurrence and Plaintiff personal injuries as hereinafter mentioned.

10. That as a direct and proximate result of one or more of the aforesaid acts and/or omissions of the Defendant, the Plaintiff then and there sustained severe and permanent injuries, both internally and externally, and was and will be in the future hindered and prevented in whole or in part from attending to his usual duties and affairs, and has lost and in the future will lose the value of that time, and has suffered a loss of earning capacity, as aforementioned. Further, that the Plaintiff also suffered great pain and anguish both in mind and body, and will in the future continue to so suffer; the Plaintiff further expended and became liable for and will in the future expend and become liable for large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

WHEREFORE, the Plaintiff demands judgment against the Defendant in a dollar amount to satisfy the jurisdictional limitation of this Court, and in such additional amounts as the Court shall deem proper, plus the costs of this action.

## COUNT IV
### Loss of Consortium

NOW COMES the Plaintiff, ELIZA WILLIAMS, by her attorneys, HORWITZ, HORWITZ AND ASSOCIATES, LTD., and complaining of the Defendant, CHICAGO BULK CARRIER alleges as follows:

1-9. Plaintiff adopts Paragraphs 1-9 of Count III, above, and re-alleges them as Paragraphs 1-9 of Count IV.

10. That as a direct and proximate result of one or more of the aforesaid acts and/or omissions constituting legal misconduct of the Defendant, Plaintiff's spouse, KARRY WILLIAMS, then and there sustained severe and permanent injuries, both externally and internally, and

has been and will be in the future hindered and prevented from attending to the duties and affairs in which Plaintiff's spouse has usually been engaged.

11. That on and prior to November 2, 2004, the Plaintiff was the lawfully wedded spouse of Karry Williams.

12. That as a direct and proximate result of one or more of the aforesaid acts and/or omissions constituting legal misconduct of the Defendants, Plaintiff, ELIZA WILLIAMS, has been deprived, and is reasonably certain to be deprived in the future, of the services, society, support, companionship and conjugal relationship with the Plaintiff's lawfully wedded spouse. Further, the Plaintiff, ELIZA WILLIAMS, has and will in the future incur great medical expenses endeavoring to care for and receive treatment for the injuries suffered by Karry Williams.

WHEREFORE, the Plaintiff demands judgment against the Defendant in a dollar amount to satisfy the jurisdictional limitation of this Court, and in such additional amounts as the Court shall deem proper, plus the costs of this action.

Clifford W. Horwitz
**HORWITZ, HORWITZ AND ASSOCIATES, LTD.**
25 E. Washington, Suite 900
Chicago, Illinois 60602
(312) 372-8822, fax: (312) 372-1673

08CV4079
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE ASHMAN
RCC

# EXHIBIT B

STATE OF ILLINOIS )
                ) SS
COUNTY OF COOK )

07 SEP 14 AM 9:00

CIRCUIT COURT OF COOK
COUNTY ILLINOIS
...CH
CLERK

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| KARRY WILLIAMS,<br>ELIZA WILLIAMS,<br><br>     Plaintiffs,<br><br>   v.<br><br>FERRO AND FERRO d/b/a<br>FERRO CONSTRUCTION COMPANY;<br>FERRO AND FERRO INC.,<br>**CHICAGO BULK CARRIERS, INC.,**<br><br>     Defendants<br>_____<br>**CHICAGO BULK CARRIERS, INC.**<br><br>     Defendant/Third-Party Plaintiff,<br><br>   v.<br><br>CHICAGO TRANSIT AUTHORITY<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 05 L 001539<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## THIRD-PARTY COMPLAINT

NOW COMES the defendant/third-party plaintiff, **CHICAGO BULK CARRIERS, INC.,** by and through its attorneys, ADAMS SWATEK, LLC, and for its third-party complaint against the **CHICAGO TRANSIT AUTHORITY (hereinafter CTA)**, states as follows:

## COUNT I

1.    The plaintiffs, Karry and Eliza Williams, have filed a fourth-amended complaint at law against this defendant, attached hereto as Exhibit "A".

2.    This defendant/third-party plaintiff has filed an answer to the aforesaid complaint denying all material allegations. (See Exhibit "B").

3.    That upon information and belief, plaintiff was employed by the Chicago Transit Authority at the time of the occurrence alleged in the fourth-amended complaint.

4.    That upon information and belief, plaintiff was working under the direction, supervision and control of the CTA at the time stated in the aforesaid complaint at law on the date and at the time of the occurrence.

5.    That upon information and belief, an employee of Chicago Bulk Carriers, Inc. was working at the time and the date of the occurrence as stated in the aforesaid complaint at law under the direction, supervision and control of the CTA.

6.    That upon information and belief, the employee of this defendant was directed by a CTA foreman to move the bucket of the backhoe when the plaintiff was injured.

7.    That at all relevant times in the aforesaid complaint at law, plaintiff's employer, the CTA, was under a duty to exercise reasonable care in regard to the safety of the plaintiff.

8.    At all relevant times in the aforesaid complaint at law, plaintiff's employer was under a duty to this defendant/third-party plaintiff to provide reasonably safe conditions for work to be done by its employees.

9.    Notwithstanding said duties, plaintiff's employer was guilty of one or more of the following negligent acts and/or omissions:

   a.    Negligently, carelessly and improperly training its employees on the jobsite;

   b.    Negligently, carelessly and improperly failing to supervise its employees on the jobsite which caused injury to the plaintiff; and

   c.    Was otherwise careless or negligent.

10.   That one or more of the foregoing negligent acts and/or omissions of plaintiff's employer, the CTA, was the sole proximate cause of the occurrence and injuries alleged in the aforesaid complaint at law by the plaintiff.

11.    If this defendant/third-party plaintiff is found liable to plaintiff under plaintiff's fourth-amended

complaint at law, which liability has been and continues to be specifically denied, then this

defendant/third-party plaintiff is entitled to contribution from plaintiff's employer, the CTA, in the

amount of any judgment entered against this defendant/third-party plaintiff in excess of its pro rata

share of liability pursuant to the Joint Tortfeasor Contribution Act.

WHEREFORE, the defendant/third-party plaintiff, **CHICAGO BULK CARRIERS, INC.,** prays that if

plaintiff recovers judgment against it, then judgment be entered against plaintiff's employer, the CTA, in an

amount, by way of contribution, commensurate with the relative degree of fault of plaintiff's employer, the

CTA, plus costs.

### COUNT II

1-11.    This defendant/third-party plaintiff hereby re-alleges and adopts paragraphs 1-11 of Count I, above

as and for paragraphs 1-11 of Count II.

12.    That the damages and injuries alleged by plaintiffs in their fourth-amended complaint at law were

the sole proximate result of an agent of the CTA directing the back-hoe operator to operate the

equipment in the manner being used at the time of plaintiff's injury and by negligently directing the

back-hoe operator so that the plaintiff was struck by the back-hoe.

WHEREFORE, the defendant/third-party plaintiff, **CHICAGO BULK CARRIERS, INC.,** prays that

judgment be entered against the CTA plus costs.

Respectfully submitted,

ADAMS SWATEK, LLC

By:  _Donna M. Bucko_

Donna M. Bucko

ADAMS SWATEK, L.L.C.
Michael R. Stiff
Donna M. Bucko
22 West State Street
Geneva, Illinois 60134
(630) 232-6440/Att. No. 41617

3

08CV4079
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE ASHMAN
RCC

# EXHIBIT C - PART 1





PROCUREMENT SPECIFICATIONS AND CONTRACT DOCUMENTS FOR;

Rental of heavy construction equipment with/without operators to be released as required for a period of twenty four (24) months from the date of contract execution.

**REQUISITION NO.: B02OP00503**          **SPECIFICATION NO. CTA 3159-02A**

**DRAWING NO.: None**          **JOB ORDER NO.: None**

**INSURANCE REQUIRED: Yes**          **BID DEPOSIT AMOUNT: None**

**INFORMATION: Senior Procurement Administrator: Chris Lahciev**

**Phone Number (312) 664-7200, Ext.  4876**

**All Signatures to be sworn before a Notary Public**



**ISSUED BY**
**Purchasing Department, Chicago Transit Authority**
**Merchandise Mart Plaza, P.O. Box 3555, Chicago, IL 60654-0555**
**John T. Trotta,  Vice-President, Purchasing/Warehousing**
**Frank Kruesi, President**
**Valerie B. Jarrett, Chairman**

## DOCUMENT PREPARATION

This section modifies Paragraph 4. Preparation of Proposal,  page R - 1

Two (2) copies of this bid package are included. One (1) copy is for your file; One (1) remaining copy is to be returned in the enclosed envelope. This copy must contain original signatures.

## SIGNATURES REQUIRED

*DBE PARTICIPATION SCHEDULE C & D*
All information relative to Disadvantaged Business Enterprise (DBE) participation for this contract is outlined in the pages entitled: **Special Conditions Disadvantaged Business Enterprise Commitment.** Always include attached letter on your letterhead documenting Good Faith Efforts if you are asking for a waiver.

*BUY AMERICA CLAUSE* [Does Not Apply to Computer Purchases or Purchases under $100,000.00]
Certificate of Compliance or Non-Compliance with section 165 (a) and 165 (b) (3)

*CERTIFICATION OF PARTICIPANT REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS* (See attachments A & B)

*CERTIFICATION REGARDING LOBBYING*

*TO BE EXECUTED BY A CORPORATION*
Signature under Corporate Name must be President or Vice-President. If neither, a resolution or by-law must be attached showing authorization to execute a contract. **DON'T FORGET TO NOTARIZE.**

Note - Name of Signatory in Notary is same name as Signature of Authorized Officer

*TO BE EXECUTED BY PARTNERSHIP OR JOINT VENTURE*
Note - Name of Signatory in Notary is same name as first signature line - Partner

*TO BE EXECUTED BY SOLE PROPRIETOR*
Note - Name of Signatory in Notary is same name as Name of Bidder

*OWNERSHIP DISCLOSURE* - While there is *no signature* required, failure to address this will cause a delay in the execution of the contract.

*INSURANCE - [When Required]* - *No signature needed* at time of bid submittal. The awarded contractor must provide *certified* copies of insurance policies in order to allow for contract execution. CTA is to be named an additional insured. This should be taken into consideration when submitting your bid.

Note- Questions on the detail specifications must be in writing to the procurement administrator no later than 7 business days prior to the bid due date. After that there will not be sufficient time for the administrator to obtain responses from the specification author.

SPECIAL NOTE: *Failure to sign these documents may result in your firm not being awarded the contract.*

# CONTRACT FOR WORK

## REQUIREMENTS FOR BIDDING AND INSTRUCTIONS TO BIDDERS

Proposals will be received by the CHICAGO TRANSIT AUTHORITY, a Municipal Corporation, in accordance with the Contract Documents set forth herein.

### 1. DEFINITIONS:

The term "Authority" means the Chicago Transit Authority acting by and through the Chicago Transit Board or its duly authorized agent, servant or employee in connection with these Contract Documents. The term "Purchasing Agent" means the Purchasing Agent of the Chicago Transit Authority, whose duties and responsibilities are more particularly described in the "Purchase and Sales Regulations and Ordinances of the Chicago Transit Board," and the term "Designee" means any person or persons authorized by the Purchasing Agent to act for the Purchasing Agent in connection with this Contract. The singular shall include the plural and the masculine includes the feminine. The term "Engineer" means Manager of the Engineering Department of the Chicago Transit Authority, and the term "Designee" means any person or persons authorized by the Engineer to act for the Engineer in connection with this Contract.

### 2. COMPLIANCE WITH LAWS:

The bidders shall at all times observe and comply with all laws, ordinances, regulations and codes of the Federal, State, City, and other local government agencies, which may in any manner affect the preparation of proposals or the performance of the Contract.

### 3. BID DEPOSIT:

A proposal shall, when required in the advertisement, be accompanied by cash, a cashier's check, a certified check, a money order or an approved bid bond in the amount shown in the advertisement, and as may be prescribed in the Contract Documents.

All certified, cashier's checks or money orders shall be drawn on a responsible organization doing business in the United States and shall be made payable to the order of the Chicago Transit Authority.

Any bid bond submitted must reference the specific CTA inquiry numbers and have an Alfred M. Best Company "B+" Policyholders Rating and an "X" Financial Rating or better.

The period of the bond must be for not less than ninety (90) days from the date of bid opening.

### 4. PREPARATION OF PROPOSAL:

The bidder shall prepare his proposal in TRIPLICATE on the attached proposal forms. Unless otherwise stated on the proposal form, all blank spaces on the proposal, applicable to the subject specification, must be correctly filled in. Either a unit price or a lump sum price, as the case may be, must be stated for each and every item, either typed in or written in ink, in figures, and if required, in words.

If bidder is a Corporation, the President or Vice-President and Secretary or Assistant Secretary, shall execute all three (3) copies of the bid. The Corporation shall affix its seal to all three (3) copies. In the event that this bid is executed by someone other than the President or Vice-President, a certified copy of that section of the Corporate By-Laws or resolution of the Corporation which permits the person to execute the offer for the Corporation shall be furnished with the proposal.

If bidder is a Partnership or Joint-Venture, all partners or joint-venturers shall execute three (3) copies of the bids unless one partner or joint-venturer has been authorized to sign for the Partnership or Joint-Venture, in which case, evidence of such authority satisfactory to the Purchasing Agent shall be submitted with the proposal.

If bidder is a Sole Proprietor, he shall execute three (3) copies of the bid.

A "Partnership," "Joint-Venture" or "Sole Proprietor" operating under an Assumed Name must be registered with the Illinois County in which located, as provided in Chapter 96, Section 4 et seq., Illinois Revised Statutes, as amended.

### ALL SIGNATURES SHALL BE SWORN TO BEFORE A NOTARY PUBLIC

### 5. SUBMISSION OF PROPOSALS:

All prospective bidders shall submit sealed proposals in TRIPLICATE in envelopes provided for that purpose to the CHICAGO TRANSIT AUTHORITY, Office of the Secretary to the Board, Merchandise Mart Plaza, P.O. Box 3555, Chicago, Illinois 60654; or, if proposals are submitted in envelopes other than those so provided for this purpose, then the sealed envelope submitted by the prospective bidder shall carry the following information on the face of the envelope: **bidder's name, address, subject matter of proposal, including identifying numbers, advertised date of bid opening, and the hour designated for the bid opening as shown on the advertisement.**

Where proposals are sent by mail to the Office of the Secretary, the bidders shall be responsible for their delivery to the Secretary before the advertised date and hour for the opening of bids. If the mail is delayed beyond the date and hour set for the bid opening, proposals thus delayed will not be considered and will be returned unopened.

### 6. WITHDRAWAL OF PROPOSALS:

Bidders may withdraw their proposals at any time prior to the date and hour specified in the advertisement for the receipt of bids. However, no bidder shall withdraw or cancel his proposal for a period of ninety (90) calendar days after said advertised date and hour for the receipt of proposals.

### 7. RESPONSIBILITY OF BIDDER:

The Authority reserves the right to refuse to accept any proposal from any person, firm or corporation that is in arrears or is in default to the Chicago Transit Authority upon any debt or contract, or that is a defaulter, as surety or otherwise, upon any obligations to the Authority, or had failed to perform faithfully any previous contract with the Authority.

The bidder, if requested, must present within two (2) working days, evidence satisfactory to the Purchasing Agent or his designee, of performance ability and possession of necessary facilities, pecuniary resources and adequate insurance to comply with the terms of these specifications and Contract Documents.

### 8. CONSIDERATION OF PROPOSALS:

The Authority reserves the right to extend the bid opening date and to reject any or all proposals or any part thereof. The Authority further reserves the right to excuse informalities in the bids and bidding when, in the judgment of the Authority, the best interests of the Authority will be served and the spirit of competition will be maintained.

### 9. NEGOTIATED CONTRACTS:

The Authority reserves the right to reject all bids received and negotiate a contract with any and all responsible bidders, if the bids received are at unreasonable prices but otherwise acceptable, or for other reasons determined to be clearly in the public's best interest and in accordance with established guidelines.

In the event that negotiations are conducted, the Authority or its duly authorized representative shall have the right to examine and audit books, records, documents and other evidence and accounting procedures and practices, sufficient to reflect properly all costs claimed to have been incurred or anticipated in performing this contract. The Contractor agrees to include in first-tier subcontracts under this contract a clause to the effect that the Authority or duly authorized representative have access to and the right to examine any of the subcontractor's directly pertinent books, documents, papers, or other records involving transactions related to the subcontract.

### 10. CASH BILLING DISCOUNT:

No cash billing discounts will be considered in the evaluation of bids for award of this Contract.

cta   415 12 (rev 11 93)

## 11. ACCEPTANCE OF PROPOSALS:

The Authority will accept in writing one or more of the proposals or reject all proposals within ninety (90) days from the date of opening of bids, unless the lowest responsible bidder, upon request of the Purchasing Agent or his designee, extend the time of acceptance.

The contract shall not be in force and effect until the Chairman of the Board of the Chicago Transit Authority, or his designee, has affixed his signature to the Contract Document.

## 12. PERFORMANCE-PAYMENT BOND AND INSURANCE:

When required by the Contract Documents, the successful bidder or bidders shall, within ten (10) working days after acceptance of the bidder's proposal by the Authority, furnish a performance-payment bond in the full amount of the contract on an approved American Institute of Architects (A.I.A.) bond form and/or furnish and keep in force, during the life of the contract, any and all insurance in amounts designated, as provided in the Insurance Requirements, form CTA 415.27 (Revised) attached hereto, with insurance companies acceptable to the Chicago Transit Authority. Any insurance company with less than a (B+) policy holder rating by Alfred M. Best Co. will not be acceptable to the Chicago Transit Authority.

## 13. FAILURE TO FURNISH BOND OR INSURANCE:

In the event that the bidder fails to furnish the performance-payment bond and/or insurance requirements in said period of ten (10) working days after acceptance of the bidder's proposal, then the bid deposit of the bidder may be retained by the Authority as liquidated damages and not as a penalty, IT BEING NOW AGREED, that said sum shall be paid as liquidated damages, not as a penalty, to partially cover costs and losses by the Authority.

## 14. INTERPRETATION OF CONTRACT DOCUMENTS:

If any person contemplating submitting a proposal is in doubt as to the meaning of any part of the Contract Documents, he may submit to the Purchasing Agent a written request for an interpretation thereof. The person submitting the request will be responsible for its prompt delivery. Any interpretation of the proposed documents will be made only by Addendum duly issued by the Purchasing Agent or his designee. A copy of such addendum will be mailed or delivered to each person receiving a set of such Contract Documents and to such other prospective bidders as shall have requested that they be furnished with a copy of each Addendum. Failure on the part of the prospective bidder to receive a written interpretation prior to the time of the opening of bids will not be grounds for withdrawal of proposal. Oral explanation will not be binding. Bidder will acknowledge receipt of each Addendum issued in space provided on the signature page of Proposal Documents.

## 15. CATALOGS:

Subsequent to bid opening, when requested by the Purchasing Agent or his designee, each bidder shall submit in TRIPLICATE, catalogs, descriptive literature, and detailed drawings, fully detailing features, designs, construction, appointments, and finishes, necessary to fully describe the material or work he proposes to furnish. This information will be furnished to the Authority within ten (10) calendar days from date of request. Failure to furnish this information may result in the disqualification of the Bid.

## 16. TRADE NAMES:

In cases where an item is identified by a manufacturer's name, trade name, catalog number, or reference, it is understood that the bidder proposes to furnish the item so identified and does not propose to furnish an "equal" unless the proposed "equal" is definitely indicated by the bidder with his proposal.

The reference to the manufacturer's name, trade name, catalog number, or reference, is intended to be descriptive but not restrictive and only to indicate to the prospective bidder articles that will be satisfactory. Bids on other makes and catalogs will be considered, provided each bidder clearly states on the face of his proposal exactly what he proposes to furnish, or forwards with the proposal, a cut, illustration, or other descriptive matter which will clearly indicate the character of the article covered by his bid.

The Purchasing Agent, or his designee, hereby reserves the right to approve an "equal" or to reject as not being an "equal," any article the bidder proposes to furnish which contains variations from specification requirements.

## 17. RETURN OF BID DEPOSIT:

The bid deposit of all bidders, except the two apparent lowest bidders on each contract, will be returned within ten (10) calendar days after the opening of bids. The bid deposit of the two apparent lowest bidders will be returned after the proposal has been accepted by the Authority including the acceptance by the Authority of satisfactory performance-payment bond and/or insurance where such bond or insurance are required.

Within 10 days after the date of opening of bids a bidder may request that a bid bond be substituted for the bid deposit. The Manager, Materials Management, may allow substitution of a bid bond for a bid deposit upon application in writing to the Manager, Materials Management, and submittal of a bid bond in an amount equal to the bid deposit. Any bid bond submitted must reference the specific CTA inquiry number and have an Alfred M. Best Company "B+" Policyholders Rating and an "X" Financial Rating.

The period of the bond must be for not less than ninety (90) days from the date of bid opening.

## 18. TAXES:

Federal Excise Tax does not apply to materials purchased by the Chicago Transit Authority by virtue of Exemption Certificate No. 36-73-0234K. Illinois Retailers' Occupation Tax, Use Tax, and Municipal Retailers' Occupational Tax does not apply to materials or services purchased by the Authority by virtue of Statute Chapter 111 2/3 and Section 333, Illinois Revised Statutes as amended. These taxes shall not be included in any of the prices quoted herein. Illinois Tax Exemption Identification number is 15E9978-2987-01. The prices quoted herein shall agree with all Federal Laws and Regulations.

## 19. ORDER OF PRECEDENCE OF COMPONENT PARTS OF THE CONTRACT DOCUMENTS:

The order of precedence of the component parts of the Contract Documents shall be as follows:

1. General Conditions
2. Special Conditions
3. Plans and Drawings, if any
4. Detailed Specifications
5. Standard Requirements of State and Federal Government, if any
6. Proposal and Signature and Acceptance forms
7. Advertisement for Proposals
8. Instructions to Bidders
9. Bond, if required
10. Insurance, if required

Any Addenda which may be issued shall be a part of these Contract Documents and shall take precedence over any other part of the Contract Documents wherever they conflict therewith.

The foregoing order of precedence shall govern the interpretation of the Contract Documents in all cases of conflict or inconsistency therein, except as may be otherwise expressly provided in other component parts of the Contract Documents.

## 20. NOTICE:

All communications and notices provided herein shall be in writing, delivered personally or by mail, to the name and address of the accepted bidder as provided on the signature page of the proposal hereof, or to the Chicago Transit Authority, Attention, Purchasing Agent, Merchandise Mart Plaza, P.O. Box 3555, Chicago, Illinois 60654-0555.

cta ...

CONTRACT FOR WORK (Continued)

# GENERAL CONDITIONS

### 1. NON-DISCRIMINATION:

The Contractor, in performing under this Contract, shall not discriminate against any worker, employee or applicant or any member of the public, because of race, creed, color, age, sex, ancestry, handicap or national origin, nor otherwise commit an unfair employment practice. The Contractor further agrees that this Article will be incorporated by the Contractor in all contracts entered into with suppliers of materials or services, contractors and subcontractors, and all labor organizations furnishing skilled, unskilled and craft union skilled labor, or who may perform any such labor or services in connection with the Contract.

The Contractor's attention is called to the provisions of the Illinois Human Rights Act which are hereby incorporated by reference.

To demonstrate compliance, the Contractor and his subcontractors will furnish such reports and information as requested by Chicago Transit Authority or any Federal, State or local government or agencies that may require such information as a condition of financial assistance in whole or in part.

### 2. DISADVANTAGED BUSINESS ENTERPRISE:

All parties are hereby notified that in regard to any contract resulting from this invitation to bid, Disadvantaged Business Enterprises will be afforded full opportunity to participate, and will not be discriminated against because of race, color, sex or national origin in consideration for an award.

### 3. INDEMNITY IS OMITTED AND REPLACED BY SECTION 3 INDEMNITY, SEE PAGE G-7

~~The contractor shall indemnify, keep and save harmless the Authority, its agents, officials and employees against all injuries, deaths, losses, damages, claims, patent claims, suits, liabilities, judgments, costs and expenses, which may in anywise accrue against the Authority in consequence of the granting of this Contract or which may in anywise result therefrom, whether or not it shall be alleged or determined that the act was caused through negligence or omission of the Contractor or his employees, or the subcontractor or his employees, if any, and the Contractor shall, at his own expense, appear, defend and pay all charges of attorneys and all costs and other expenses arising therefrom or incurred in connection therewith; and , if any judgment shall be rendered against the Authority, in any such action, the Contractor shall at his own expense satisfy and discharge the same. Contractor expressly understands and agrees that any performance-payment bond or insurance protection required by this Contract, or otherwise provided by the Contractor, shall in no way limit the responsibility to indemnify, keep and save harmless and defend the Authority herein provided. In the event of any conflict between the provisions of any Insurance Policy for this Contract and this Section 3, this Section 3 - INDEMNITY shall govern.~~

### 4. SUBLETTING OR ASSIGNMENT OF CONTRACT OR CONTRACT FUNDS:

No contract shall be assigned or sublet in whole or in part without the written approval of the Purchasing Agent, and in no case shall such written approval relieve the Contractor from his obligations or change the terms of the Contract Documents.

The Contractor shall submit for approval a detailed breakdown of subcontractors by trade, name and costs, intended for use on this project. No subcontractors will be allowed access to the project site without prior approval.

The Contractor shall not transfer or assign any contract funds or claims due or to become due without the written approval of the Purchasing Agent having been first obtained.

### 5. GUARANTEES AND WARRANTEES:

All guarantees and warrantees required shall be furnished by the Contractor and shall be delivered to the Purchasing Agent and the Engineer before final payment on the contract is issued.

G-1

## 6. COOPERATION BETWEEN CONTRACTORS:

Unless otherwise provided in Special Conditions, if separate contracts are let for work within or adjacent to the project site as may further be hereinafter detailed in the Contract Documents, each Contractor shall conduct his work so as not to interfere with or hinder the progress of completion of the work being performed by other Contractors.

Each Contractor involved shall assume all liability, financial or otherwise, in connection with his contract, and shall protect and save harmless the Authority from any and all damages or claims that may arise because of the inconvenience, delay or loss experienced by him because of the presence and operation of other Contractors working within or adjacent to the project site. Each Contractor shall assume all responsibility for all work not completed or accepted because of the presence and operations of the other Contractors.

The Contractor shall as far as possible arrange his work and place and dispose of the materials being used so as not to interfere with the operations of the other Contractors within or adjacent to the limits of the project site. He shall join his work with that of the others in an acceptable manner and shall perform it in proper sequence to that of the others.

## 7. SUPERINTENDENCE:

The Contractor shall personally superintend the work or shall have a competent person at the site at all times to act for him.

## 8. PLANS OR DRAWINGS AND SPECIFICATIONS:

Plans or drawings mentioned in the Instructions to Bidders or in the Specifications, shall be so considered that any material shown on plans or drawings and not therein specified, or material therein specified and not shown on plans or drawings, shall be executed by the Contractor the same as though it were both shown and specified.

In case of inconsistency between the plans, drawings or specifications, the Contractor(s) shall immediately notify, in writing, the Purchasing Agent or his designee of such inconsistency. The decision of the Purchasing Agent as to the resolution of the inconsistency shall be final. Should the Contractor act without the written decision of the Purchasing Agent, he shall act at his own risk and expense.

The Contractor shall furnish shop or working drawings and erection diagrams of anything required for this work or the work of any subcontractor which is not fully detailed or not shown on the contract drawings. All shop drawings shall be submitted to and reviewed by the Engineer or his designee. Such review shall not relieve the Contractor from the responsibilities for errors or omissions therein.

At the completion of the work, and prior to final payment, the Contractor shall furnish to the Engineer or his designee two (2) copies each of all the final approved contract drawings with "as built" notes.

## 9. PROTECTION OF PROPERTY:

The Contractor shall properly protect Chicago Transit Authority property and adjacent property and shall take all necessary precautions for the safety of all persons on or near the work.

Contractor shall not commence any excavation work without the prior approval of the Engineer.

In making any excavation, Contractor shall exercise reasonable care and take such precautions as are necessary to sustain adjoining land as such, without regard to any building or other structure which may be thereon. Contractor shall be liable for any damage to the land and buildings occasioned by Contractor's failure to exercise reasonable care or take the necessary precaution to sustain the adjoining land and buildings.

Unless otherwise indicated in the plans and/or specifications, the Contractor shall be responsible, in the event excavation in excess of eight (8) feet is required, for the protection of adjoining land and any building or other structure thereon by furnishing lateral and subjacent support to said adjoining land and all buildings and structures thereon in such a manner so as to protect the same from any damage by reason of the excavation. Contractor shall be liable for any damage to the land or to any building or other structure thereon.

The foregoing reference to excavation in excess of eight (8) feet shall be taken to mean a depth of eight (8) feet below the

cta   415 12 (rev 11 93)

established grade of a street, highway or other public way upon which such land abuts, or if there is no established grade, below the surface of adjoining land.

The Contractor shall furnish all temporary work required to keep in operation all requisite lights, guards, temporary heat to prevent freezing, temporary scaffold, sidewalks, fences, and other safeguards for the protection of the work and safety of the premises and the public.

## 10. PERMITS:

Unless otherwise provided in Special Conditions, the Contractor shall take out, at his own expense, all permits and licenses necessary to carry out the work described in this Contract.

## 11. EXAMINATION AND INSPECTION BY BIDDER:

The Bidder shall, before submitting his bid, carefully examine all the Contract Documents, He shall inspect in detail the site of the proposed work and familiarize himself with all the local conditions affecting the contract and the detailed requirements of construction. If his bid is accepted, he will be responsible for all errors in his proposal resulting from his failure or neglect to comply with these instructions. The Authority will, in no case, be responsible for any additional costs or expenses resulting from such failure or neglect.

## 12. MATERIALS INSPECTION AND RESPONSIBILITY:

The Engineer or his designee shall have a right to inspect any material to be used in carrying out this contract.

The Authority does not assume any responsibility for the availability of any controlled materials or other materials and equipment required under his contract. All materials and equipment furnished under the contract shall be new, unless otherwise specifically stated.

The Contractor shall be responsible for the contracted quality and standards of all materials, components or completed work furnished under this contract.

Materials, components or completed work not complying with the Contract Documents may be rejected by the Engineer or his designee and shall be replaced by the Contractor at no cost to the Authority.

Any materials or components rejected shall be removed within a reasonable time from the premises of the Authority, at the entire expense of the Contractor, after written notice has been mailed by the Authority to the Contractor that such materials or components have been rejected.

## 13. PAYMENT TO CONTRACTOR:

No payments make under the contract nor the partial or entire occupancy of the premises by the Authority shall be construed as an acceptance of defective work or of improper material or as condoning any omission of required work. At the discretion of the Authority, work performed under this contract may be interpreted to include materials to be furnished under this contract which are suitably stored at the site of the work so as not to interfere with the operations of the Authority. Unless otherwise provided in Special Conditions, the Engineer may from time to time, in cases where the Contractor shall proceed properly to perform and complete his contact, grant to such Contractor as the work progresses Partial Payments based on estimates of work performed.

The partial payments to the Contractor will be made on the basis of duly certified and approved estimates of the work performed, but the Authority will retain ten per cent (10%) of the amount of each such estimate until the work is fifty per cent (50%) completed and accepted. After fifty per cent (50%) of the work has been completed and, in the opinion of the Engineer, the progress and performance of the work is satisfactory, the Authority may not require further retainage be held.

Waivers from subcontractors and suppliers, indicating that they have received payments from the Contractor to date of request for partial payment, must be presented concurrently by the Contractor when he presents an estimate and waiver for a partial payment.

All partial payment estimates shall be subject to correction by the final accounting statement.

The Purchasing Agent may, whenever he shall have reason to believe that the Contractor has neglected or failed to pay any subcontractors, workmen or employees for work performed or for materials furnished and used in or about the work contracted for, order and direct that no future payments be made upon the the contract until the Purchasing Agent shall be satisfied that such subcontractors, workmen and employees have been fully paid.

Whenever the Purchasing Agent shall notify the Contractor by notice, as prescribed herein, that no further vouchers or estimates will be issued or payments make on the contract until subcontractors, workmen and employees have been paid, and the Contractor shall neglect or refuse for the space of ten (10) days after such notice is given, as above provided, to pay such subcontractors, workmen and employees, the Authority may then apply any money due or that may become due under the contract to the payment of such subcontractors, workmen and employees without other or further notice to said Contractor; but failure of the Authority to retain and apply such monies, or of the Purchasing Agent to order or direct that no vouchers or estimates shall be issued or further payments be made shall not, nor shall the paying over of such reserve sum without such subcontractors, workmen or employees being first paid, in any way affect the liability of the Contractor or of his Sureties to the Authority, or to any such subcontractors, workmen or employees, upon any bond given in connection with such contract.

Before final payment is made under the contract, and as a condition precedent to such final payment, the Contractor shall furnish final waivers of all liens and satisfactory guarantees against all claims on account of work performed, tools and plant employed, and materials and labor furnished under the contract, The Contractor shall not be entitled to demand or receive final payment until all the stipulations, provisions and conditions set forth in the contract have been complied with and the work has been accepted by the Engineer; whereupon the Purchasing Agent will authorize payment of the money retained and due the Contractor under the contract.

The acceptance by the Contractor of the final payment above mentioned shall operate as and shall be a release to the Authority from all claims or liability under this contract for anything done or furnished or relating to the work under this contract or for any act or neglect of the Authority relating to or connected with this contract.

## 14. CHANGES

The Purchasing Agent may at any time, by written order and without notice to the Sureties, make changes in the drawings and/or specifications of this contract if within the General Scope of this contract. However, if the estimated cost exceeds $5,000, the prior approval of the Authority is required. If such changes cause an increase or decrease in the Contractor's cost of, or time required for, performance of the contract, an equitable adjustment, as may be hereinafter further described in Special Conditions, shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be submitted in writing to the Purchasing Agent within ten (10) days from the date of receipt by the Contractor of the notification of change, unless the Purchasing Agent grants a further period of time before the date of final payment under the contract If the parties fail to agree upon the adjustment to be made, the dispute shall be resolved by the Purchasing Agent, but nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise provided in this contract, no charge for any extra work or material will be allowed.

No changes authorized under the provisions of this paragraph shall release the Sureties from their obligations under any Performance-Payment Bond required by Paragraph 11 of the Instructions to Bidders.

## 15. TIME AND PROGRESS:

It is understood and agreed that TIME IS OF THE ESSENCE OF THIS CONTRACT, and the Contractor agrees to begin actual work covered by this contract in conformity with the provisions set forth herein and to prosecute the same with all due diligence, so as to complete the entire work under this contract within the calendar days stipulated after the date for commencement of work as specified in the written notification to the Contractor from the Purchasing Agent, using double shift and holiday work when necessary.

Unless otherwise provided in the Special Conditions, the Contractor shall submit to the Engineer or his designee, for approval within fifteen (15) calendar days after the effective date of the contract, a Schedule for performing operations under the contract which will ensure the satisfactory completion of the entire work within the time specified. Critical Path Type Schedules using Arrow Diagraming Technique shall be used. The Schedule shall show not only the time required in days to perform various operations but also their proper sequence.

Before starting the work, the Engineer of his designee will call a conference for the purpose of reviewing the Schedule, to establish procedures and schedules for handling shop drawings and other submittals, processing estimates for partial payments, arrangements for testing and inspection, anticipated number of labor shifts to be used, and to establish a working understanding

between the parties on all major aspects of the work.

The Schedule for the contract shall be updated and revised by the Contractor at least monthly, and more frequently if directed by the Engineer or his designee.

If the rate of progress be such that the total amount of work accomplished by the Contractor within any time mentioned in such approved Schedule is less than the amount therein specified to be completed within such time, then the Purchasing Agent may declare this contract in default as provided herein.

### 16. NOTICE TO SUSPEND WORK:

The Contractor shall suspend the progress of the work, or any part thereof, whenever he shall be so required by written order of the Authority, and for such reasonable periods of time as the Authority may order, provided that in the event of such suspension or suspensions of the progress of the work or any part thereof, the time for the completion of the work so suspended shall be extended for a period equivalent to the time lost by reason of such suspension or suspensions, but such order of the Authority shall not otherwise modify or invalidate in any way any of the provisions of the contract.

The Contractor shall not be entitled to any damages or compensations, or be reimbursed for any loss on account of any delay resulting from the Authority's written order under this Section, except compensation for extra premiums paid by the Contractor on his bond and insurance and for wages and salaries of employees and other expenses of the Contractor that, in the opinion of the Purchasing Agent and the Engineer, are necessary only for the proper storage and protection of materials and equipment prepared or in the process of being prepared by the Contractor exclusively for use on the contract during or on account of a delay or delays caused by the Authority.

### 17. UNAVOIDABLE DELAY:

Should the Contractor be obstructed or delayed in the commencement, prosecution or completion of the work under this contract by any act or delay of the Authority or its agents or employees, then the time herein fixed for the completion of said work shall be extended for a period equivalent to the time lost by reason of such acts or delays of the Authority or its agents or employees.

Should the Contractor be delayed at any time in the progress of the work under this contract by a cause, other than as specified above, which is beyond the Contractor's control, the time for completion of the work under this contract may be extended for such reasonable time as the Purchasing Agent and the Engineer shall decide, upon compliance by the Contractor with the provisions of this Section. "Cause which is beyond the Contractor's control" is hereby limited to the following:

1. It must be a cause not reasonably expected to occur in connection with or during the performance of the contract; and

2. It must be in no way directly or substantially caused by an act or omission of the Contractor or its agents; and

3. It must in fact cause a cessation in the progress of the work; and

4. It must be a cause which could not have been adequately guarded against by contractual or legal means.

Request for extensions shall be made in writing and served upon the Purchasing Agent and the Engineer within ten (10) business days after the delay commences. Requests for extension of time shall specify the nature of the cause of the delay, an approximation of the length of the delay, and such other proofs as are reasonably related to the cause of the delay. The Contractor is further required to provide the Authority, at the end of each calendar month in which a delay occurs, a list of the days in which the Contractor was in fact delayed during that month. The Contractor agrees to supply any other reasonable proofs as are required by the Purchasing Agent and/or Engineer to make a decision on the request. The Purchasing Agent and the Engineer shall examine the request and any documents supplied by the Contractor and shall determine if the Contractor is entitled to an extension. The Purchasing Agent shall notify the Contractor of their decision in writing and that decision shall be final and binding.

The Contractor shall not be entitled to any damages or compensation, or be reimbursed for any loss on account of any delay resulting from any cause under this Section except for compensation for extra premiums paid by the Contractor on his bond and insurance and for wages and salaries of employees and other expenses of the Contractor that, in the opinion of the Purchasing Agent and the Engineer, are necessary only for the proper storage and protection of materials and equipment prepared or in the process of being prepared by the Contractor exclusively for use on the contract during or on account of any unavoidable delay that has been submitted to and approved by the Purchasing Agent.

## 18. DEFAULT

If the Contractor fails to begin the work under this contract within the time specified, or fails to perform the work with sufficient workmen and equipment or with sufficient materials to ensure the completion of said work within the specified time, or shall perform the work in an unsatisfactory manner; he shall neglect or refuse to remove materials or perform anew such work as shall be rejected as defective or unsuitable, or shall discontinue the prosecution of the work; or the Contractor shall become insolvent or be declared bankrupt, or shall commit any act of bankruptcy or insolvency, or shall make an assignment for the benefit of creditors; or for any other cause whatsoever shall not carry on the work in an acceptable manner, the Purchasing Agent shall give notice in writing to the Contractor and his Surety of such failure, delay, neglect, refusal or default, specifying the same; and if the Contractor within a period of ten (10) days after such notice shall not proceed in accordance therewith, then the Purchasing Agent acting for and on behalf of the Contractor in this contract, and the Purchasing Agent at his option may call upon the Surety to complete work in accordance with the terms of this contract, or may have the Chicago Transit Authority take over the work, including any or all materials and equipment on the grounds as may be suitable and acceptable to the Authority and may complete the work by or on its own force account, or may enter into a new contract for the completion or the work, or may use such other methods as in the opinion of the Purchasing Agent shall be required for the completion of the work in an acceptable manner. All costs and charges incurred by the Authority, together with the cost of completing the work, shall be deducted from any monies due or which may become due on this contract. If such monies are insufficient to cover the costs incurred by the Authority, the Contractor and his Surety shall be liable to the Authority for all such costs in excess of monies due or to become due.

## 19. DISPUTES

Except as otherwise provided in this Contract, any dispute concerning a question of fact arising under this Contract which is not disposed of by agreement shall be decided by the Purchasing Agent, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Purchasing Agent shall be final and conclusive unless within thirty (30) days from the date of receipt of such copy the Contractor mails or otherwise furnishes to the Authority a written appeal addressed to the Purchasing Agent. The decision of the Purchasing Agent or his designee for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the Contract in accordance with the Purchasing Agent's decision. This SECTION 19 — DISPUTES does not preclude consideration of law questions in connection with decisions provided above; *provided*, that nothing in this Contract shall be construed as making a final decision of any Authority representative, or Board, on a question of law.

## 20. EXECUTION

All businesses which submit responses or bids and all businesses awarded contracts by the CTA are hereby notified that no contract, modification, amendment, change order or extension, if any, shall be effective, or in any way obligate the CTA, until it has been executed by the CTA signatory duly authorized by the CTA's Regulations, By Laws, and Procedures.

The following replaces Section 3. Indemnity of the General Conditions Page G-1.

**"3.    INDEMNITY**

**Construction Contracts:** The Contractor shall indemnify and hold harmless to the maximum extent permitted by law the Authority, its agents, officials and employees against all injuries, death, losses, damages, claims, suits, liabilities, judgments, costs and expenses which may in any manner accrue against the Authority as a consequence of the award or performance of this Contract. This indemnity applies: (a) whether any loss for which the Authority seeks indemnity shall be caused or contributed to by the sole or partial negligent act or omission of the Contractor or Contractor's employees; and (b) whether any of the losses for which the Authority seeks indemnity shall be caused or contributed to by the sole or partial negligence or omission of the Contractor's subcontractors or their employees. The Contractor shall, at Contractor's own expense, appear, defend and pay all charges of attorneys and all costs and other expenses arising in connection with this indemnity. If any judgment shall be rendered against the Authority, the Contractor shall at Contractor's own expense satisfy and discharge the judgment. If indemnity pursuant to this subparagraph shall not be permitted by the applicable law, then, to the maximum extent permitted by law, the Contractor shall make full contribution to the Authority for its percentage share of any liability that is attributable to the Contractor's acts or omissions. Contractor expressly waives any legal limitations on its liability to the Authority for contribution, including but not limited to limitations related to the payment of workers compensation benefits. The Contractor expressly understands and agrees that any performance-payment bond or insurance-protection required by this Contract or otherwise provided by the Contractor, shall in no way limit the responsibility to indemnify and defend the Authority pursuant to this Section. The indemnifications contained herein shall survive the termination of this Agreement."

# SPECIAL CONDITIONS
## DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT
### (Construction Contracts)

## I. POLICY AND TERMS

A. It is the policy of the Chicago Transit Authority (CTA) that Disadvantaged Business Enterprises (DBE) as defined in United States Department of Transportation (USDOT) Regulation 49 C.F.R., Part 23 and Section 106(c) Surface Transportation and Uniform Relocation Assistance Act of 1987 (STURAA), shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with federal funds. This policy also applies to contracts financed in whole or in part with funds provided by UMTA, Illinois Department of Transportation (IDOT), Regional Transportation Authority (RTA) and the City of Chicago (City).

B. Failure to carry out the commitments and policies set forth herein shall constitute a material breach of contract and may result in the termination of the contract or such remedy as CTA deems appropriate.

C. Accordingly, the Contractor agrees to expend not less than the following percentages of the total contract price, if awarded, for contract participation by DBEs (Refer to Item VI, Page 4):

**Disadvantaged Business Enterprise Goal:    30%**

D. For purposes of evaluating bidders' responsiveness, the contract DBE participation goal shall be a percentage of the Total Contract Price by the Contractor. However, the DBE participation goal shall apply to the total dollar value of this contract, inclusive of all amendments, modifications and change orders, and the Contractor agrees to make their best effort to include DBE participation in any contract modification work.

E. This contract DBE participation goal may be met by the bidder's status as a DBE, or by a joint venture with one or more DBEs, or by the purchase of materials used in the performance of the contract from one or more DBEs or by any combination of the above.

F. The Contractor, after exhausting all required efforts to involve DBEs directly and with prior approval by CTA, may also meet all or part of the DBE commitment by contracting with DBEs for the provision of goods and services *not directly* related to the performance of this contract. However, the Contractor shall, in determining the manner of DBE participation, first consider involvement of DBE firms as joint venture partners, subcontractors and suppliers of goods and services *directly* related to the performance of this contract. In all cases CTA requires the Contractor to demonstrate the specific efforts undertaken by it to involve DBE firms *directly* in the performance of this contract.

G. The Contractors who fail to meet the DBE goal and fail to demonstrate sufficient "Good Faith" efforts shall not be eligible to be awarded the Contract.

H. In connection with the performance of this contract, the contractor will cooperate with CTA in meeting its commitments and goals with regard to maximum utilization of Disadvantaged Business Enterprises (DBE), and will ensure that DBEs shall have the maximum practicable opportunity to compete for subcontract work under this contract agreement.

I. Agreements between a contractor and a DBE in which the DBE promises not to provide subcontracting quotations to other contractors are prohibited.

J. Contractors and their subcontractors/suppliers agree to ensure that DBEs as defined in U.S.DOT Regulation 49 CFR, Part 23 and Section 106(c) (STURAA) have the maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with federal funds provided under this agreement. In this regard, contractors and their subcontractors shall take all necessary and reasonable steps in accordance with 49 CFR, Part 23 and Section 106(c) (STURAA) to ensure that DBEs have the maximum opportunity to compete for and perform contracts. Contractors and their subcontractors shall not discriminate on the basis of race, color, national origin or sex in the award and performance of contracts assisted by the U.S. Department of Transportation.

## II. DEFINITIONS

A. **"Disadvantaged Business Enterprise"** or "DBE" means a small business concern awarded certification by the CTA as a business owned and controlled by socially and economically disadvantaged individuals in accordance with U.S.DOT Regulation 49 CFR, Part 23 and Section 106(c) (STURAA).

B. **"Socially and Economically Disadvantaged Individuals"** means those individuals who are citizens of the United States (or lawfully admitted permanent residents) and who are Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Asian-Indian Americans or women regardless of ethnicity, and any other minorities or individuals found to be disadvantaged by the Small Business Administration pursuant to Section 8(a) of the Small Business Act.

The Manager, DBE Program/Contract Compliance shall make a rebuttable presumption that individuals in the following groups are socially and economically disadvantaged. The Manager, DBE Program/Contract Compliance may also determine, on a case-by-case

basis, that individuals who are not a member of one of the following groups are socially and economically disadvantaged:

1. **"Black Americans,"** which includes persons having origins in any of the Black racial groups of Africa;

2. **"Hispanic Americans,"** which includes persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;

3. **"Native Americans,"** which includes persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians;

4. **"Asian-Pacific Americans,"** which includes persons whose origins are from Japan, China, Taiwan, Korea, Vietnam, Laos, Cambodia, the Philippines, Samoa, Guam, the U.S. Trust Territories of the Pacific, and the Northern Marianas; and

5. **"Asian-Indian Americans,"** which includes persons whose origins are from India, Pakistan and Bangladesh.

C. **"Small Business Concern"** means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto except that a small business concern shall not include any concern or groups of concerns controlled by the same socially and economically disadvantaged individual or individuals which has annual average gross receipts in excess of $14 million over the three previous fiscal years.

D. **"Directory"** means the Directory of Certified Disadvantaged Business Enterprises maintained and published by the DBE Program/Contract Compliance Department. The Directory identifies firms that have been certified as DBEs, and includes both the date of their last certification and the area of specialty in which they have been certified. Contractors are responsible for verifying the current certification status of all proposed DBE firms.

E. **"Area of Specialty"** means the description of the DBE firm's business which has been determined by the Manager, DBE Program/Contract Compliance to be most reflective of the DBE firm's claimed specialty or expertise. Each DBE letter of certification contains a description of their Area of Specialty. This information is also contained in the Directory. Credit toward this contract's DBE participation goals shall be limited to the participation of firms performing within their Area of Specialty. CTA reserves the right to investigate and determine active DBE participation and applicable DBE credit specifically identified for this contract prior to award.

**NOTICE:** The Chicago Transit Authority does not make any representations concerning the ability of any DBE to perform work within their Area of Specialty. It is the responsibility of all contractors to determine the capability and capacity of the DBE firms to satisfactorily perform the work proposed.

F. **"Joint Venture"** means an association of two or more businesses to carry out a single business enterprise for profit, and for which purpose they combine their expertise, property, capital, efforts, skill and knowledge. Contractors may develop joint venture agreements as an instrument to provide participation by DBEs in contract work. A joint venture seeking to be credited for DBE participation may be formed among DBE firms or between DBE firm(s) and non-DBE firm(s).

A joint venture is eligible for DBE credit if the DBE partner(s) share in the ownership, control, management responsibilities, risks and profits of the joint venture, and are responsible for a clearly defined portion of the work to be performed, in proportion with the DBE ownership percentage.

## III. THIRD PARTY CHALLENGES TO ELIGIBILITY OF DBE FIRMS

A. Any third party may challenge the socially and economically disadvantaged status of any individual presumed to be socially and economically disadvantaged pursuant to Title 49 C.F.R., Part 23.62 provided that the challenged individual is an owner of a firm certified by or seeking certification with CTA as a disadvantaged business. An individual who has a current 8 (a) certification from the Small Business Administration may not be challenged through this procedure.

B. The challenge shall be in writing and shall include all information available to the challenging party relevant to the determination of whether the challenged individual is in fact socially and economically disadvantaged. The written challenge shall be filed with CTA's Manager, DBE Program/Contract Compliance Department.

C. CTA shall determine, on the basis of the information provided to it, whether there is reason to believe that the challenged individual is, in fact, not socially and economically disadvantaged. If CTA determines that there is no reason to believe that the challenged individual is not socially and economically disadvantaged, CTA shall so inform the challenging party in writing. The decision is final and terminates the proceedings as hereinafter provided. If CTA determines that there is reason to believe that the challenged party is not socially and economically disadvantaged, CTA shall begin a proceeding as follows:

1. CTA shall notify the challenged party that his or her status as a socially and economically disadvantaged individual has been challenged. The notice shall identify the challenging party and summarize the grounds for the challenge. The notice shall also require the challenged individual to provide CTA, within ten (10) business days, information sufficient to permit CTA to evaluate his or her status as a socially and economically disadvantaged individual. Failure to provide the requested information will result in decertification or denial of certification.

2. CTA shall evaluate the information available to it, conduct such investigation as deemed necessary and make a proposed determination of the social and economic disadvantaged status of the challenged individual. CTA shall notify both parties of the proposed determination in writing, setting forth the reason(s) for its proposal. CTA shall also provide an opportunity to the parties for an informal hearing at which time each party shall have the opportunity to respond to this proposed determination in writing

and in person. The rules of evidence shall not apply; there shall be no presentation of witnesses or cross-examination.

3. Following the informal hearing, CTA shall make a final determination. CTA shall inform the parties, in writing, of the final determination, setting forth the reasons for its decision. In making its determination, CTA shall be guided by the social and economic eligibility standards of Title 49 C.F.R., Part 23.

D. During the pendency of a challenge under this office, the presumption that the challenged party is a socially and economically disadvantaged individual shall remain in effect.

E. Once CTA has made a final decision on a challenge matter, that determination goes into effect immediately with respect to CTA's Federally-assisted contracts. Except as provided in Title 49 C.F.R., Part 23.55, the decision by CTA shall be final for all contracts being let at the time of the final determination.

F. The final determination by CTA may be appealed by the adversely affected party to the Secretary, United States Department of Transportation under the procedures set forth in 49 C.F.R. Section 23.55. Any firm which believes that it has been wrongly denied certification as a DBE or joint venture may file an appeal in writing, signed and dated with the Secretary, United States Department of Transportation, no later than 180 days after the date of CTA's final determination. Third parties who have reason to believe that another firm has been wrongly denied or granted certification may advise the Secretary of the United States Department of Transportation.

## IV. JOINT VENTURES

Contractors may develop joint venture agreements as an instrument to provide participation by DBEs in contract work. A joint venture seeking to be credited for DBE participation may be formed among DBE firms or between a DBE firm and a non-DBE firm.

A joint venture is eligible if, and only if, all of the following requirements are satisfied:

- the DBE venturer(s) share in the (1) *ownership*, (2) *control*, (3) *management responsibilities*, (4) *risks* and (5) *profits* of the joint venture in proportion with the DBE ownership percentage; and

- the DBE venturer(s) are responsible for a clearly defined portion of work to be performed, in proportion with the DBE ownership percentage.

The Manager, DBE Program/Contract Compliance will evaluate the proposed joint venture agreement, Schedule B submitted on behalf of the proposed joint venture, and all related documents to determine whether these requirements have been satisfied. In addition, the Manager, DBE Program/Contract Compliance shall consider the record of the joint venturers as joint venturers on CTA contracts. The decision of the Manager, DBE Program/Contract Compliance, regarding the eligibility of the Joint Venture shall be final.

**NOTE:** Credit for participation by DBEs in joint venture with non-DBEs does not require a minimum participation of 51% venture ownership and control on the part of the DBE. A junior ownership interest only in the venture by the DBE can be credited toward the contract DBE goal in a pro rata fashion as indicated below, **V. COUNTING DBE PARTICIPATION TOWARD THE CONTRACT GOAL.**

DBE/non-DBE joint ventures are creditable at any tier. **(Notice:** CTA requires that, whenever a joint venture is proposed as the prime contractor, each joint venturer must sign the proposal to CTA.).

## V. COUNTING DBE PARTICIPATION TOWARD THE CONTRACT GOAL

The inclusion of any DBE in the Contractor's DBE Utilization Plan shall not conclusively establish the Contractor's eligibility for full DBE credit for the firm's participation in the contract.

The Manager, DBE Program/Contract Compliance reserves the right to deny or limit DBE credit to the Contractor where any DBE is found to be engaged in substantial subcontracting or pass-through activities with others. In this regard, a Contractor may count toward its DBE goal only expenditures to firms that are currently certified with the CTA and perform a commercially useful function. A firm is considered to perform a commercially useful function when it is responsible for the performance of a distinct element of the work and in carrying out its responsibilities by actually performing, managing, and supervising the work involved. To determine whether a firm is performing a commercially useful function, the Manager, DBE Program/Contract Compliance shall evaluate the amount of work subcontracted, industry practices and other relevant factors. The amount of DBE participation credit shall be based upon an analysis by the Manager, DBE Program/Contract Compliance of the specific duties that will be performed by the DBE. Each DBE will be expected to perform all of the work contemplated for it by any subcontract or agreement through the use of its own employees and equipment.

Credit for the participation of DBE firms as joint venture partners shall be based upon a detailed analysis of the duties, responsibilities and risks undertaken by the DBE as specified by the joint venturer's executed joint venture agreement. The Manager, DBE Program/Contract Compliance reserves the right to deny or limit DBE credit to the Contractor where any DBE joint venture partner is found to have duties, responsibilities, risks of loss and management control over the joint venture that is not commensurate with or in proportion to its joint venture ownership.

DBE participation shall be counted toward the DBE goal set in the contract as follows:

A. Once a DBE is determined to be eligible in accordance with these rules, the total dollar value of the contract awarded to the DBE may be counted toward the DBE goal, except as indicated below.

B. A Contractor may count toward its DBE goal a portion of the total dollar value of a contract with a joint venture eligible under the standards of the Special Conditions equal to the percentage of the ownership and control of the DBE venturer.

C. A Contractor may count toward its DBE goal only expenditces to firms that perform a commercially useful function in the work of a contract. A firm is considered to perform a commercially useful function when it is responsible for execution of a distinct element of the work of a contract and carries out its responsibilities by actually performing, managing, and supervising the work involved. To determine whether a firm is performing a commercially useful function the Manager, DBE Program/Contract Compliance shall evaluate the amount of work subcontracted, industry practices and other relevant factors.

Consistent with normal industry practices, a DBE may enter into subcontracts. If a DBE Contractor subcontracts a significantly greater portion of the work of the contract than would be expected on the basis of normal industry practices, the DBE shall be presumed not to be performing a commercially useful function. Evidence may be presented by the contractors involved to rebut this presumption.

D. A contractor may count towards its DBE goal sixty percent (60%) of its expenditures for materials and supplies required under the contract and obtained from a DBE regular dealer, and one-hundred percent (100%) of such expenditures to a DBE manufacturer.

.For purposes of this section, a manufacturer is a firm that operates or maintains a factory or establishment that produces on the premises the materials or supplies obtained by the contractor.

For purposes of this section, a regular dealer is a firm that owns, operates, or maintains a store, warehouse, or other establishment in which the materials or supplies required for performance of the contract are bought, kept in stock, and regularly sold to the public in the usual course of business. To be considered a regular dealer, the firm must engage in, as its principal business, and in its own name, the purchase and sale of the products in question. A regular dealer in such bulk items as steel, cement, gravel, stone, and petroleum products need not keep such products in stock, if it owns or operates distribution equipment. Brokers and packagers shall not be considered as manufacturers or regular dealers within the meaning of this section.

E. A contractor may count towards its DBE goal the following expenditures to DBE firms that are not manufacturers or regular dealers:

1. The fees or commissions charged for providing a bona fide service, such as professional, technical, contractor or managerial services and assistance in the procurement of essential personnel, facilities, equipment, materials or supplies required for performance of the contract, provided that the fee or commission is determined by the Manager, DBE Program/Contract Compliance to be reasonable and not excessive as compared with fees customarily allowed for similar services.

2. The fees charged for delivery of materials and supplies required on a job site (but not the cost of the materials and supplies themselves) when the hauler, trucker, or delivery service is not also the manufacturer of or a regular dealer in the materials and supplies provided that the fee is determined by the Manager, DBE Program/Contract Compliance to be reasonable and not excessive as compared with fees customarily allowed for similar services.

3. The fees or commissions charged for providing any bonds or insurance specifically required for the performance of the contract, provided that the fee or commission is determined by the Manager, DBE Program/Contract Compliance to be reasonable and not excessive as compared with fees customarily allowed for similar services.

## VI. GRANT OF RELIEF FOR BIDDERS: WAIVER OF DBE GOALS

In the event the Contractor finds it impossible to fully meet the DBE goal of this contract, the Contractor must submit a signed petition for grant of relief from this Special Condition on the Contractor's letterhead, accompanied by documentation demonstrating that all reasonable "good faith" efforts were made toward fulfilling the goal.

To demonstrate sufficient reasonable efforts to meet the DBE contract goal, a Contractor shall document the steps it has taken to obtain DBE participation, including but not limited to the following:

A. Attendance at a pre-bid meeting, if any, scheduled by the CTA to inform DBEs of subcontracting opportunities under a given solicitation.

B. Advertisement in general circulation media, trade association publications, and minority-focus media for at least 20 days before bids or proposals are due. If 20 days are not available, publication for a shorter reasonable time is acceptable.

C. Written notification to DBEs that their interest in the contract is solicited.

D. Efforts made to select portions of the work proposed to be performed by DBEs in order to increase the likelihood of achieving the stated goal.

E. Efforts to negotiate with DBEs for specific subbids including at a minimum:

1. The names, addresses, and telephone numbers of DBEs that were contacted;

2. A description of the information provided to DBEs regarding the plans and specifications for portions of the work to be performed; and

3. A statement of why additional agreements with DBEs were not reached;

F. Concerning each DBE the competitor contacted but rejected as unqualified, the reason for the competitor's conclusion;

G. *Efforts made to assist the DBEs contacted that needed assistance in obtaining bonding or insurance required by Contractor or CTA.*

Contractors that fail to meet DBE goals and fail to demonstrate sufficient reasonable efforts will be deemed in non-compliance and shall not be eligible to be awarded the contract.

To ensure that all obligations under contracts awarded to DBEs are met, CTA shall review the contractor's DBE involvement efforts during the performance of the contract. The Contractor shall bring to the attention of CTA, any situation in which regularly scheduled progress payments are not made to DBE subcontractors.

If the contractor does not meet the DBE goal, price alone shall not be an acceptable basis for which the contractor may reject the DBE sub-bid unless the *bidder/proposer can show to the satisfaction of CTA that no reasonable price can be obtained from a DBE.* A determination of reasonable price is based on such factors as CTA's estimate for work under a specific subcontract, the bidder/proposer's own estimate for the specific subcontracts, and the average of bona fide prices quoted for the specific subcontract. A DBE bid for subcontract will be presumed to be unreasonable if the DBE's price exceeds the average price quoted by more than fifteen (15) percent.

## VII. PROCEDURE TO DETERMINE BID COMPLIANCE

**The following Schedules and described documents constitutes the Contractor's DBE proposal, and must be submitted with the Contractor's bid at time of bid opening. Failure to submit completed Schedules and described documents with Contractor's bid will cause the bid to be considered non-responsive and will be cause to reject the bid in its entirety.**

### A. Schedule B: Affidavit of DBE/Non-DBE Joint Venture

Where the bidder's DBE proposal includes the participation of any DBE as a joint venturer, on any tier, the bidder must submit, together with their bid, a **Schedule B: Affidavit of DBE/Non-DBE Joint Venture** with an attached copy of the joint venture agreement proposed among the parties.

The **Schedule B**, in conjunction with the joint venture agreement must clearly evidence that the DBE venturer will be responsible for a clearly defined portion of the work to be performed, and that the DBE firm's responsibilities are in proportion with their ownership percentage. In order to demonstrate the DBE venturer's share in the ownership, control, management responsibilities, risks and profits of the joint venture, the proposed joint venture agreement shall include specific details related to **(1) the contributions of capital and equipment; (2) work items to be performed by the DBE's own forces; (3) work items to be performed under the supervision of the DBE venturer; and (4) the commitment of management, supervisory and operating personnel employed by the DBE to be dedicated to the performance of the project.**

### B. Schedule C: Letter of Intent from DBE to Perform as Subcontractor/Subcontractor/Supplier.

A **Schedule C**, executed by the DBE firm (or Joint Venture Subcontractor) must be submitted by the contractor with its bid at time of bid opening for each DBE included on their **Schedule D**. Each schedule must accurately detail the work to be performed by the DBE firm and the agreed rates and prices to be paid.

### C. Letters of Certification.

1. A copy of each proposed DBE firm's current Letter of Certification or Recertification from CTA must be submitted with the proposal (LIQ or RFP).

2. All Letters of Certification or Recertification issued by CTA include a statement of the DBE firm's area of specialization and appropriate DBE goal credit (see Section V. COUNTING DBE PARTICIPATION TOWARD THE CONTRACT GOAL). The DBE firm's scope of work, as detailed by their **Schedule C** must conform to their stated area of specialization. Where a DBE is proposed to perform work not covered by their area of specialization, they must request in writing, an expansion of their area of specialization prior to their being proposed to perform such work. The DBE firm's request to expand the scope of their area of specialization, together with all documentation required by CTA to process that request, must be received by the Manager, DBE Program/Contract Compliance prior to the bid opening.

    NOTE: In order for a non-certified DBE firm to be considered as a proposed DBE by the Contractor, a **Schedule A, Certification Affidavit or Recertification Affidavit** must be received by the DBE Program/Contract Compliance Department prior to the bid opening.

3. All Letters of Certification or Recertification are dated and are valid for one (1) year from the date of issue by CTA.

### D. Joint Venture Agreements.

1. If the Contractor's DBE proposal includes the participation of DBE firm(s) as joint venturers on any tier (either as the Contractor or as a subcontractor), Contractor must provide a fully executed and notarized copy of the joint venture agreement, with their bid at time of opening.

2. In order to demonstrate the DBE partner's share in the ownership, control, management responsibilities, risks and profits of the joint venture, the agreement must contain specific details related to:

    a. Contributions of capital and equipment;
    b. Work responsibilities or other performance to be undertaken by the DBE firm;
    c. The commitment of management, supervisory and operating personnel employed by the DBE to be dedicated to the performance of the contract. The joint venture agreement must also clearly define each partner's authority to contractually obligate the joint venture and each partner's authority to expend joint venture funds (e.g. check signing authority).

## E.  Schedule D: DBE Utilization Plan

1. Contractors must submit, together with the bid, a completed **Schedule D** committing them to the utilization of each listed DBE firm.

2. Except in cases where the contractor has received a complete waiver of the DBE goal in accordance with Section VI herein, the contractor must commit to the expenditure of a specific dollar amount of participation by each DBE firm included on their **Schedule D.** The total dollar commitment to proposed DBE firms must at least equal the DBE goal. Contractors are responsible for calculating the dollar equivalent to the DBE goal as a percentage of their total base bids or, in the case of annual contracts, as percentages of unit price in conjunction with total estimated annual usage/expenditures.

3. All commitments made by the Contractor's **Schedule D** must conform to those presented in the submitted Schedule C. Except in cases where substantial and documented justification is provided, contractors will not be allowed to reduce the dollar commitment made to any DBE in order to achieve conformity between the Schedules C and D.

4. The submittals must have all spaces on the Schedule pages correctly filled in.

5. During the period before award, the submitted documentation will be evaluated. Furthermore, the bidder agrees to give upon request, earnest and prompt cooperation to the Manager, DBE Program/Contract Compliance in:

    a. Submitting to interviews that may be necessary;
    b. Allowing entry to places of business;
    c. Providing further documentation; or
    d. Soliciting the cooperation of a proposed DBE in providing such assistance.

6. A bid may be treated as non-responsible by reason of the determination that:

    a. A contractor's proposal contains an insufficient level of DBE participation;
    b. The contractor was found to be unresponsive or uncooperative when asked for further information relative to the proposal; or
    c. False statements were made in the Schedules.
    d. The DBE submitted is not certified by the CTA or has not submitted a Schedule A to the DBE Department prior to the bid opening.

## VIII.  REPORTING REQUIREMENTS DURING THE TERM OF THE CONTRACT

A. The contractor shall, within five (5) business days of receiving the awarded contract or prior to any work being performed, execute formal subcontracts or purchase orders with the DBE firms included in their proposed Schedules. These written agreements shall be made available to the Manager, DBE Program/Contract Compliance Department upon request.

B. During the life of the project, the Contractor shall submit partial and final waivers of lien from DBE subcontractors which are drawn up to show the true, cumulative dollar amount of subcontractor payments made to date.

C. The contractor shall file regular Status Reports of DBE Subcontract Payments according to the following procedure: At the time of signing each monthly payment voucher (Pay Request 308 Form), the Contractor shall present the Pay Request 308 Status Report form executed to reflect the status of current and projected payments to DBEs. Vouchers will not be processed by CTA for payment until the Status Report has been presented.

## IX. DBE SUBSTITUTIONS

**A.** Arbitrary changes by the Contractor of the commitments earlier certified in the **Schedule D** are prohibited. Further, after once entering into each approved DBE subagreement, the contractor shall, thereafter, neither terminate the subagreement, nor reduce the scope of the work to be performed by the DBE, nor decrease the price to the DBE, without in each instance receiving prior written approval of the Manager, DBE Program/Contract Compliance Department.

**B.** In some cases, however, it may become necessary to substitute a new DBE in order to actually fulfill the DBE requirements. In such cases, the Manager, DBE Program/Contract Compliance must be given reasons justifying the release by CTA of prior specific DBE commitments established in the contractor's bid proposal. The substitution procedure will be as follows:

   1. The Contractor must notify the Manager, DBE Program/Contract Compliance immediately in writing of an apparent necessity to reduce or terminate a DBE subcontract and to propose a substitute firm for some phase of work, in order to sustain the fulfillment of the DBE contract goals.

   2. The Contractor's notification to CTA should include the specific reasons for the proposed substitution. Stated reasons which would be acceptable include any of the following examples: A previously committed DBE was found not to be able to perform, or not to be able to perform on time; a committed DBE was found not to be able to produce acceptable work; a DBE previously committed to a given price later demands an unreasonable escalation of price.

      The Contractor's position in these cases must be fully explained and supported with adequate documentation. Stated reasons which will not be acceptable include: A replacement firm has been recruited to perform the same work under terms more advantageous to the prime contractor; issues about performance by the committed DBE were disputed (unless every reasonable effort has already been taken to have the issues resolved or mediated satisfactorily); a DBE has requested reasonable price escalation which may be justified due to unforeseen circumstances (i.e., a change in scope of DBE's work).

   3. The Contractor's notification should include the name, address, and principal official of any proposed substitute DBE and the dollar value and scope of work of the proposed subcontract. The same DBE affidavits and documents, which are required of contractors, as enumerated above in Section VII, "Procedure to Determine Bid Compliance" shall be attached.

   4. CTA will evaluate the submitted documentation and respond within fifteen (15) working days to the request for approval of a substitution. The response may be in the form of requesting more information, or requesting an interview to clarify or mediate the problem. The response may also be in the form of a rejection of the proposed DBE substitution with the reasons therefor included in CTA's response. In the case of an expressed emergency need to receive the necessary decision for the sake of job progress, CTA will instead respond as soon as practicable.

   5. Actual substitution of a DBE to fulfill contract requirements should not be made prior to CTA approval. Once notified of CTA approval, the substitute DBE subcontract must be executed within five (5) working days, and a copy of the DBE subcontract, with signatures of both parties to the agreement, should be submitted to CTA.

**C.** CTA will not approve extra payment for escalated costs incurred by the Contractor when a substitution of subcontractors becomes necessary in order to comply with DBE contract requirements.

**D.** After award of contract, no relief of the DBE requirements will be granted by CTA except in exceptional circumstances. Requests for complete or partial waiver of the DBE requirements of the contract must be made in writing, stating all details of the request, the circumstances, and all relevant information. The request must be accompanied by a record of all efforts taken by the Contractor to locate specific firms, solicit DBE bids, seek assistance from technical assistance agencies, etc., as outlined above in Section VI, "Grant of Relief for Bidders: Waiver of DBE Goals."

**E.** In a case where an enterprise under contract was previously considered to be a DBE but is later found not to be, or whose work is found not to be creditable toward the DBE goal fully as planned, CTA will consider the following special criteria in evaluating a waiver request:

   1. Whether the prime contractor was reasonable in believing the enterprise was a DBE or that eligibility or "counting" standards were not being violated;

   2. The adequacy of unsuccessful efforts taken to obtain a substitute DBE as outlined in Section VI above, "Grant of Relief for Bidders: Waiver of DBE Goal."

**F.** The Manager, DBE Program/Contract Compliance has sole authority regarding all matters of DBE compliance, including the granting of waivers or other relief to Contractors.

## X. NON-COMPLIANCE

**A.** The Manager, DBE Program/Contract Compliance shall have the discretion to apply suitable sanction(s) to the Contractor if the Contractor is found to be in non-compliance with the DBE requirements. Failure to comply with the DBE terms of this contract or failure to use DBEs as stated in the Contractor's submitted schedules constitutes a material breach of this contract, and may lead to the suspension and/or termination of this contract in whole or in part; furthermore, continued eligibility to enter into future contracting arrangements with CTA may be jeopardized as a result of non-compliance. In some cases, payments may be withheld until corrective action is taken.

B. When work is completed, in the event that CTA has determined that the Contractor was not compliant in the fulfillment of the required DBE goal, and a grant of relief of the requirement was not obtained, CTA will thereby be damaged in the failure to provide the benefit of participation to Disadvantaged Business Enterprises to the degree set forth in this SPECIAL CONDITION.

C. Therefore, if CTA has determined, before the contract has been completed, the contractor is in non-compliance with the DBE goal, CTA will deduct part of the total contract amount, in cumulative amounts computed as follows:

> **For each one (1) percent (or fraction thereof) of shortfall towards the DBE goal, one (1) percent of the total contract amount shall be withheld from the Contractor as a means of satisfying the DBE goal shortfall.**

## XI.   RECORD KEEPING

The Contractor shall maintain records of all relevant data with respect to the utilization of DBEs, retaining these records for a period of at least three (3) years after final acceptance of the work. Full access to these records shall be granted to the Chicago Transit Authority, Federal or State authorities in this project, the U.S. Department of Justice, the U.S. Department of Transportation, or any duly authorized representatives thereof.

## XII.   ASSISTANCE AGENCIES

The following agencies are available to the prospective bidders for assistance:

A. Management and technical assistance to minority and women contractors; linkage between major firms and DBEs:

U.S. Department of Transportation
Minority Business Resource Center
400 7th Street SW, Room 9410
Washington, DC 20590
Attn: Joe Capuano
(202) 366-2852

Cosmopolitan Chamber of Commerce
1326 South Michigan Avenue, Suite 100
Chicago, Illinois 60605
Attn: Connie Pope
(312) 786-0212, FAX: 786-9079

Illinois Department of Commerce and Community Affairs
Small Business Office
100 West Randolph, Suite 3-400
Chicago, Illinois 60601
Attn: LaMar Green
(312) 814-3263

National Association of Women Business Owners
Executive Director
414 Plaza Drive, Suite 209
Westmont, Illinois 60559
Attn: Kevin Boyer

Grant Thornton Minority Business Development Center
600 One Prudential Plaza, Suite 700
Chicago, Illinois 60601
Attn: Ken Robinson
(312) 856-0200

Chicago Minority Business Development Center
Burgos & Associates, Inc.
35 East Wacker Drive, Suite 922
Chicago, Illinois 60601
Attn: Clara Rhodes
(312) 977-9190

Chicago Urban League
1346 South Michigan Avenue
Chicago, Illinois 60605
Attn: Suzanne A. Daniel
(312) 663-9216, FAX: 663-9809

Chicagoland Chamber of Commerce and Industry
200 North LaSalle Street
Chicago, Illinois 60601
Attn: Samuel Mitchell
(312) 580-6900, FAX: 580-6957

Minority Economic Resources Corporation (MERC)
2570 East Devon Avenue
Des Plaines, Illinois 60018
Attn: Carlina Rodriguez
        Director, Minority Business Department
(708) 297-4705

Women's Business Development Center
8 South Michigan, Suite 400
Chicago, Illinois 60603
Attn: Hedy M. Ratner
(312) 853-3477, FAX: 853-0145

NAACP
7 East 63rd Street
Chicago, Illinois 60637
Attn: Syd Finley
(312) 853-3477

Latin American Chamber of Commerce
2539 North Kedzie, Suite 11
Chicago, Illinois 60647
Attn: Cristina Hernandez
(312) 252-5211

Gary Minority Business Development Center
567 Broadway
Gary, Indiana 46402
Attn: Jeffery Williams
(219) 883-5802

B.  Minority contractor associations; linkage major firms and DBEs:

Association of Asian Construction Enterprises
c/o Sam Chung, President
333 North Ogden Avenue
Chicago, Illinois 60607
(312) 666-3626, FAX: 666-1785

Black Contractors United (BCU)
c/o Jerome Peters
1641 North Milwaukee Avenue
Chicago, Illinois 60647
(312) 663-0704

Hispanic-American Construction Industry Association
(HACIA)
c/o Carlos Ponce, Executive Director
542 South Dearborn
Chicago, Illinois 60605
(312) 786-0101, FAX: 786-0104

Midwest Contractors of Progress
c/o Tommy Harrington
4647 West Huron
Chicago, Illinois 60644
(312) 921-0463

Women Construction Owners and Executives
c/o Theresa Kern
6723 South Pulaski Road
Chicago, Illinois 60629
(312) 582-9800, FAX: 582-9850

C.  Small business guaranteed loans; surety bond guarantees; 8(a) certification:

U.S. Small Business Administration
219 South Dearborn Street, Suite 437
Chicago, Illinois 60604
Attn: Robert Connor
(312) 353-9098

Bond Guarantee Program
Surety Bond
230 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
Attn: Tony Zanetello
(312) 353-7331

Procurement Assistance
230 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
Attn: Robert Murphy
(312) 353-1395

D.  Project information, general DBE information; Directory of local and out-of-state construction and design DBEs:

**Project Information**
Chicago Transit Authority
Purchasing Department
Merchandise Mart Plaza, Room 725
Chicago, Illinois 60654
Attn: Purchasing Agent
(312) 664-7200 Ext. 4829

**DBE Information**
Chicago Transit Authority
DBE/EEO Program/Contract Compliance
Merchandise Mart Plaza
Chicago, Illinois 60654
Attn: Pamela J. Beavers
(312) 664-7200, Ext. 3525

E.  Information on DBE availability in the manufacturing, sales or supplies, and related fields (direct assistance from 42 regional affili-
ates located throughout the U.S.):

National Minority Suppliers Development Council, Inc.
1412 Broadway - 11th Floor
New York, NY 10018
Attn: Suzette Eaddy
(212) 944-2430

Chicago Regional Purchasing Council
36 South Wabash, Suite 725
Chicago, IL 60602
Attn: Maye Foster-Thompson
(312) 263-0105

## XIII.  PRIME CONTRACTOR ASSISTANCE

Prime contractors must have themselves assist DBEs in overcoming barriers to program participation. The following instruments of as-
sistance, for example, should be used as applicable:

A.  Developing solicitations of subcontract bids so as to increase potential DBE participation. This can take the form of breaking down
large subcontracts into small ones, and of issuing notice of solicitations in a timely manner;

B.  Providing technical assistance and guidance in the bidding, estimating, and scheduling processes;

C.  Considering purchasing supplies and/or leasing the required equipment for a job, then subcontracting only for the expertise re-
quired to perform the work;

D.  Providing accelerated payments or establishing pro-rated payment and delivery schedules so as to minimize cash flow problems
faced by small firms;

E.  Providing, waiving, or reducing subcontractor bonding requirements; allowing state bonding (bonding carried over from one project
state to the next);

F.  Providing a pre-bid conference for potential subcontractors.

In addition to the employment of DBE construction enterprises and material suppliers, the Contractor should consider the utilization
of DBEs in fields indirectly related to construction contracts; banking, office equipment sales, vehicle sales, mechanical repair, legal
and accounting services, building security, graphics and advertising, etc.

## XIV.  EQUAL EMPLOYMENT OPPORTUNITY

Compliance with DBE requirements will not diminish or supplant Equal Employment Opportunity and Civil Rights provisions as speci-
fied elsewhere in this contract and as they relate to Prime Contractor and Subcontractor obligations.

## XV.  MINORITY FINANCIAL INSTITUTIONS/INSURANCE AGENCIES

The prime contractor is encouraged to use the services of banks and insurance agencies owned and controlled by minorities or women.

**Schedule B**
**AFFIDAVIT OF DBE/NON-DBE JOINT VENTURE**

This form need not be submitted if all joint venturers are DBEs. In such a case, however, a written joint venture agreement among the DBE venturers must be submitted. In all proposed joint ventures, each DBE venturer must submit a copy of their current Letter of Certification.

ALL INFORMATION REQUESTED BY THIS SCHEDULE MUST BE ANSWERED IN THE SPACES PROVIDED. DO NOT REFER TO YOUR JOINT VENTURE AGREEMENT EXCEPT TO EXPAND ON ANSWERS PROVIDED ON THIS FORM. IF ADDITIONAL SPACE IS REQUIRED, ADDITIONAL SHEETS MAY BE ATTACHED.

I.  **Name of joint venture:** _____

Address of joint venture: _____

_____

Phone number of joint venture: _____

II.  **Identify each non-DBE venturer(s):**

Name of Firm: _____

Address: _____

Phone: _____

Contact person for matters concerning DBE compliance: _____

III.  **Identify each DBE venturer(s):**

Name of Firm: _____

Address: _____

Phone: _____

Contact person for matters concerning DBE compliance: _____

IV.  **Describe the role(s) of the DBE venturer(s) in the joint venture:**

_____

_____

_____

_____

_____

V.  **Attach a copy of the joint venture agreement.** In order to demonstrate the DBE venturer's share in the ownership, control management responsibilities, risks and profits of the joint venture, the proposed joint venture agreement must include specific details related to: (1) the contributions of capital and equipment; (2) work items to be performed by the DBE's own forces; (3) work items to be performed under the supervision of the DBE venturer; and (4) the commitment of management, supervisory and operative personnel employed by the DBE to be dedicated to the performance of the project.

VI.  **Ownership of the Joint Venture.**

A.  What are the percentage(s) of DBE ownership of the joint venture?

DBE ownership percentage(s) _____

Non-DBE ownership percentage(s) _____

**Schedule B**
**AFFIDAVIT OF DBE/NON-DBE JOINT VENTURE**

VI.   **Ownership of the Joint Venture** *(continued):*

B.   *Specify DBE/non-DBE percentages for each of the following (provide narrative descriptions and other detail as applicable):*

1.   Profit and loss sharing: _____

2.   Capital contributions:
(a) Dollar amounts of initial contribution: _____
_____

(b) Dollar amounts of anticipated on-going contributions: _____
_____

3.   Contributions of equipment *(specify types, quality and quantities of equipment to be provided by each venturer):*
_____
_____
_____

4.   Other applicable ownership interests, including ownership options or other agreements which restrict or limit ownership and/or control:
_____
_____

5.   Provide copies of **all** written agreements between venturers concerning this project.

6.   Identify each current Chicago Transit Authority contract and each contract completed during the past two (2) years by a joint venture of two or more firms participating in this joint venture:
_____
_____
_____
_____

VII.   **Control of and Participation in the Joint Venture.** Identify by name and firm those individuals who are, or will be, responsible for, and have the authority to engage in the following management functions and policy decisions. *(Indicate any limitations to their authority such as dollar limits and co-signatory requirements.):*

A.   *Joint venture check signing:*
_____
_____
_____

B.   *Authority to enter contracts on behalf of the joint venture:*
_____
_____
_____
_____

Schedule B
**AFFIDAVIT OF DBE/NON-DBE JOINT VENTURE**

    C.  Signing, co-signing and/or collateralizing loans:

    D.  Acquisition of lines of credit:

    E.  Acquisition and indemnification of payment and performance bonds:

    F.  Negotiating and signing labor agreements:

    G.  Management of contract performance. *(Identify by name and firm only):*

        1. Supervision of field operations:

        2. Major purchases:

        3. Estimating:

        4. Engineering:

**VIII.**  **Financial Controls of joint venture:**

    A.  Which firm and/or individual will be responsible for keeping the books of account?

    B.  Identify the "managing partner," if any, and describe the means and measure of their compensation:

    C.  What authority does each venturer have to commit or obligate the other to insurance and bonding companies, financing institutions, suppliers, subcontractors, and/or other parties participating in the performance of this contract or the work of this project?

Schedule B
**AFFIDAVIT OF DBE/NON-DBE JOINT VENTURE**

IX.    State the approximate number of operative personnel (by trade) needed to perform the joint venture's work under this contract. Indicate whether they will be employee of the majority firm, DBE firm, or the joint venture.

| Trade | Non-DBE Firm (number) | DBE (number) | Joint Venture (number) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Professional | | | |
| | | | |
| | | | |
| Administrative/Clerical | | | |
| | | | |
| | | | |
| Unskilled Labor | | | |
| | | | |
| | | | |

If **any** personnel proposed for this project will be employees of the joint venture:

A.    Are **any** proposed joint venture employees currently employed by either venturer? _____

Currently employed by non-DBE (number) _____    Employed by DBE _____

B.    Identify by name and firm the individual who will be responsible for hiring joint venture employees: _____

_____

X.    Please state any material facts of additional information pertinent to the control and structure of this joint venture.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Schedule B**
**AFFIDAVIT OF DBE/NON-DBE JOINT VENTURE**

The undersigned affirms that the foregoing statements are correct and include all material information necessary to identify and explain the terms and operations of our joint venture and the intended participation of each venturer in the undertaking. Further, the undersigned covenant and agree to provide to CTA current, complete and accurate information regarding actual joint venture work and the payment therefore, and any proposed changes in any provision of the joint venture, or those of each venturer relevant to the joint venture by authorized representatives of CTA or the Federal funding agency.

Any material misrepresentation will be grounds for terminating any contract which may be awarded and for initiating action under federal or state laws concerning false statements.

NOTE:  *If, after filing this Schedule B and before the completion on the joint venture's work on the project, there is any change in the information submitted, the joint venture must inform the Chicago Transit Authority directly or through the prime contractor if the joint venture is a subcontractor.*

_____        _____
Name of DBE Partner Firm                          Name of Non-DBE Partner Firm

_____        _____
Signature of Affiant                                      Signature of Affiant

_____        _____
Name and Title of Affiant                             Name and Title of Affiant

_____        _____
Date                                                              Date

On this _____ day of _____, 19 _____, the above-signed officers

_____
(Names of Affiants)

personally and, known to me be the persons described in the foregoing Affidavit, acknowledged that they executed the same in the capacity therein stated and for the purpose therein contained.

**IN WITNESS OF, I hereunto set my hand and offical seal.**

_____
Signature of Notary Public

My Commission Expires: _____

SEAL

**Schedule C:**
**LETTER OF INTENT FROM DBE TO PERFORM AS**
**SUBCONTRACTOR, SUPPLIER AND/OR CONSULTANT**
*Bidder's or Proposer's failure to submit this form with their bid*
*will result in their bid being rejected in its entirety*

Name of Project/Contract: _____

Requisition No.: _____

Job Order No.: _____

From: _____
                    (Name of DBE Firm)

To: _____ **and the Chicago Transit Authority**
              (Name of Prime Contractor)

The DBE status of the undersigned is confirmed by the attached Letter of Certification from the Chicago Transit Authority dated _____ . (If proposing to perform as a DBE/non-DBE Joint Venture, then Letter of Certification from DBE venturer is attached along with completed Schedule B and joint venture agreement)

The undersigned is prepared to provide the following described services or supply the following described goods in connection with the above named project/contract:

| Pay Item No./Description | Quantity/Unit Price | Total |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Sub (or Grand) Total:  $_____

**Partial Pay Items.** (For any of the above items that are partial pay items, specifically describe the work and subcontract dollar amount):

_____
_____
_____
_____
_____
_____
_____

Grand Total: $_____

If more space is needed to fully describe the DBE firm's (or DBE/non-DBE joint venture's) proposed scope of work and/or payment schedule, attach additional sheets.

**cta**  715.04 (rev. 11/99) DBE Program and Contract Compliance                    (Front)

**Schedule C:**
**LETTER OF INTENT FROM DBE**

**Sub-Contracting Levels**

_____% of the dollar value of the DBE's subcontract will be sublet to non-DBE contractors.

_____% of the dollar value of the DBE's subcontract will be sublet to DBE contractors.

**NOTICE:** IF DBE WILL NOT BE SUB-SUBCONTRACTING ANY OF THE WORK DESCRIBED IN THIS SCHEDULE, A ZERO (0) MUST BE SHOWN IN EACH BLANK ABOVE.

**NOTICE:** IF MORE THAN TEN PERCENT (10%) OF THE VALUE OF THE DBE's SCOPE OF WORK WILL BE SUBLET, A BRIEF EXPLANATION AND DESCRIPTION OF THE WORK TO BE SUBLET MUST BE ATTACHED TO THIS SCHEDULE.

The undersigned will enter into a formal written agreement for the above work with you as a Prime Contractor, conditioned upon your execution of a contract with the Chicago Transit Authority, and will do so within (5) five working days of your receipt of a signed contract from the Chicago Transit Authority.

**NOTICE:** THIS SCHEDULE (AND ACCOMPANYING ATTACHMENTS TO BE SUBMITTED IN TRIPLICATE. ORIGINAL SIGNATURES REQUIRED ON ALL THREE (3) COPIES.

_____
(Signature of Owner, President or Authorized Agent of DBE)

_____
Name/Title (Print)

_____
Date

_____
Phone

**If proposing to perform as a DBE/non-DBE Joint Venture:**

_____
(Signature of Owner, President or Authorized Agent of non-DBE)

_____
Name/Title (Print)

_____
Date

_____
Phone



 **Chicago Transit Authority**
Merchandise Mart Plaza, P.O. Box 3555
Chicago, Illinois 60654
(312) 664-7200

September 12, 2001

Ms. Julie McKevitt
Will Rent, Inc. (1746)
3228 S. Wood St.
Chicago, Il 60608

Dear Ms. McKevitt:

The Chicago Transit Authority's DBE/EEO Programs/Contract Compliance Department has received your application for certification as a Disadvantaged Business Enterprise (DBE). This application was processed in accordance with Department of Transportation Regulation 49 CFR, Part 26.

The result of our review of your submission is that your company is hereby **RECERTIFIED** as a DBE eligible to participate in Chicago Transit Authority contracts financed by the U. S. Department of Transportation and other CTA contracts and it will be listed in our directory as follows:

> **RENTAL & SERVICE OF CONSTRUCTION EQUIPMENT (CREDIT: 100%)**
> **CONSTRUCTION EQUIPMENT SALES (CREDIT: 60%)**
> **(773) 847-7255**

The DBE certification of your firm is valid for three (3) years from the date of this letter and will be reviewed on an annual basis to determine if any changes have occurred in the firm's circumstances impacting continued eligibility. It is the obligation of your firm to submit a *No Change Affidavit* prior to your next anniversary date of certification. Additionally, it is your obligation to promptly notify CTA's DBE/EEO Programs/Contract Compliance Department when any changes occur in the firm's circumstances affecting its ability to meet size, disadvantaged status, ownership, and/or control requirements for eligibility.

Should you have any questions, please don't hesitate to contact me or any member of my staff. We look forward to a mutually successful relationship with your company.

Sincerely,

Pamela Ø. Beavers
General Manager
DBE/EEO Programs/Contract
Compliance Department

xc: DUS

Schedule C:
LETTER OF INTENT FROM DBE

**Sub-Contracting Levels**

_____ 0 % of the dollar value of the DBE's subcontract will be sublet to non-DBE contractors.

_____ 0 % of the dollar value of the DBE's subcontract will be sublet to DBE contractors.

**NOTICE: IF DBE WILL NOT BE SUB-SUBCONTRACTING ANY OF THE WORK DESCRIBED IN THIS SCHEDULE, A ZERO (0) MUST BE SHOWN IN EACH BLANK ABOVE.**

**NOTICE: IF MORE THAN TEN PERCENT (10%) OF THE VALUE OF THE DBE's SCOPE OF WORK WILL BE SUBLET, A BRIEF EXPLANATION AND DESCRIPTION OF THE WORK TO BE SUBLET MUST BE ATTACHED TO THIS SCHEDULE.**

The undersigned will enter into a formal written agreement for the above work with you as a Prime Contractor, conditioned upon your execution of a contract with the Chicago Transit Authority, and will do so within (5) five working days of your receipt of a signed contract from the Chicago Transit Authority.

**NOTICE: THIS SCHEDULE (AND ACCOMPANYING ATTACHMENTS TO BE SUBMITTED IN TRIPLICATE. ORIGINAL SIGNATURES REQUIRED ON ALL THREE (3) COPIES.**

_Lisa Donegan_
(Signature of Owner, President or Authorized Agent of DBE)

_Lisa Donegan / Office Mgr._
Name/Title (Print)

_6.19.02_
Date

_(773) 847.7255_
Phone

**If proposing to perform as a DBE/non-DBE Joint Venture:**

_____
(Signature of Owner, President or Authorized Agent of non-DBE)

_____
Name/Title (Print)

_____
Date

_____
Phone

cta  715.04 (rev. 11/29) DBE Program and Contract Compliance                (back)

Schedule C:
## LETTER OF INTENT FROM DBE TO PERFORM AS
## SUBCONTRACTOR, SUPPLIER AND/OR CONSULTANT
*Bidder's or Proposer's failure to submit this form with their bid*
*will result in their bid being rejected in its entirety*

Name of Project/Contract: Heavy Equipment Rental

Requisition No.: B02OP00503

Job Order No.: None

From: Will-Rent Inc
(Name of DBE Firm)

To: Chicago Bulk Carriers Inc and the Chicago Transit Authority
(Name of Prime Contractor)

The DBE status of the undersigned is confirmed by the attached Letter of Certification from the Chicago Transit Authority dated 9/01 . (If proposing to perform as a DBE/non-DBE Joint Venture, then Letter of Certification from DBE venturer is attached along with completed Schedule B and joint venture agreement)

The undersigned is prepared to provide the following described services or supply the following described goods in connection with the above named project/contract:

| Pay Item No./Description | Quantity/Unit Price | Total |
|---|---|---|
| Rental of skid steers, loader backhoes + attachments, or any type of equipment to meet the required goal | | $385,500.00 |

Sub (or Grand) Total: $ 385,500.00

**Partial Pay Items.** (For any of the above items that are partial pay items, specifically describe the work and subcontract dollar amount):

Grand Total: $

*If more space is needed to fully describe the DBE firm's (or DBE/non-DBE joint venture's) proposed scope of work and/or payment schedule, attach additional sheets.*

cta 715.04 (rev 11/99) DBE Program and Contract Compliance

08/18/02  14:15 FAX 773 847 1407          WILL RENT                              ☑002

**DBE UTILIZATION PLAN**

*Bidder's or Proposer's failure to submit this form with their bid*
*will result in their bid being rejected in its entirety.*

Project Name: _____

Requisition No.: BD2DP00503

Job Order No.: None

State of ILLINOIS

County (City) of COOK

In connection with the above captioned contract, I HEREBY DECLARE AND AFFIRM that I am the

PRESIDENT _____ and duly authorized representative of
(Title of Affiant)

Chicago Bulk CARRIERS Inc.
(Name of Prime Contractor)

and that I have personally reviewed the material and facts set forth in and submitted with the attached Schedules of
Disadvantaged Business Enterprises (DBE), Schedule Cs and Schedule Bs (if applicable), being such information.

| Names of DBE Firm(s) | Type of Work to be Performed (In accordance with Schedule Cs) | Contract Amount |
|---|---|---|
| Will-Rent Inc | Rental of Skid Steers, Loaders | $ 385,500 |
| Will-Rent Inc | Backhoe and attachments, or | $ 385,500.00 |
| | any type of equipment to | $ |
| | meet the required goal | Total DBE Credit: $ 385,500.00 |

**AFFIDAVIT OF PRIME CONTRACTOR**

To the best of my knowledge, information and belief the facts and representations contained in the afformentioned attach-
ed Schedules are true, and no material facts have been omitted.

The undersigned will enter into formal agreements with all listed DBE firms for work as indicated by this Schedule D and
accompanying Schedules, and will enter into such agreements within five (5) business days after receipt of the contract
executed by the Chicago Transit Authority.

The Prime contractor designated the following person as their DBE Liaison Officer:

Michael FeRRO                           773-650-9000
(Name - Please Print or Type)                    (Phone)

I do solemnly declare and affirm under penalties of perjury that the contents of the foregoing document are true and cor-
rect, and that I am authorized on behalf of the Prime Contractor to make this affidavit.

Chicago Bulk CARRIERS Inc
(Name of Prime Contractor - Print or Type)

Michael Ferro
(Signature)

Michael FeRRO
(Name of Affiant)

6-25-02
(Date)

cta  715.03 (rev  11/99) DBE Program and Contract Compliance

* mike needs to sign this instrument

**RECEIVED**

Schedule D:
## DBE UTILIZATION PLAN
*Bidder's or Proposer's failure to submit this form with their bid
will result in their bid being rejected in its entirety.*

Project Name: Heavy Equipment Rental

Requisition No.: B020 POD 503

Job Order No.: None

State of Illinois

County (City) of Cook

In connection with the above captioned contract, I HEREBY DECLARE AND AFFIRM that I am the

President
(Title of Affiant)

and duly authorized representative of

Chicago Bulk Carriers Inc
(Name of Prime Contractor)

and that I have personally reviewed the material and facts set forth in and submitted with the attached Schedules of Disadvantaged Business Enterprises (DBE), Schedule Cs and Schedule Bs (if applicable), being such information.

| Names of DBE Firm(s) | Type of Work to be Performed (In accordance with Schedule Cs) | Contract Amount |
|---|---|---|
| Will-Rent Inc | Rental of Equipment as listed on Attached Sheet | $385,500.00 |
| West Fuels Inc | supply -deliver fuel - and any type of oils -see Attached | $48,000.00 |
| West Fuels listed | $80,000.00 of which 60% Counts | $ |

Total DBE Credit: $433,500.00

## AFFIDAVIT OF PRIME CONTRACTOR

To the best of my knowledge, information and belief the facts and representations contained in the afformentioned attached Schedules are true, and no material facts have been omitted.

The undersigned will enter into formal agreements with all listed DBE firms for work as indicated by this Schedule D and accompanying Schedules, and will enter into such agreements within five (5) business days after receipt of the contract executed by the Chicago Transit Authority.

The Prime contractor designated the following person as their DBE Liaison Officer:

Michael Ferro
(Name - Please Print or Type)

773-650-9000
(Phone)

I do solemnly declare and affirm under penalties of perjury that the contents of the foregoing document are true and correct, and that I am authorized on behalf of the Prime Contractor to make this affidavit.

Chicago Bulk Carriers Inc
(Name of Prime Contractor - Print or Type)

Michael Ferro
(Signature)

Michael Ferro
(Name of Affiant)

6-25-02
(Date)

cta 715.03 (rev. 11/89) DBE Program and Contract Compliance

06/13/2002  07:54   7084880091                WEST FUELS                           PAGE  02

Schedule C:
**LETTER OF INTENT FROM DBE TO PERFORM AS
SUBCONTRACTOR, SUPPLIER AND/OR CONSULTANT**
        *Bidder's or Proposer's failure to submit this form with their bid
          will result in their bid being rejected in its entirety*

Name of Project/Contract: Heavy Equipment Rental

Requisition No.: B020 P00503

Job Order No.: NONE

From: WEST Fuels Inc
            (Name of DBE Firm)

To: Chicago Bulk Carrier Inc   and the Chicago Transit Authority
       (Name of Prime Contractor)

The DBE status of the undersigned is confirmed by the attached Letter of Certification from the Chicago Transit Authority
dated 4/29/02 . (If proposing to perform as a DBE/non-DBE Joint Venture, then Letter of Certification from
DBE venturer is attached along with completed Schedule B and joint venture agreement)

The undersigned is prepared to provide the following described services or supply the following described goods in con-
nection with the above named project/contract:

| Pay Item No./Description | Quantity/Unit Price | Total |
|---|---|---|
| Supply fuel & oil to machines and trks | | -80,000°° |
| as needed for contract for 2 years | | |
| | | |
| | USE - 60% of value | |
| | | |
| | | |
| | | |
| | Sub (or Grand) Total: $ | 48,000°° |

Partial Pay Items. (For any of the above items that are partial pay items, specifically describe the work and subcontract
dollar amount):

_____

_____

_____

_____

_____

                                                    Grand Total: $ 48,000°°

If more space is needed to fully describe the DBE firm's (or DBE/non-DBE joint venture's) proposed scope of work and/or
payment schedule, attach additional sheets.

cta  715 2d Rev. 11/601 DBE Program and Contract Compliance                                    (Front)

RECEIVED
BY         DATE

**Schedule C:**
**LETTER OF INTENT FROM DBE**

**Sub-Contracting Levels**

_____*0*_____ % of the dollar value of the DBE's subcontract will be sublet to non-DBE contractors.

_____*0*_____ % of the dollar value of the DBE's subcontract will be sublet to DBE contractors.

**NOTICE: IF DBE WILL NOT BE SUB-SUBCONTRACTING ANY OF THE WORK DESCRIBED IN THIS SCHEDULE, A ZERO (0) MUST BE SHOWN IN EACH BLANK ABOVE.**

**NOTICE: IF MORE THAN TEN PERCENT (10%) OF THE VALUE OF THE DBE's SCOPE OF WORK WILL BE SUBLET, A BRIEF EXPLANATION AND DESCRIPTION OF THE WORK TO BE SUBLET MUST BE ATTACHED TO THIS SCHEDULE.**

The undersigned will enter into a formal written agreement for the above work with you as a Prime Contractor, conditioned upon your execution of a contract with the Chicago Transit Authority, and will do so within (5) five working days of your receipt of a signed contract from the Chicago Transit Authority.

**NOTICE: THIS SCHEDULE (AND ACCOMPANYING ATTACHMENTS TO BE SUBMITTED IN TRIPLICATE. ORIGINAL SIGNATURES REQUIRED ON ALL THREE (3) COPIES.**

_Deborah Stange_
(Signature of Owner, President or Authorized Agent of DBE)

_Deborah Stange / President_
Name/Title (Print)

_6/19/02_
Date

_708/246-4800_
Phone

**If proposing to perform as a DBE/non-DBE Joint Venture:**

_____
(Signature of Owner, President or Authorized Agent of non-DBE)

_____
Name/Title (Print)

_____
Date

_____
Phone

cta  733.04 (Rev. 11/93) DBE Program and Contract Compliance                    (back)


RECEIV___
BY __ | DATE

06/19/2002  07:54   7084880091                WEST FUELS                          PAGE  05



# Chicago Transit Authority

Merchandise Mart Plaza, P.O. Box 3555
Chicago, Illinois 60654
(312) 664-7200

April 29, 2002

Ms. Deborah L. Stange
West Fuels, Inc. (1837)
7340 W. Harrison
Forest Park, IL  60130

Dear Ms. Stange:

The Chicago Transit Authority's DBE/EEO Programs/Contract Compliance Department has received your application for certification as a Disadvantaged Business Enterprise (DBE). This application was processed in accordance with Department of Transportation Regulation 49 CFR, Part 26.

The result of our review of your submission is that your company is hereby CERTIFIED as a DBE eligible to participate in Chicago Transit Authority contracts financed by the U. S. Department of Transportation and other CTA contracts and it will be listed in our directory as follows:

> SUPPLIER OF DIESEL, GASOLINE. MOTOR OILS
> LUBRICANTS & ANTIFREEZE
> (CREDIT: 60%)
> HAULER OF BULK PETROLEUM PRODUCTS
> (CREDIT: 100%)
> (708) 246-4800

The DBE certification of your firm is valid for three (3) years from the date of this letter and will be reviewed on an annual basis to determine if any changes have occurred in the firm's circumstances impacting continued eligibility. It is the obligation of your firm to submit a *No Change Affidavit* prior to your next anniversary date of certification. Additionally, it is your obligation to promptly notify CTA's DBE/EEO Programs/Contract Compliance Department when any changes occur in the firm's circumstances affecting its ability to meet size, disadvantaged status, ownership, and/or control requirements for eligibility.

Should you have any questions, please don't hesitate to contact me or any member of my staff. We look forward to a mutually successful relationship with your company.

Sincerely,

Pamela J. Beavers
General Manager
DBE/EEO Programs/Contract
Compliance Department

xc: wes



# STANDARD GOVERNMENT REQUIREMENTS
# FOR CONSTRUCTION CONTRACTS

This contract is subject to a financial assistance contracts between the U.S. Department of Transportation (DOT), Urban Mass Transportation Administration (UMTA); the State of Illinois Department of Transportation (IDOT), Division of Public Transportation (DPT); and the Chicago Transit Authority (CTA).

## STANDARD CLAUSES

The following standard clauses are a part of this construction contract and shall be included in each of the Contractor's subcontracts:

**A. CONTRACT CHANGES.** Any proposed change in this construction contract shall be submitted to CTA for its prior written approval.

**B. GOVERNMENT INSPECTIONS.** Representatives of UMTA and DPT shall have access to the site of construction and shall have the right to inspect all project works and inspect and audit all data and records of the Contractor relating to his performance under this contract.

**C. INTEREST OF MEMBERS OF CONGRESS.** No member of, or delegate to, the Illinois General Assembly or the Congress of the United States shall be admitted to any share or part of this contract or to any benefit arising therefrom.

**D. PROHIBITED INTEREST.** "No member, or officer, or employee of Chicago Transit Authority or a local public body with financial interest or control in this contract during his tenure or for one year thereafter shall have any interest, direct or indirect, in this contract or the proceeds thereof."

**E. INELIGIBLE CONTRACTORS.** Contractors are required to certify that they ARE NOT included on the U.S. Comptroller General's Consolidated List of persons or firms currently debarred for violations of various Public Contracts incorporating labor standards provisions.

**F. NONDISCRIMINATION.** During the performance of the contract, the contractor agrees as follows:

1. The contractor will not discriminate against any employee or applicant for employment because of race, religion, color, sex, national origin, ancestry or handicap. The Contractor will examine all job classifications to determine if minority persons or women are underutilized and will take appropriate affirmative action to rectify any such underutilization. If the contractor hires additional employees in order to perform this contract, or any portion hereof, the contractor will determine the availability (in accordance with the Human Rights Commission's Rules and Regulations for Public Contracts) of minorities and women in the area(s) from which it may reasonably recruit and it will hire for each job classification for which employees are hired in such a way that minorities and women are not underutilized. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, religion, color, sex, national origin, ancestry or handicap. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided setting forth the provisions of this nondiscrimination clause.
2. The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment, without regard to race, religion, color, sex, national origin, ancestry or handicap.
3. The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided, advising the said labor union or workers' representatives of the contractor's commitments under this section, 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.
4. The contractor will comply with all provisions of Executive Order 11246 entitled "Equal Employment Opportunity" of September 24, 1965 as amended by Executive Order 11375 and as supplemented in Department of Labor regulations (41CFR Part 60).
5. The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the Urban Mass Transportation Administration and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.
6. In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of the said rules, regulations or orders, this contract may be cancelled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts or federally-assisted construction contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, as amended, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.
7. The contractor will include a citation to 41 C.F.R. § 60-1.4(b)(1) and (c) and the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions shall be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the Urban Mass Transportation Administration may direct as a means of enforcing such provision, including sanctions for noncompliance; provided, however, that in the event a contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the Urban Mass Transportation Administration, the contractor may request the United States to enter into such litigation to protect the interests of the United States.
8. The prime contractor shall on behalf of itself and its subcontractors, submit monthly Manpower Utilization Reports as prescribed by the Department of Labor (OFCCP). This completed report is to be submitted to the Department of Labor (OFCCP) Regional Office by the fifth of the following month. Should the fifth be on a weekend, submission of the report must be received by the Friday prior to the fifth.

**G. ILLINOIS HUMAN RIGHTS ACT - Equal Employment Opportunity.** During the performance of this contract, the contractor agrees as follows:

1. That it will not discriminate against any employee or applicant for employment because of race, color, religion, sex, marital status,national origin or ancestry, age, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service; and further that it will examine all job classifications to determine if minority persons or women are underutilized and will take appropriate affirmative action to rectify any such underutilization.
2. That, if it hires additional employees in order to perform this contract, or any portion hereof, it will determine the availability (in accordance with the Department's Rules and Regulations) of minorities and women in the area(s) from which it may reasonably recruit and it will hire for each job classification for which employees are hired in such a way that minorities and women are not underutilized.
3. That, in all solicitations or advertisements for employees placed by it or on its behalf, it will state that all applicants will be afforded equal opportunity without discrimination because of race, color, religion, sex, marital status, national origin or ancestry, age, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service
4. That it will send to each labor organization or representative of workers with which it has or is bound by a collective bargaining or other agreement or understanding, a notice advising such labor organization or representative of the contractor's obligations under the Illinois Human Rights Act and the Department's Rules and Regulations. If any such labor organization or representative fails or refuses to cooperate with the contractor in its efforts to comply with such Act and Rules and Regulations, the contractor will promptly so notify the department and the contracting agency and will recruit employees from other resources when necessary to fulfill its obligations thereunder.

5. That it will submit reports as required by the Department's Rules and Regulations, furnish all relevant information as may from time to time be requested by the Department or the contracting agency, and in all respects comply with the Illinois Human Rights Act and the Department's Rules and Regulations.

6. That it will permit access to all relevant books, records, accounts and work sites by personnel of the contracting agency and the Department for purposes of investigation to ascertain compliance with the Illinois Human Rights Act and the Department's Rules and Regulations.

7. That it will include verbatim or by reference the provisions of this clause in every subcontract it awards under which any portion of the contract obligations are undertaken or assumed, so that such provisions will be binding upon such subcontractor. In the same manner as with other provisions of this contract, the contractor will be liable for compliance with applicable provisions of this clause by such subcontractors; and further it will promptly notify the contracting agency and the Department in the event of any subcontractor fails or refuses to comply therewith. In addition, the contractor will not utilize any subcontractor declared by the Illinois Human Rights Commission to be ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations.

**J.  STANDARD FEDERAL EQUAL EMPLOYMENT OPPORTUNITY CONSTRUCTION CONTRACT SPECIFICATIONS (EXECUTIVE ORDER 11246):**

1. As used in these specifications:
   (a) "Covered Area" means the geographical area described in the solicitation from which this contract resulted;
   (b) "Director" means Director, Office of Federal Contract Compliance Programs, United States Department of Labor, or any person to whom the Director delegates authority;
   (c) "Employer Identification Number" means the Federal Social Security number used on the Employer's Quarterly Federal Tax Return, U.S. Treasury Department Form 941.
   (d) "Minority" includes:
      (i) BLACK (All persons having origins in any of the Black African racial groups not of Hispanic origin);
      (ii) HISPANIC (All persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin regardless of race);
      (iii) ASIAN AND PACIFIC ISLANDER (All persons having origins in any of the original people of the Far East, Southeast Asia, the Indian Subcontinent or the Pacific Islands); and
      (iv) AMERICAN INDIAN or ALASKAN NATIVE (All persons having origins in any of the original people of North America and maintaining identifiable tribal affiliations through memberships and participation or community identification).

2. Whenever the contractor, or any subcontractor at any tier, subcontracts a portion of the work involving any construction trade, it shall physically include in each subcontract in excess of $10,000 the provisions of these specifications and the notice which contains the applicable goals for minority and female participation and which is set forth in the solicitations from which this contract resulted.

3. If the contractor is participating (pursuant to 41 C.F.R. 60-4.5) in a hometown plan approved by the U.S. Department of Labor in the covered area, either individually or through an association, its affirmative action obligations on all work in the plan area (including goals and timetables) shall be in accordance with that plan for those trades which have unions participating in the plan. Contractors must be able to demonstrate their participation in and compliance with the provisions of any such hometown plan. Each contractor or subcontractor participating in an approved plan is individually required to comply with its obligations under the EEO Clause, and to make a good faith effort to achieve each goal under the plan in each trade in which it has employees. The overall good faith performance by other contractors or subcontractors toward a goal in an approved plan does not excuse any covered contractor's or subcontractor's failure to take good faith efforts to achieve the plan goals and timetables.

4. The contractor shall implement the specific affirmative action standards provided in Paragraphs (7)(a) through (p) of these specifications. The goals set forth in the solicitation from which this contract resulted are expressed as percentages of the total hours of employment and training of minority and female utilization the contractor should reasonably be able to achieve in each construction trade in which it has employees in the covered area. Covered construction contractors performing construction work in geographical areas where they do not have a Federal or Federally assisted construction contract shall apply the minority and female goals established for the geographical area where the work is being performed. Goals are published periodically in the Federal Register in notice form, and such notices may be obtained from any office of Federal Contract Compliance Program office or from Federal Procurement Contracting Officers. The contractor is expected to make substantially uniform progress toward its goal in each craft during the period specified.

5. Neither the provisions of any collective bargaining agreement, nor the failure by a union with whom the contractor has a collective bargaining agreement, to refer either minorities or women shall excuse the contractor's obligations under these specifications, Executive Order 11246, or the regulations promulgated pursuant thereto.

6. In order for the nonworking training hours of apprentices and trainees to be counted in meeting the goals, such apprentices and trainees must be employed by the contractor during the training period, and the contractor must have made a commitment to employ the apprentices and trainees at the completion of their training, subject to the availability of employment opportunities. Trainees must be trained pursuant to training programs approved by the U.S. Department of Labor.

7. The contractor shall take specific affirmative actions to ensure equal employment opportunity. The evaluation of the contractor's compliance with these specifications shall be based upon its effort to achieve maximum results from its actions. The contractor shall document these efforts fully, and shall implement affirmative action steps at least as extensive as the following:
   (a) Ensure and maintain a working environment free of harrassment, intimidation, and coercion at all sites, and in all facilities at which the contractor's employees are assigned to work. The contractor, where possible, will assign two or more women to each construction project. The contractor shall specifically ensure that all foremen, superintendents, and other on-site supervisory personnel are aware of and carry out the contractor's obligation to maintain such a working environment, with specific attention to minority or female individuals working at such sites or in such facilities.
   (b) Establish and maintain a current list of minority and female recruitment sources, provide written notification to minority and female recruitment sources and to community organizations when the contractor or its unions have employment opportunities available, and maintain a record of the organizations' responses.
   (c) Maintain a current file of the names, addresses and telephone numbers of each minority and female off-the-street applicant and minority or female referral from a union, a recruitment source or community organization and of what action was taken with respect to each such individual. If such individual was sent to the union hiring hall for referral and was not referred back to the contractor by the union or, if referred, not employed by the contractor, this shall be documented in the file with the reason therefore, along with whatever additional actions the contractor may have taken.
   (d) Provide immediate written notification to the director when the union or unions with which the contractor has a collective bargaining agreement has not referred to the contractor a minority person or woman sent by the contractor, or when the contractor has other information that the union referral process has impeded the contractor's efforts to meet its obligations.
   (e) Develop on-the-job training opportunities and/or participate in training programs for the area which expressly include minorities and women, including upgrading programs and apprenticeship and trainee programs relevant to the contractor's employment needs, especially those programs funded or approved by the Department of Labor. The contractor shall provide notice of these programs to the sources compiled under (7)(b) above.
   (f) Disseminate the contractor's EEO Policy by providing notice of the policy to unions and training programs and requesting their cooperation in assisting the contractor in meeting its EEO Obligations; by including it in any policy manual and Collective Bargaining Agreement; by publicizing it in the company newspaper, annual report, etc.; by specific review of the policy with all management personnel and with all minority and female employees at least once a year; and by posting the company EEO Policy on bulletin boards accessible to all employees at each location where construction work is performed.
   (g) Review, at least annually, the company's EEO Policy and Affirmative Action Obligations under these specifications with all employees having any responsibility for hiring, assignment, layoff, termination or other employment decisions including specific review of these items with on-site supervisory personnel such as, superintendents, general foremen, etc., prior to the initiation of construction work at any job site. A written record shall be made and maintained identifying the time and place of these meetings, persons attending, subject matter discussed, and disposition of the subject matter

news media, and providing written notification to and discussing the contractor's EEO Policy with other contractors and subcontractors with whom the contractor does or anticipates doing business.

(i) Direct its recruitment efforts, both oral and written, to minority, female and community organizations, to schools with minority and female students and to minority and female recruitment and training organizations serving the contractor's recruitment area and employment needs. Not later than one month prior to the date for the acceptance of applications for apprenticeship or other training by any recruitment source, the contractor shall send written notification to organizations such as the above, describing the openings, screening procedures, and tests to be used in the selection process.

(j) Encourage present minority and female employees to recruit other minority persons and women and, where reasonable, provide after school, summer and vacation employment to minority and female youth both on the site and in other areas of the contractor's workforce.

(k) Validate all tests and other selection requirements where there is an obligation to do so under 41 C.F.R. Part 60-3.

(l) Conduct, at least annually, an inventory and evaluation at least of all minority and female personnel for promotional opportunities and encourage these employees to seek or to prepare for, through appropriate training, etc., such opportunities.

(m) Ensure that seniority practices, job classifications, work assignments and other personnel practices, do not have a discriminatory effect by continually monitoring all personnel and employment related activities to ensure that the EEO Policy and the contractor's obligations under these specifications are being carried out.

(n) Ensure that all facilities and company activities are non-segregated except that separate or single-user toilet and necessary changing facilities shall be provided to assure privacy between the sexes.

(o) Document and maintain a record of all solicitations of offers for subcontracts from minority and female construction contractors and suppliers, including circulation of solicitations to minority and female contractor associations and other business associations.

(p) Conduct a review, at least annually, of all supervisors' adherence to and performance under the contractor's EEO Policies and Affirmative Action Obligations.

8. Contractors are encouraged to participate in voluntary associations which assist in fulfilling one or more of their affirmative action obligations set forth in Paragraphs (7)(a) through (p). The efforts of a contractor association, joint contractor-union, contractor-community, or other similar group of which the contractor is a member and participant, may be asserted as fulfilling any one or more of its obligations under (7)(a) through (p) of these specifications provided that the contractor actively participates in the group, makes every effort to assure that the group has a positive impact on the employment of minorities and women in the industry, ensures that the concrete benefits of the program are reflected in the contractor's minority and female workforce participation, makes a good faith effort to meet its individual goals and timetable, and can provide access to documentation which demonstrates the effectiveness of actions taken on behalf of the contractor. The obligation to comply, however, is the contractor's and failure of such a group to fulfill an obligation shall not be a defense for the contractor's non-compliance.

9. A single goal for minorities and a separate single goal for women have been established. The contractor, however, is required to provide equal employment opportunity and to take affirmative action for all minority groups, both male and female, and all women, both minority and non-minority. Consequently, the contractor may be in violation of the executive order if a particular group is employed in a substantially disparate manner (for example, even though the contractor has achieved its goal for women generally, the contractor may be in violation of the executive order if a specific minority group of women is underutilized).

10. The contractor shall not use the goals and timetables or affirmative action standards to discriminate against any person because of race, color, religion, sex, or national origin.

11. The contractor shall not enter into any subcontract with any person or firm debarred from government contracts pursuant to Executive Order 11246.

12. The contractor shall carry out such sanctions and penalties for violation of these specifications and of the equal opportunity clause, including suspension, termination and cancellation of existing subcontracts as may be imposed or ordered Pursuant to Executive Order 11246, as amended, and its implementing regulations by the Office of Federal Contract Compliance Programs. Any contractor who fails to carry out such sanctions and penalties shall be in violation of these specifications and Executive Order 11246, as amended.

13. The contractor, in fulfilling its obligations under these specifications, so as to achieve maximum results from its efforts to ensure equal employment opportunity. If the contractor fails to comply with the requirements of the Executive Order, the implementing regulations, or these specifications, the director shall proceed in accordance with 41 C.F.R. 60-4.8.

14. The contractor shall designate a responsible official to monitor all employment related activity to ensure that the company EEO Policy is being carried out, to submit reports relating to the provisions hereof as may be required by the government and to keep records. Records shall at least include for each employee the name, address, telephone numbers, construction trade, union affiliation if any, employee identification number when assigned, social security number, race, sex, status (E.G. mechanic, apprentice, trainee, helper, or laborer), dates of changes in status, hours worked per week in the indicated trade, rate of pay, and locations at which the work was performed. Records shall be maintained in an easily understandable and retrievable form; however, to the degree that existing records satisfy this requirement, contractors shall not be required to maintain separate records.

15. Nothing herein provided shall be construed as a limitation upon the application of other laws which establish different standards of compliance or upon the application of requirements for the hiring of local or other area resident (e.g., those under the Public Works Employment Act of 1977 and the Community Development Block Grant Program.)

I.  NOTICE OF REQUIREMENT FOR AFFIRMATIVE ACTION TO ENSURE EQUAL EMPLOYMENT OPPORTUNITY (EXECUTIVE ORDER 11246)

1.  The offerer's or bidder's attention is called to the "Equal Opportunity Clause" and the "Standard Federal Equal Employment Opportunity Construction Contract Specifications" set forth herein.

2.  (a) The goals and timetables for minority and female participation, expressed in percentage terms for the contractor's aggregate workforce in each trade on all construction work in the covered area, are as follows:

1/85 Through And Until Further Notice

| Contractor Must Insert Goals For Current Year | Goals For Minority Participation For Each Trade 19.6% | Goals For Female Participation In Each Trade 6.9% |
|---|---|---|
| These goals are applicable to all contractor's construction work (whether or not it is Federal or Federal Assisted) performed in the covered area. If the contractor performs construction work in a geographical area located outside the covered area, it shall apply the goals established for such geographical area where the work is actually performed. With regard to this second area, the contractor also is subject to the goals for both its Federally involved and non-Federally involved construction. | Goals | Goals |

(b) The contractor's compliance with the Executive Order and the Regulations in 41 C.F.R. Part 60-4 shall be based on its implementation of the equal opportunity clause, specific affirmative action obligations required by the specifications set forth in 41 C.F.R. 60-4.3(a), and its efforts to meet the goals. The hours of minority and female employment and training must be substantially uniform throughout the length of the contract, and in each trade, and the contractor shall make a good faith effort to employ minorities and women evenly on each of its projects. The transfer of minority or female employees or trainees from contractor to contractor or from project to project for the sole purpose of meeting the contractor's goals shall be a violation of the contract, the Executive Order, and the Regulations in 41 C.F.R. Part 60-4. Compliance with the goals will be measured against the total work hours performed.

1515 (rev 01/85)

3. The contractor shall provide notification to the Director of the Office of Federal Contract Compliance Programs within ten (10) working days of award of any construction subcontract in excess of $10,000 at any tier for construction work under the contract resulting from this solicitation. The notification shall list the name, address and telephone number of the subcontractor; employer identification number of the subcontractor; estimated dollar amount of the subcontract; estimated starting and completion dates of the subcontract and the geographical area in which the contract is to be performed.

4. As used in this Notice, and in the contract resulting from this solicitation, the "covered area," is (insert description of the geographical areas where the contract is to be performed, giving the State, County and City, if any).

**J.   PRIME CONTRACTOR PARTICIPATION.** The prime contractor shall perform, on site, with his own staff, work equivalent to at least 25 percent of the total amount of construction work at the site. Only pay items of the construction contract will be used in computing the total amount of construction work at the site. CTA may increase this minimum amount of prime contractor participation, depending upon degree of specialization required to perform this work.

**K.   CONTRACT SECURITY.** The contractor shall furnish a surety bond in a sum equal to the full amount of the contract price to ensure the faithful performance of the contract and for the payment of all persons performing labor and furnishing materials in connection with the contract, and with sureties satisfactory to the Chicago Transit Authority.

**L.   WAGE RATES.** Minimum wages to be paid on this construction project have been established by the U.S. Department of Labor and are shown on sheets attached to this specification. These wage rates must be prominently posted at the construction site.

**M.   LABOR PROVISIONS.** Pursuant to regulations set forth at 29 C.F.R. Part 5, all construction contracts of $2,000 or more shall be subject to the following provisions:

### 1.   MINIMUM WAGES.

(a) All mechanics and laborers employed or working upon the site of work, will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by Regulations issued by the Secretary of Labor under the Copeland Act (29 C.F.R., Part 3), the full amounts due at the time of payment computed at wage rates not less than those contained in the wage determination decision of the Secretary of Labor which wage determination decision is attached hereto and made a part hereof, regardless of any contractual relationship which may be alleged to exist between the contractor and such laborers and mechanics; and the wage determination decision shall be posted by the contractor at the site of the work in a prominent place where it can be easily seen by the workers. For the purpose of this clause, contributions made or costs reasonably anticipated under Section 1(b)(2) of the Davis-Bacon Act, 40 U.S.C. §276a(b)(2), on behalf of laborers of mechanics are considered wages paid to such laborers or mechanics, subject to the Provisions of 29 C.F.R. 5.5(A)(1)(iv). Also for the purpose of this clause, regular contributions made or costs incurred for more than a weekly period under plans, funds, or programs, but covering the particular weekly period, are deemed to be constructively made or incurred during such weekly period.

(b) The contracting officer shall require that any class of laborers or mechanics, including apprentices and trainees, which is not listed in the wage determination and which is to be employed under the contract, shall be classified or reclassified conformably to the wage determination, and a report of the action taken shall be sent by the Department of Transportation (DOT) to the Secretary of Labor. In the event the interested parties cannot agree on the proper classifications or reclassification of a particular class of laborers and mechanics, including apprentices and trainees, to be used, the question, accompanied by the recommendation of the contracting officer, shall be referred to the Secretary of Labor for final determination.

(c) The contracting officer shall require, whenever the minimum wage rate prescribed in the contract for a class of laborers or mechanics includes a fringe benefit which is not expressed as an hourly wage rate and the contractor is obligated to pay a cash equivalent of such a fringe benefit, an hourly cash equivalent thereof to be established. In the event the interested parties cannot agree upon a cash equivalent of the fringe benefit, the question, accompanied by the recommendation of the contracting officer, shall be referred to the Secretary of Labor for determination.

(d) If the contractor does not make payments to a trustee or other third person, he may consider as part of the wages of any laborer or mechanic the amount of any costs reasonably anticipated in providing benefits under a plan or program of a type expressly listed in the Wage Determination Decision of the Secretary of Labor which is a part of this contract. Provided, however, the Secretary of Labor has found, upon the written request of the contractor, that the applicable standards of the Davis-Bacon Act have been met. The Secretary of Labor may require the contractor to set aside in a separate account assets for the meeting of obligations under the plan or program.

### 2.   WITHHOLDING.

UMTA, DPT, or CTA shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld from the contractor under this contract or any other federal contract with the same prime contractor, or any other federally-assisted contract subject to Davis-Bacon prevailing wage requirements, which is held by the same prime contractor, so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics, including apprentices, trainees, and helpers, employed by the contractor or any subcontractor the full amount of wages required by the contract. In the event of failure to pay any laborer or mechanic, including any apprentice, trainee, or helper, employed or working on the site of the work (or under the United States Housing Act of 1937 or under the Housing Act of 1949 in the construction or development of the project), all or part of the wages required by the contract, UMTA, DPT or CTA may, after written notice to the contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds until such violations have ceased.

### 3.   PAYROLLS AND BASIC RECORDS.

(i) Payrolls and basic records relating thereto shall be maintained by the contractor during the course of the work and preserved for a period of three years thereafter for all laborers and mechanics working at the site of the work (or under the United States Housing Act of 1937, or under the Housing Act of 1949, in the construction or development of the project). Such records shall contain the name, address, and social security number of each such worker, his or her correct classification, hourly rates of wages paid (including rates of contributions or costs anticipated for bona fide fringe benefits or cash equivalents thereof of the types described in Section 1(b)(2)(B) of the Davis-Bacon Act), daily and weekly number of hours worked, deductions made and actual wages paid. Whenever the Secretary of Labor has found under 29 CFR §5.5 (a)(1)(iv) that the wages of any laborer or mechanic include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in Section 1(b)(2)(B) of the Davis-Bacon Act, the contractor shall maintain records which show that the commitment to provide such benefits is enforceable, that the plan or program is financially responsible, and that the plan or program has been communicated in writing to the laborers or mechanics affected, and records which show the costs anticipated or the actual cost incurred in providing such benefits. Contractors employing apprentices or trainees under approved programs shall maintain written evidence of the registration of apprenticeship programs and certification of trainee programs, the registration of the apprentices and trainees, and the ratios and wage rates prescribed in the applicable programs.

(ii) A. The contractor shall submit weekly for each week in which any contract work is performed a copy of all payrolls to DOT if DOT is a party to the contract, but if DOT is not such a party, the contractor will submit the payrolls to the CTA for transmission to DOT and DPT. The payrolls submitted shall set out accurately and completely all of the information required to be maintained under §5.5(a)(3)(i) of regulations. 29 CFR part 5. This information may be submitted in any form desired. Optional form WH-347 is available for this purpose and may be purchased from the Superintendent of Documents (federal stock number 029-005-00014-1). U.S. Government Printing Office, Washington, D.C. 20402. The prime contractor is responsible for the submission of copies of payrolls by all subcontractors.

B. Each payroll submitted shall be accompanied by a "Statement of Compliance," signed by the contractor or subcontractor or his or her agent who pays or supervises the payment of the persons employed under the contract and shall certify the following:

1. That the payroll for the payroll period contains the information required to be maintained under §5.5(a)(3)(i) of regulations, 29 CFR part 5 and that such information is correct and complete;

2. That each laborer or mechanic (including each helper, apprentice, and trainee) employed on the contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly, and that no deductions have been made either directly or indirectly from the full wages earned, other than permissible deductions as set forth in regulations, 29 CFR part 3;

3. That each laborer or mechanic has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the contract.

C. The weekly submission of a properly executed certification set forth on the reverse side of option form WH-347 shall satisfy the requirement for submission of the "Statement of Compliance" required by paragraph (a)(3)(ii)(B) of 29 CFR §5.5

D. The falsification of any of the above certifications may subject the contractor or subcontractor to civil or criminal prosecution under section 1001 title 18 and section 231 of title 31 of the United States code.

(iii) The contractor or subcontractor shall make the records required under paragraph (a)(3)(i) of 29 CFR §5.5 available for inspection, copying, or transcription by authorized representatives of DOT, DPT or the Department of Labor, and shall permit such representatives to interview employees during working hours on the job. If the contractor or subcontractor fails to submit the required records or to make them available, the federal agency may, after written notice to the contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds. Furthermore, failure to submit the required records upon request or to make such records available may be grounds for debarment action pursuant to 29 CFR §5.12.

## 4. APPRENTICES AND TRAINEES.

(i) Apprentices: Apprentices will be permitted to work at less than the predetermined rate for the work they performed when they are employed pursuant to and individually registered in a bona fide apprenticeship program registered with the U.S. Department of Labor, Employment and Training Administration, Bureau of Apprenticeship and Training, or with a State Apprenticeship Agency recognized by the Bureau, or if a person is employed in his or her first 90 days of probationary employment as an apprentice in such an apprenticeship program, who is not individually registered in the program, but who has been certified by the Bureau of Apprenticeship and Training or a State Apprenticeship Agency (where appropriate) to be eligible for probationary employment as an apprentice. The allowable ratio of apprentices to journeymen on the job site in any craft classification shall not be greater than the ratio permitted to the contractor as to the entire work force under the registered program. Any worker listed on a payroll at an apprentice wage rate, who is not registered or otherwise employed as stated above, shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any apprentice performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. Where a contractor is performing construction on a project in a locality other than that in which its program is registered, the ratios and wage rates (expressed in percentages of the journeymen's hourly rate) specified in the contractor's or subcontractor's registered program shall be observed. Every apprentice must be paid at not less than the rate specified in the registered program for the apprentice's level of progress, expressed as a percentage of the journeyman's hourly rate specified in the applicable wage determination. Apprentices shall be paid fringe benefits in accordance with the provisions of the apprenticeship program. If the apprenticeship program does not specify fringe benefits, apprentices must be paid the full amount of fringe benefits listed on the wage determination for the applicable classification. If the administrator determines that a different practice prevails for the applicable apprentice classification, fringe benefits shall be paid in accordance with that determination. In the event the Bureau of Apprenticeship and Training or a State Apprenticeship Agency recognized by the bureau, withdraws approval of an apprenticeship program, the contractor will no longer be permitted to utilize apprentices at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

(ii) Trainees: Except as provided in 29 CFR ⁵ 5.16, trainees will not be permitted to work at less than the predetermined rate for the work performed unless they are employed pursuant to and individually registered in a program which has received prior approval, evidenced by formal certification, by the U.S. Department of Labor, Employment and Training Administration. The ratio of trainees to journeymen on the job site shall not be greater than permitted under the plan approved by the Employment and Training Administration. Every trainee must be paid at not less than the rate specified in the approved program for the trainee's level of progress, expressed as a percentage of the journeymen's hourly rate specified in the applicable wage determination. Trainees shall be paid fringe benefits in accordance with the provisions of the trainee program. If the trainee program does not mention fringe benefits, trainees shall be paid the full amount of fringe benefits listed on the wage determination unless the Administrator of the Wage and Hour Division determines that there is an apprenticeship program associated with the corresponding journeyman's wage rate on the wage determination which provides for less than full fringe benefits for apprentices. Any employee listed on the payroll at a trainee rate who is not registered and participating in a training plan approved by the Employment and Training Administration shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any trainee performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. In the event the Employment and Training Administration withdraws approval of a training program, the contractor will no longer be permitted to utilize trainees at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

(iii) Equal Employment Opportunity: The utilization of apprentices, trainees and journeymen under this part shall be in conformity with the equal employment opportunity requirements of Executive Order 11246, as amended, and 29 CFR Part 30.

## 5. COMPLIANCE WITH COPELAND ACT REQUIREMENTS.
The contractor shall comply with the requirements of 29 CFR Part 3, which are incorporated by reference.

## 6. CONTRACT TERMINATION: DEBARMENT.
A breach of contract clauses in 29 CFR §5.5 may be grounds for termination of the contract, and for debarment as a contractor and a subcontractor as provided in 29 CFR §5.12.

## 7. COMPLIANCE WITH DAVIS-BACON AND RELATED ACT REQUIREMENTS.
All rulings and interpretations of the Davis-Bacon and related acts contained in 29 CFR parts 1, 3, and 5 are herein incorporated by reference.

## 8. DISPUTES CONCERNING LABOR STANDARDS.
Disputes arising out of the labor standards provisions of this contract shall not be subject to the general disputes clause of this contract. Such disputes shall be resolved in accordance with the procedures of the Department of Labor set forth in 29 CFR parts 5, 6, and 7. Disputes within the meaning of this clause include disputes between the contractor (or any of its subcontractors) and the contracting agency, the U.S. Department of Labor, or the employees or their representatives.

## 9. CERTIFICATION OF ELIGIBILITY.
(i) By entering into this contract, the contractor certifies that neither it (nor he or she) nor any person or firm who has an interest in the contractor's firm is a person or firm ineligible to be awarded government contracts by virtue of Section 3(a) of the Davis-Bacon Act or 29 CFR §5.12(a)(1)

(ii) No part of this contract shall be subcontracted to any person or firm ineligible for award of a government contract by virtue of Section 3(a) of the Davis-Bacon Act or 29 CFR §§ 12(a)(1)

(iii) The penalty for making false statements is prescribed in the U.S. Criminal Code, 18 U.S.C. §1001

**10. OVERTIME REQUIREMENTS.**

No contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics shall require or permit any laborer or mechanic in any workweek in which he or she is employed on such work to work in excess of forty hours in such workweek unless such laborer or mechanic receives compensation at a rate not less than one and one-half times his basic rate of pay for all hours worked in excess of forty hours in such workweek.

**11. VIOLATION, LIABILITY FOR UNPAID WAGES; LIQUIDATION DAMAGES.**

In the event of any violation of the clause set forth in subparagraph (b)(1) of 29 CFR §5.5. , the contractor and any subcontractor responsible therefor shall be liable for the unpaid wages. In addition, such contractor and subcontractor shall be liable to the United States (in the case of work done under contract for the District of Columbia or a territory, to such District or to such territory), for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic, including watchmen and guards, employed in violation of the clause set forth in subparagraph (b)(1) of 29 CFR §5.5 in the sum of $10 for each calendar day on which such individual was required or permitted to work in excess of eight hours or in excess of the standard workweek of forty hours without payment of the overtime wages required by the clause set forth in subparagraph (b)(1) of 29 CFR §5.5.

**12. WITHHOLDING FOR UNPAID WAGES AND LIQUIDATED DAMAGES.**

DOT, DPT or the CTA upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld, from any moneys payable on account of work performed by the contractor or subcontractor under any such contract or any other federal contract with the same prime contractor, or any other federally-assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same prime contractor, such sums as may be determined to be necessary to satisfy any liabilities of such contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth in subparagraph (b)(2) of 29 CFR §5.5

**13. NONCONSTRUCTION CONTRACTS.**

In addition to the clauses contained in 29 CFR 5.5(b) or paragraphs (10) through (14) herein. In any contract subject only to the Contract Work Hours and Safety Standards Act and not to any of the other statutes cited in 29 CFR §5.1, the recipient shall insert a clause requiring that the contractor or subcontractor shall maintain payrolls and basic payroll records during the course of the work and shall preserve them for a period of three years from the completion of the contract for all laborers and mechanics, including guards and watchmen, working on the contract. Such records shall contain the name and address of each such employee, social security number, correct classifications, hourly rates of wages paid, daily and weekly number of hours worked, deductions made, and actual wages paid. Further, the recipient shall require the contracting officer to insert in any such contract a clause providing that the records to be maintained under this paragraph shall be made available by the contractor or subcontractor for inspection, copying, or transcription by authorized representatives of DOT and the Department of Labor, and the contractor or subcontractor will permit such representatives to interview employees during working hours on the job.

**14. SUBCONTRACTS.**

The contractor or subcontractor shall insert in any subcontracts the clauses set forth in subparagraph (1) through (14) of this paragraph and also a clause requiring the subcontractors to include these clauses in any lower tier subcontracts. The prime contractor shall be responsible for compliance by any subcontractor or lower tier subcontractor with the clauses set forth in subparagraphs (1) through (14) of this paragraph.

**15. FINAL LABOR SUMMARY.**

The contractor and each subcontractor shall furnish to CTA, upon the completion of the contract, a summary of all employment, indicating for the completed project, the total hours worked and the total amount earned.

**16. FINAL CERTIFICATION.**

Upon completion of the contract, the contractor shall submit to CTA with the voucher for final payment for any work performed under the contract a certificate concerning wages and classifications for laborers and mechanics, including apprentices and trainees employed on the project, in the following form:

THE UNDERSIGNED, CONTRACTOR ON

_____

(CONTRACT NO.)

HEREBY CERTIFIES THAT ALL LABORERS. MECHANICS. APPRENTICES. AND TRAINEES EMPLOYED BY HIM OR BY A SUBCONTRACTOR PERFORMING WORK UNDER THE CONTRACT ON THE PROJECT HAVE BEEN PAID WAGES AT RATES NOT LESS THAN THOSE REQUIRED BY THE CONTRACT PROVISIONS, AND THAT THE WORK PERFORMED BY EACH SUCH LABORER. MECHANIC. APPRENTICE OR TRINEE CONFORMED TO THE CLASSIFICATIONS SET FORTH IN THE CONTRACT OR TRAINING PROGRAM PROVISIONS APPLICABLE TO THE WAGE RATE PAID.

SIGNATURE AND TITLE: _____

**E.  CERTIFIED PAYROLLS — CONSTRUCTION PROJECTS.** The CTA shall obtain from each contractor and subcontractor a certified copy of each weekly payroll within seven days after the regular payroll date. Following a review by CTA for compliance with State and Federal labor laws, the payroll copy shall be retained at the project site for later review by UMTA/DPT.

A contractor may use the Department of Labor Form WH-347, "Optional Payroll Form", which provides for all the necessary payroll information certifications. This Department of Labor form may be purchased at nominal cost from the Superintendent of Documents, U.S. Government Printing Office, Washington, D. C. 20402. However, the contractor may use his own payroll form provided it includes the same information and certifications as the Department of Labor Form WH-348, "Statement of Compliance".

**F.  TERMINATION FOR CONVENIENCE OF THE AUTHORITY.** The Authority may at any time terminate the contract by notice in writing to the contractor. On the receipt of such notice, the contractor shall immediately discontinue the work but shall do such extra work as is ordered therein to safeguard the work then completed and the materials and equipment then delivered and do such other extra work as may be ordered by the Authority for the purpose of leaving the work in a safe and useful condition

Forthwith upon the Authority giving such notices of termination, the Authority shall estimate all the work done up to the time of the receipt of such notice and the contractor shall be entitled to and shall receive payment therefor in the manner provided in the contract. In addition thereto, the Authority will pay to

**cta**  E515 (rev. 01/89)

the contractor. In full and complete satisfaction and settlement for the contractor's inconvenience, loss of anticipated profits, cost of removing his equipment from the site and all other expenses whatsoever, 5 percent of the difference between the contract price and the sum of the payments made to the contractor for work done to the date of receipt of the notice of termination. On completion, to the satisfaction of the Authority, of any extra work, the contract shall be deemed to be at an end and of no further force or effect and, except as hereinbefore provided, the Contractor shall have no claim against the Authority for any reason whatsoever by reason of the termination of the contract.

For the purpose of this article, "all of the work done" includes all materials ordered for this contract by the Contractor prior to the date of receipt of such notice of termination, whether or not they have been delivered to the fabrication site. The amount of payment for all such materials under this article shall be their actual necessary cost to the contractor up to the date of receipt of such notice of termination, all the contractor's right, title and interest in and to the materials mentioned in this article shall be vested in the Authority and the contractor shall upon demand of the Authority execute and deliver to the Authority all requisite bills of sale, assignments and other documents of transfer that may be necessary to give effect to the intention of this article.

P.  **SINGLE BID REQUIREMENTS.** In the event a single bid is received, the CTA will conduct a price and/or cost analysis of the bid. A price analysis is the process of examining the bid and evaluating a prospective price without evaluating the separate cost elements. It should be recognized that a price analysis through comparison to other similar procurements must be based on an established or competitive price of the elements used in the comparison. The comparison must be made to a purchase of similar quantity and involving similar specifications. Where a difference exists, a detailed analysis must be made of this difference and costs attached thereto.

Where it is impossible to obtain a valid price analysis, it may be necessary for the CTA to conduct a costs analysis of the bid price. The price and/or cost analysis shall be made by competent and experienced auditors or price analysts, an engineer's estimate or comparison of the prices involved is insufficient.

If the CTA does not have the capabilities to perform the needed analyses, UMTA will lend support in obtaining the services of the Defense Contract Audit Agency.

The CTA shall submit to UMTA all data and analyses of the determination prior to award of the contract.

Q.  **WARRANTY OF CONSTRUCTION.** Refer to the Contract Documents for Warranty requirements.

R.  **LIQUIDATED DAMAGES.** Refer to the Contract Documents for Liquidated Damages requirements.

S.  **ENVIRONMENTAL AND ENERGY PROTECTION AND CONSERVATION REQUIREMENTS.** The facilities and equipment will meet the criteria for air and water pollution control and energy conservation as follows:

"All facilities and equipment acquired, constructed, reconstructed, or improved using UMTA and DPT grant funds, shall be designed and equipped to prevent or control air and water pollution in accordance with criteria issued by the Department of Health, Education and Welfare. However, in those locations where State or local air and water pollution regulations are in force, the more restrictive criteria shall govern."

"All contractors and suppliers must submit evidence to the CTA that the governing air and water pollution criteria will be met. This evidence and related documents will be retained by the sponsor for on-site examination by UMTA or DPT representatives."

"All contractors and suppliers shall recognize mandatory standards and policies relating to energy efficiency which are contained in the State energy conservation plan issued in compliance with the Energy Policy and Conservation Act (42 U.S.C. § 6321 et seq.)."

T.  **PROJECT SIGN.** The contractor shall erect and maintain signs, satisfactory to UMTA and DPT identifying the project and indicating Federal and State participation.

Form 715.46 replaces Section "U".
See Table of Contents to locate Form 715.46.

**V.    CONTRACT WORK HOURS AND SAFETY STANDARDS ACT.** It is a condition of this contract, and shall be made a condition of each subcontract entered into pursuant to this contract, that the contractor and any subcontractor shall comply with sections 103 and 107 of the Contract Work Hours and Safety Standards Act (40 USC 327-330) as supplemented by Department of Labor regulations (29 CFR Part 5), which are herein incorporated by reference.

**W.    CARGO PREFERENCE—USE OF UNITED STATES—FLAG VESSELS.** The contractor agrees:
1.  To utilize privately owned United States-flag commercial vessels to ship at least 50 percent of the gross tonnage (computed separately for dry bulk carriers, dry cargo liners, and tankers) involved, whenever shipping any equipment, materials or commodities pursuant to this contract, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels.
2.  To furnish within 20 days following the date of loading for shipments originating within the United States, or within 30 working days following the date of loading for shipments originating outside the United States, a legible copy of a rated, "on-board" commercial ocean bill-of-landing in English for each shipment of cargo described in paragraph (1) above to the CTA (through the prime contractor in the case of subcontractor bills-of-lading) and to the Division of National Cargo, Office of Market Development, Maritime Administration, 400 Seventh Street, S.W., Washington, D.C. 20590, marked with appropriate identification of the Project.

**X.    PATENT RIGHTS.**
1.  In all third party contracts at any tier with any small business firm, non-profit organization, or university, the patent rights clause of Office of Management and Budget (OMB) Circular A-124, Attachment A, dated February 10, 1982, (implementing the Patent and Trademark Amendments of 1980, 35 U.S.C. §200 et seq.) will be applicable, when the purpose of its participation is to perform experimental, development, or research work.
2.  In third party contracts at any tier with any other party (except a small business firm, non-profit organization, or university), the Recipient shall acquire for the Government those rights that would be due to the Government as set forth in the Patent Rights clause - Acquisition by the Government, at 41 C.F.R. 1-9.107-5(a).
3.  Any deviations from the requirement of this section V must be approved in writing by the Secretary or, if appropriate, by his designee.

08CV4079
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE ASHMAN
RCC

# EXHIBIT C - PART 2

The Contractor is also required to comply with the following clauses required by the U.S. Department of Transportation Federal Transit Administration as applicable:

1. Seismic Safety Requirements - The Contractor agrees that any new building or addition to an existing building will be designed and constructed in accordance with the standards for Seismic Safety required in Department of Transportation Seismic Safety Regulations 49 CFR Part 41 and will certify to compliance to the extent required by regulation. The Contractor also agrees to ensure that all work performed under this contract including work performed by a subcontractor is in compliance with the standards required by the Seismic Safety Regulations and the certification of compliance issued on the project.

2. Recycled Products - The Contractor agrees to comply with all the requirements of Section 6002 of the Resource Conservation and Recovery Act (RCRA), as amended (42 U.S.C. 6962), including but not limited to the regulatory provisions of 40 CFR Part 247, and Executive Order 12873, as they apply to the procurement of the items designated in Subpart B of 40 CFR Part 247.

3. No Obligation by the Federal Government -The Contractor acknowledges and agrees that, notwithstanding any concurrence by the Federal Government in or approval of the solicitation or award of the underlying contract, absent the express written consent by the Federal Government, the Federal Government is not a party to this contract and shall not be subject to any obligations or liabilities to the Contractor, or any other party pertaining to any matter resulting from the underlying contract.

4. Privacy Act - The following requirements apply to a Contractor and its employees that administer any system of records on behalf of the Federal Government under any contract.

   A) The Contractor agrees to comply with, and assure the compliance of its employees with, the information restrictions and other applicable requirements of the Privacy Act of 1974. 5 USC subsection 552a. The Contractor agrees to obtain the express consent of the Federal Government before the Contractor or its employees operate a system of records on behalf of the Federal Government. The Contractor understands that the requirements of the Privacy Act, including the civil and criminal penalties for violation of that Act, apply to those individuals involved, and that failure to comply with the terms of the Privacy Act may result in termination of the underlying contract.

   B) The Contractor also agrees to include these requirements in each subcontract to administer any system of records on behalf of the Federal Government financed in whole or in part with FTA funding.

5. Access to Records and Reports - The following access to records requirement apply to this Contract.

   A) The Contractor agrees to provide the Authority, the FTA Administrator, the Comptroller General of the United States or any other authorized representatives access to any books, documents, papers and records of the Contractor which are directly pertinent to this Contract for the purposes of making audits, examination, excerpts and transcriptions. Contractor also agrees, pursuant to 49C.F.R. 633.17 to provide the FTA Administrator or his authorized representatives access to Contractor's records and construction sites pertaining to a major capital project, defined at 49U.S.C. 5302(a)1, which is receiving federal financial assistance through the programs described at 49U.S.C. 5307, 5309 or 5311. By definition, a major capital project excludes contracts of less than the simplified acquisition threshold currently set at $100,000.

   B) For any contract for a capital project or improvement entered into which was not the result of competitive bidding, the Contractor shall make available records related to the Contract to the Authority, the FTA and the Comptroller General or any authorized officer or employee of any of them for the purposes of conducting an audit and inspection.

GR-10a

C) The Contractor agrees to permit the authorized representatives to reproduce by any means whatsoever or to copy excerpts and transcriptions as reasonable needed.

D) The Contractor agrees to maintain all books, records, accounts and reports required under this contract, except in the event of litigation or settlement of claims arising from the performance of this contract, in which case Contractor agrees to maintain same under the Authority, the FTA Administrator, the Comptroller General, or any of their dully authorized representatives, have disposed of all such litigation, appeals, claims or exceptions related thereto.

6.  Fraud and False or Fraudulent Statements or Related Acts - The Contractor acknowledges that the provisions of the Program Fraud Civil Remedies Act of 1986, as amended, 31 U.S.C. subsection 3801 et seq and U.S. Department of Transportation and FTA regulations, "Program Fraud Civil Remedies", 49 C.F.R. Part 31, apply to its actions pertaining to this Contract.

By submitting a proposal and execution of the Contract, the Contractor certifies or affirms the truthfulness and accuracy of any statement it has made, it makes, it may make, or causes to be made, pertaining to the Contract Documents.   In addition to other penalties that may be applicable the Contractor further acknowledges that if it makes, or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification, the Federal Government reserves the right to impose the penalties of the Program Fraud Civil Remedies Act of 1986 on the Contractor.  The Contractor also acknowledges that it makes, or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification to the Federal Government under a contract connected with a project that is financed in whole or in part with Federal assistance originally awarded by FTA under the authority of 49 U.S.C. subsection 5307, the Government reserves the right to impose the penalties of 18 U.S.C. subsection 5307, the Government reserves the right to impose the penalties of 18 U.S.C. subsection 1001 and 49 U.S.C. subsection 5307(n)(1) on the Contractor, to the extent the Federal Government deems appropriate.  The Contractor agrees to include the above language in each subcontract without modification, except to identify the subcontractor who will be subject to the provisions.

7.  Incorporation of Federal Transit Administration (FTA) Terms - The provisions in this "Standard Government Requirements for Construction Contract" exhibit include, in part, certain Standard Terms and Conditions required by FTA, whether or not expressly set forth in the preceding contract provisions.  All contractual provisions required by FTA, as set forth in FTA Circular 4220.1D, dated April 15, 1996, are hereby incorporated by reference.  The Contractor shall not perform any act, fail to perform any act, or refuse to comply with any Authority requests which would cause the Authority to be in violation of FTA terms and conditions.

8.  Clean Air - (1) The Contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. (7401et seq.).  The Contractor agrees to report each violation to the Purchaser and understands and agrees that the Purchaser will, in turn, report each violation as required notification to FTA and the appropriate EPA Regional Office.  (2) The Contractor also agrees to include these requirements in each subcontract exceeding $100,000 financed in whole or in part with Federal assistance provided by FTA.

9.      Federal Changes - Contractor shall at all times comply with all applicable FTA regulations, policies, procedures and directives, including without limitation those listed directly or by reference in the Agreement (Form FTA MA (4) dated October 1, 1997) between Purchaser and FTA, as they may be amended or promulgated from time to time during the term of this contract.  Contractor's failure to so comply shall constitute a material breach of this contract.

## BID PROTEST PROCEDURES

**SECTION I - AUTHORITY BID PROTEST PROCEDURE**

A. The Chicago Transit Authority (CTA/ Authority) will hear and consider a bona fide bid protest regarding its procurement actions. It is anticipated that the majority of protests will be evaluated and finally decided by the Authority. Accordingly, the Authority intends to provide a thorough review of all bona fide bid protests. The Authority's primary concern, however, is the timely procurement of needed capital equipment, supplies or services. It does not intend to allow the filing of bid protests to unnecessarily delay the procurement process, especially if the protest involved is vexatious or frivolous in nature.

Notwithstanding the availability of these protest procedures, any interested party is encouraged to exhaust all methods described in the Contract Documents of resolving a procurement issue before filing a formal protest with the Authority. In its consideration of a bid protest, the Authority reserves the right to give due consideration to the good faith efforts of the protestor to resolve the issue involved through informal methods.

*Note - The Federal Transit Administration (FTA) will be notified by the Authority of all formal, written protests, when FTA funds are involved.*

B. **Definitions**  For purposes of this section -
  1. The term "days" refers to working days of the Authority.
  2. The term "interested party" means any person (a) who is an actual bidder or prospective bidder in the procurement involved, and (b) whose direct economic interest would be affected by the award of the contract or by a failure to award the contract.

C. **Submission of Protests**
Any interested party may file a bid protest with the Authority on the basis that the Authority has failed to comply with applicable Federal or State law or with the Authority's Procurement Regulations. The protest must be filed in accordance with the timing requirements set forth in subsection D of this section, and must include:
  1. The name and address of the protestor;
  2. The number of the contract solicitation;
  3. A statement of the grounds for the protest, and in particular the Federal or State law or Authority Regulation alleged to have been violated. This statement should be accompanied by any supporting documentation the protesting party desires the Authority to consider in making its decision.

Protests should be submitted to:       General Manager, Purchasing
                                        Chicago Transit Authority
                                        Merchandise Mart Plaza, Room 700
                                        Chicago, IL 60654

D. **Types of Protests and Timing**
The requirement for timely filing of a bid protest with the Authority will depend upon the type of protests involved. The Authority will consider the following three types of protests by interested parties:

  1. **Protests regarding solicitation**
  Any bid protest regarding the solicitation by the Authority must be filed **no later than five (5) days before the opening of bids**. Any protest filed after that date which raises issues regarding the solicitation will not be considered by the Authority.

  This type of protest would include any claim that the bid solicitation contained exclusionary or discriminatory specifications, any challenge to the basis of award, or any claim that the solicitation documents or the solicitation process violated applicable Federal or State law, or that the Authority failed to follow its Procurement Regulations in the solicitation of bids.

**2. Protests regarding bid evaluation**

Any bid protest regarding the evaluation of bids by the Authority must be filed with the Authority <u>no later than twenty (20) days after the opening of bids</u>. Any protest filed after such date which raises issues regarding the bid evaluation will not be considered by the Authority.

This type of protest would include any challenge to determinations by the Authority of the responsiveness of a bid or the responsibility of a bidder, or any claim that the evaluation of bids violated Federal or State law or the Authority's Procurement Regulations.

**3. Protests Regarding Award of Contract**

Any protest regarding the award of the contract must be filed <u>no later than ten (10) days after the date of award.</u> Any protest regarding the award of the contract filed after that date will not be considered by the Authority.

This type of protest will only be entertained by the Authority if the protestor is able to demonstrate that the party awarded the contract fraudulently represented itself as a responsible bidder or that the Authority violated Federal or State law or its Procurement Regulations in the award of the contract.

**E. Authority Response**

**1. Types of Protests**

The Authority will notify the protestor upon timely receipt of a bid protest and may, where appropriate, request additional information from the protestor. The Authority may, at its discretion, meet with the protestor to review the matters raised by the protest. The Authority's consideration of the particular types of protests will, except as otherwise provided in Paragraph 2 of this subsection, be in accordance with the following provisions:

**a. Protests regarding solicitation**

Upon receipt of a timely filed protest regarding the solicitation, the Authority will postpone the opening of bids until resolution of the protest. No additional bids will be accepted during the period of postponement.

If the protest regarding the solicitation involves a claim of unduly restrictive or exclusionary specifications, the Authority will, in evaluating the protest, consider both the specific need of the Authority for the feature or item challenged and any effects on competition of including the specification regarding that feature or item. If the Authority determines that such feature or item was included in the specification in order to meet justified and valid transit needs of the Authority, and was not unduly restrictive of competition or designed to exclude a particular competitor, then the Authority will have grounds to deny the protest.

**b. Protests regarding bid evaluation**

Upon receipt of a timely filed protest regarding the evaluation of bids, the Authority will suspend its evaluation of all bids submitted until resolution of the protest if the Authority determines that the protestor has established that there are reasonable doubts regarding the responsiveness of a bid or the responsibility of a bidder or regarding the Authority's compliance with Federal or State law or its Procurement Regulations.

**c. Protests after award**

Upon receipt of a timely filed protest regarding the award of a contract, the Authority will issue a stop work order, if necessary, until the resolution of the protest if the Authority determines that the protestor has established a **Prima facie** case that the contract was awarded fraudulently or in violation of that Federal or State law or the Authority's Procurement Regulations.

**2. Decisions by Authority**

As indicated above, in most instances the Authority will suspend the procurement process upon receipt of a bona fide bid protest. However, the Authority reserves the right, notwithstanding the pendency of a protest, to proceed with the appropriate action in the procurement process or under the contract in the following cases:

> a. where the item to be procured is urgently required;
> b. where the Authority determines that the protest was vexatious or frivolous; and
> c. where delivery or performance will be unduly delayed, or other undue harm will occur, by failure to make the award promptly.

After review of a bid protest submitted under this section, the Authority will issue a written decision on the basis of the information provided by the protestor, the results of any meetings with the protestor, and the Authority's own investigation. If the protest is upheld, the Authority will take appropriate action to correct the procurement process and protect the rights of the protestor, including resolicitation of bids, revised evaluation of bids or Authority determinations, or termination of the contract. If the protest is denied, the Authority will lift any suspension imposed and proceed with the procurement process or the contract, as the case may be.

The availability of review of bid protests by FTA is described in Section II. As noted in that section, under FTA's revised procurement guidelines the role of the Federal government in bid protest review is quite limited.

## SECTION II - FTA BID PROTEST PROCEDURE

Under FTA Circular 4220.1D, *reviews of protests by FTA will be limited to claims that the CTA failed to have or follow protest procedures, or claims that CTA failed to review a complaint or protest. A protester must exhaust all administrative remedies with the CTA before pursuing a protest with FTA. An appeal to FTA must be received by the cognizant FTA regional or Headquarters Office within five (5) working days of the date the protester knew or should have known of the violation.*

*Violations of Federal law or regulation will be handled by the complaint process stated within that law or regulation. Violations of State or local law or regulations will be under the jurisdiction of State or local authorities.*

GENERAL DECISION IL020009 04/26/2002 IL9

Date: April 26, 2002
General Decision Number IL020009

  Superseded General Decision No. IL010009

  State: **Illinois**

  Construction Type:
  BUILDING
  HEAVY
  **HIGHWAY**
  RESIDENTIAL

  County(ies):
  COOK

  BUILDING, RESIDENTIAL, HEAVY, AND **HIGHWAY** PROJECTS (does not
  include landscape projects).

  | Modification Number | Publication Date |
  |---------------------|------------------|
  | 0                   | 03/01/2002       |
  | 1                   | 03/08/2002       |
  | 2                   | 04/26/2002       |

  COUNTY(ies):
  COOK

  ASBE0017A  06/01/2001
  |                                                  | Rates | Fringes |
  |--------------------------------------------------|-------|---------|
  | INSULATORS/ASBESTOS WORKERS                      |       |         |
  |  Includes the application of all                 |       |         |
  |  insulating materials, protective                |       |         |
  |  coverings, coatings, and finishes               |       |         |
  |  to all types of mechanical systems              | 29.05 | 12.96   |
  | HAZARDOUS MATERIAL HANDLERS                      |       |         |
  |  Includes preparation, wetting,                  |       |         |
  |  stripping, removal, scrapping                   |       |         |
  |  vacuuming, bagging and disposing                |       |         |
  |  of all insulation materials from                |       |         |
  |  mechanical systems, whether they                |       |         |
  |  contain asbestos or not                         | 20.20 | 9.02    |

----------------------------------------------------------

  BOIL0001A  07/01/2001
  |             | Rates | Fringes  |
  |-------------|-------|----------|
  | BOILERMAKERS | 33.19 | 4.65+14% |

----------------------------------------------------------

  BRIL0021A  06/01/2001
  |                          | Rates | Fringes |
  |--------------------------|-------|---------|
  | BUILDING CONSTRUCTION:   |       |         |
  | BRICKLAYERS              | 29.30 | 9.19    |
  | RESIDENTIAL CONSTRUCTION: |      |         |
  | BRICKLAYERS              | 26.78 | 7.36    |

```
-----------------------------------------------------------------
```

BRIL0052A  06/01/2001

|  | Rates | Fringes |
|---|---|---|
| POINTERS, CLEANERS & CAULKERS | 29.65 | 8.41 |

```
-----------------------------------------------------------------
```

CARP0555A  06/01/2001

|  | Rates | Fringes |
|---|---|---|
| CARPENTERS, LATHERS, MLLWRIGHTS, PILEDRIVERMEN, & SOFT FLOOR LAYERS | 30.47 | 8.21 |

```
-----------------------------------------------------------------
```

CARP0555B  10/01/2001

| | Rates | Fringes |
|---|---|---|
| RESIDENTIAL: | | |
| CARPENTERS (Excluding structures with elevators and structures over 3 1/2 stories) | 30.22 | 8.20 |

```
-----------------------------------------------------------------
```

ELEC0009D  05/29/2001

| | Rates | Fringes |
|---|---|---|
| LINE CONSTRUCTION: | | |
| Lineman | 31.30 | 37.21% |
| Equipment Operator | 31.30 | 37.21% |
| Groundman | 24.41 | 37.21% |

```
-----------------------------------------------------------------
```

ELEC0134A  06/05/2000

| | Rates | Fringes |
|---|---|---|
| BUILDING CONSTRUCTION: | | |
| ELECTRICIANS | 30.50 | 12.59+3% |
| RESIDENTIAL CONSTRUCTION: | | |
| ELECTRICIANS | 30.50 | 12.54+3% |

```
-----------------------------------------------------------------
```

ELEC0134B  04/01/1998

| | Rates | Fringes |
|---|---|---|
| ELECTRICIANS  (CLASS B) (Install magnetic or electronic replacement ballasts either singly or in groups including necessary wiring within fixture; Install replacement lamp holders and/or sockets including necessary wiring within fixture including relocating sockets within fixture; Install replacement lighting circuit breakers where necessary; Install replacement lighting switches where necessary; Repair lighting fixtures other than ballast or socket replacements; Rewire chandeliers or incandescent fixtures only within fixtures themselves. | 20.71 | 2.975+a+b |

ELECTRICIANS (CLASS C) (Washing of lighting fixtures
 including florescent, incandescent or chandeliers;
 Replace lamps whether individually or in groups;
 Disassemble fixtures to be retrofitted by "B"
 lighting technician; Install non-electrical specular
 reflectors; Reassemble completed washed or retrofitted
 fixtures; Wash lens or louvers in tanks or

```
machines                        20.21          2.975+a+b
```

FOOTNOTES:
  a-Paid Vacation- Employees who have been employed for one
year but less than three years receive 1 week of paid
vacation; employees who have been employed three years
but less than ten years receive 2 weeks of paid vacation;
Employees who have been employed ten years but less than

twenty years receive 3 weeks of paid vacation; and employees
who have worked twenty or more years receive 4 weeks of
paid vacation.
  b-Funeral Leave-In the instance of the death of a mother,
mother-in-law-; father, father-in-law, sister, brother,
husband, wife, or a child of an employee shall receive
up to three days of paid funeral leave.
----------------------------------------------------------------

```
ELEC0134C  01/01/1997
                                Rates          Fringes
ELECTRICAL TECHNICIAN           22.55          5.28+13%
```

The work shall consist of the installation, operation,
inspection, maintenance, repair and service of radio,
television, recording, voice sound vision production and
reproduction, telephone and telephone interconnect, facsimile,
data appatatus, coaxial, fibre optic and wireless equipment,
appliances and systems used for the transmission and reception of
signals of any nature, business, domestic, commercial, education,
entertainment and residential purposes, including but not limited
to communication and telephone, electronic and sound equipment,
fibre optic and data communication systems, and the performance
of any task directly related to such installation or service
whether at new or existing sites, such tasks to include the
placing of wire and cable and electrical power conduit or other
raceway work within the equipment room and pulling wire and/or
cable through conduit and the installation of any incidential
conduit.
----------------------------------------------------------------

```
ELEV0002C  07/03/2000
                                Rates          Fringes
ELEVATOR MECHANICS              32,695         6.935+A+B
```

FOOTNOTES:
  A. Seven paid holidays: New Year's Day; Memorial Day;
     Independence Day; Labor Day; Thanksgiving Day; Day after
     Thanksgiving; and Christmas Day.
  B. Employer contributes 8% of regular basic hourly rate as
     vacation pay credit for employees with more than 5 years of
     service; and 6% for 6 months to 5 years of service.
----------------------------------------------------------------

```
ENGI0150F  06/01/2001
                                Rates          Fringes
BUILDING & RESIDENTIAL:

POWER EQUIPMENT OPERATORS
   GROUP  1                     32.05          11.20
   GROUP  2                     30.75          11.20
   GROUP  3                     28.20          11.20
   GROUP  4                     26.45          11.20
```

POWER EQUIPMENT OPERATORS CLASSIFICATIONS

GROUP 1: Mechanic; Asphalt Plant*; Asphalt Spreader; Autograde*; Backhoes with Caisson attachment*:Batch Plant*; Benoto(Requires two Engineers); Boiler and Throttle Valve; Caisson Rigs*; Central Redi-Mix Plant*; Combination Backhoe Front Endloader Machine; Compressor and Throttle Valve; Concrete Breaker (Truck Mounted)*; Concrete Conveyor; Concrete Conveyor, Truck Mounted; Concrete Paver over 27E cu. ft.*; Concrete Paver 27E cu ft and Under*; Concrete Placer*; Concrete Placing Boom; Concrete Pump (Truck Mounted); Concrete Tower; Cranes*; Cranes, Hammerhead*; Cranes, (GCI and similar type Requires two operators only); Creter Crane; Crusher, Stone, etc; Derricks; Derricks, Traveling*; Formless Curb and Gutter Machine*; Grader, Elevating; Grouting Machines; Highlift Shovels or Front Endloader 2 1/4 yd. and over; Hoists, Elevators, Outside Type Rack and pinion and similar Machines; Hoists, One, Two, and Three Drum; Hoists, Two Tugger One Floor; Hydraulic Backhoes*; Hydraulic Boom Trucks; Hydraulic Vac (and similar equipment);Locomotives; Motor Patrol*; Pile Drivers amd Skid Rig*; Post Hole Digger; Pre-Stress Machine; Pump Cretes Dual Ram(Requiring frequent Lubrication and Water); Pump Cretes; Squeeze Cretes-Screw Type Pumps Gypsum Bulker and Pump; Raised and Blind Hole Drill*; Roto Mill Grinder (36" and Over)*; Roto Mill Grinder (Less Than 36")*; Scoops-Tractor Drawn; Slip-Form Paver*; Straddle Buggies; Tournapull; Tractor with Boom, and Side Boom; and Trenching Machines*.

GROUP 2: Bobcat (over 3/4 cu yd); Boilers; Broom, Power Propelled; Bulldozers; Concrete Mixer (Two Bag and over); Conveyor, Portable; Forklift Trucks; Greaser Engineer; Highlift Shovels or Front End loaders under 2 1/4 cu yd; Aotomatic Hoists, Hoists, Inside Elevators; Hoists, Sewer Dragging Machine; Hoists, Tugger Single Drum; Laser Screed; Rock Drill (Self-Propelled); Rock Drill (Truck Mounted)*; Rollers; Steam Generators; Tractors; Tractor Drawn Vibratory Roller (Receives an additional $.50 per hour); Winch Trucks with "A" Frame.

GROUP 3: Air Compressor-Small 250 and Under (1 to 5 not to exceed a total of 300 ft); Air Compressor-Large over 250; Combination-Small Equipment Operator; Generator- Small 50 kw and under; Generator-Large over 50 kw; Heaters, Mechanical; Hoists, Inside Elevators (Remodeling or Renovatin work); Hydraulic Power Units (Pile Driving, Extracting, and Drilling); Low Boys; Pumps Over 3" (1 To 3 not to exceed a total of 300 ft); Pumps, Well Points; Welding Machines (2 through 5); Winches, 4 Small Electric Drill Winches; Bobcat (up to and including 3/4 cu yd)

GROUP 4 - Bobcats and/or other Skid Steer Loaders; Brick Forklifts; Oilers

*-Requires Oiler
--------------------------------------------------------------

ENGI9150D  06/01/2000

|  | Rates | Fringes |
|---|---|---|
| SEWER, HEAVY AND **HIGHWAY** | | |
| POWER EQUIPMENT OPERATORS: | | |
| GROUP 1 | 28.55 | 10.15 |
| GROUP 2 | 28.00 | 10.15 |
| GROUP 3 | 25.95 | 10.15 |

|          |       |       |
|----------|-------|-------|
| GROUP 4  | 24.55 | 10.15 |
| GROUP 5  | 23.35 | 10.15 |

## POWER EQUIPMENT OPERATORS CLASSIFICATIONS

GROUP 1: Asphalt Plant*; Asphalt Heater and Planer combination;
Asphalt Heater Scarfire*,Asphalt Spreader; Autograder/ GOMACO or
similar; ABG Paver*, Backhoes with Caisson attachment*, Ballast
Regulator,Belt Loader*;Caisson Rigs*Car Dumper, Central Redi-Mix
Plant*,Combination Backhoe; Front End Loader Machine (1 cu yd or
over Backhoe bucket or with attachments); Concrete Breaker (truck
mounted);Concrete Conveyor; Concrete Paver over 27E cu ft*;
Concrete Placer*; Concrete Tube Float; Cranes, all attachments*;
Cranes, Hammerhead, Linden, Peco and machines of a like nature*;
Creter Crane; Crusher, stone; All Derricks; Derrick Boats;
Derricks, traveling*; Dowell Machine with Air Compressor ($1.00
above Class 1); Dredges*; Field Mechanic Welder; Formless Curb
and Gutter Machine*; Gradall and machines of a like nature*;
Grader, Elevating; Grader, Motor Grader, Motor Patrol, Auto
Patrol, Form Grader, Pull Grader, Subgrader; Guard Rail Post
Driver mounted*; Hoists, one, two, and three Drum; Hydraulic
Backhoes*; Backhoes with Shear attachments*; Mucking Machine;
Pile Drivers and Skid Rig*; Pre-Stress Machine; Pump Cretes Dual
Ram (requires frequent lubrication and water)*; Rock Drill-
Crawler or Skid Rig*; Rock Drill truck mounted*; Rock/ Track
Tamper; Roto Mill Grinder, (36" and over)*; Slip-Form Paver*;
Soil Test Drill Rig, truck mounted*; Straddle Buggies;
Hydraulic Telescoping Form (tunnel); Tractor Drawn Belt Loader*;
Tractor Drawn Belt Loader with attached Pusher(two engineers);
Tractor with boom; Tractaire with attachment; Traffic Barrier
Transfer Machine*; Trenching Machine; Truck Mounted Concrete Pump
with boom*; Underground Boring and/or Mining Machines 5 ft in
diameter and over tunnel, etc.*; Wheel Excavator* & Widener
(Apsco); Raised or Blind Hoe Drill, Tunnel & Shaft*

GROUP 2: Batch Plant*; Bituminous Mixer; Boiler and Throttle
Valve; Bulldozer; Car Loader Trailing Conveyors;  Combination
Backkhoe Front End Loader Machine, (less than 1 cu yd Backhoe
Bucket with attachments); Compressor and Throttle Valve;
Compressor, common receiver (3); Concrete Breaker
or Hydro Hammer; Concrete Grinding Machine; Concrete Mixer or
Paver 7S series to and including 27 cu ft; Concrete Spreader;
Concrete Curing Machine; Burlap Machine; Belting Machine and
Sealing Machine; Concrete Wheel Saw; Conveyor  Muck Cars (Haglund
or similar type); Drills (all); Finishing Machine-Concrete;
Greaser Engineer; Highlift Shovels or Front End Loader; Hoist-
Sewer Dragging Machine; Hydraulic Boom Trucks, all attachments;
Hydro-Blaster (requires two operators); Laser
Screed*; Locomotives, Dinky; Off-Road Hauling Units (including

articulating); Pump Cretes; Squeeze Cretes-Screw Type pumps,
Gypsum Bulker and Pump; Roller Asphalt; Rotary Snow Plows;
Rototiller, Seaman, self-Propelled; Scoops-Tractor Drawn; Self-
propelled Compactor; Spreader-Chip-Stone; Scraper; Scraper-Prime
Mover in Tandem regardless of size (add $1.00 to Group 2 hourly
rate for each hour and for each machine attached thereto add
$1.00 to Group 2 hourly rate for each hour); Tank Car Heater;
Tractors, Push, pulling Sheeps Foot, Disc, or Compactor, etc; Tug
Boats

GROUP 3: Boilers; Brooms, all power propelled; Cement Supply
Tender; Compressor, Common Receiver (2); Concrete Mixer, two bag
and over; Conveyor, Portable; Farm type Tractors used for mowing,
seeding, etc; Fireman on Boilers; Forklift Trucks; Grouting

Machines; Hoists, Automatic; Hoists, all Elevators; Hoists,
Tugger single Drum; Jeep Diggers; Low Boys; Pipe Jacking
Machines; Post-hole Digger; Power Saw, Concrete, Power Driven;
Pug Mills; Rollers, other than asphalt; Seed and Straw Blower;
Steam Generators; Stump Machine; Winch Trucks with A-Frame; Work
Boats; Tamper-Form motor driven

GROUP 4: Air compressor - Small 250 and under (1 to 5 not to
exceed a total of 300 ft); Air Compressor - Large over 250;
Combination - Small Equipment Operator; Directional Boring
Machine; Generators - Small 50 kw and under; Generators - Large ,
over 50 kw; Heaters, Mechanical; Hydraulic power unit (Pile
Driving, Extracting or Drilling); Light Plants (1 to 5); Pumps,
over 3" (1 to 3, not to exceed a total of 300 ft); Pumps, Well
Points; Tractaire; Welding Machines (2 through 5); Winches, 4
small electric drill winches;

GROUP 5: Bobcats (All); Brick Forklifts; Oilers; Directional
Boring

*-Requires Oiler
----------------------------------------------------------------

 IRON0001B  06/01/2001
                              Rates            Fringes
IRONWORKERS:
 Structural and Reinforcing   31.25            15.04
 Sheeters                     31.50            15.04
----------------------------------------------------------------

 IRON0063A  06/01/2001
                              Rates            Fringes
IRONWORKER; ORNAMENTAL        28.85            14.04
----------------------------------------------------------------

 IRON0063B  06/01/2001
                              Rates            Fringes
FENCE ERECTORS                28.83            13.74

METAL FENCE ERECTORS          21.84            11.19
----------------------------------------------------------------

 IRON0136A  07/01/2001
                              Rates            Fringes
IRONWORKERS:
 Machinery Movers & Riggers    23.25           16.57
 Master Riggers                25.00           16.57
----------------------------------------------------------------

 LABO0002N  06/01/2001
                              Rates            Fringes
LABORERS (BUILDING & RESIDENTIAL):
 GROUP  1                      26.65            6.22
 GROUP  2                      26.55            6.22
 GROUP  3                      26.725           6.22
 GROUP  4                      26.75            6.22
 GROUP  5                      26.80            6.22
 GROUP  6                      26.85            6.22
 GROUP  7                      26.875           6.22
 GROUP  8                      26.975           6.22
 GROUP  9                      27.00            6.22
 GROUP 10                      27.10            6.22
 GROUP 11                      26.925           6.22
 GROUP 12                      27.30            6.22

LABORERS CLASSIFICATIONS (BUILDING & RESIDENTIAL)

GROUP 1:  Building Laborers; Plasterer Tenders; Pumps for Dewatering; and other unclassified laborers.

GROUP 2:  Fireproofing and Fire Shop laborers.

GROUP 3:  Cement Gun.

GROUP 4:  Chimney over 40 ft.; Scaffold Laborers.

GROUP 5:  Cement Gun Nozzle Laborers (Gunite); Windlass and capstan person.

GROUP 6:  Stone Derrickmen & Handlers.

GROUP 7:  Jackhammermen; Power driven concrete saws; and other power tools.

GROUP 8:  Firebrick & Boiler Laborers.

GROUP 9:  Chimney on fire brick; Caisson diggers; & Well Point System men.

GROUP 10:  Boiler Setter Plastic Laborers.

GROUP 11:  Jackhammermen on fire brick work only.

GROUP 12:  Dosimeter use (any device) monitoring nuclear exposure); Asbestos Abatement Laborer; Toxic and Hazardous Waste Removal Laborers.
--------------------------------------------------------------

| LABO000020  06/01/2001 | Rates | Fringes |
|---|---|---|
| LABORERS (HEAVY AND HIGHWAY): | | |
| GROUP 1 | 26.65 | 6.22 |
| GROUP 2 | 26.725 | 6.22 |
| GROUP 3 | 26.80 | 6.22 |
| GROUP 4 | 26.925 | 6.22 |
| GROUP 5 | 27.305 | 6.22 |

LABORERS CLASSIFICATIONS

GROUP 1:  Common laborer; Tenders; Material expeditor (asphalt plant); Street paving, Grade separation, sidewalk, curb & gutter, strippers & All laborers not otherwise mentioned

GROUP 2: Ashpalt tampers & smoothers; Cement gun laborers

GROUP 3: Cement Gun Nozzle (laborers) Gunite

GROUP 4: Rakers, Lutemen; Machine-Screwmen; Kettlemen; Mixermen; Drun-men; Jackhammermen (asphalt); Paintmen; Mitre box spreaders; Laborers on birch, overman and similar spreader equipment; Laborers on APSCO; Laborers on air compressor; Paving Form Setter; Jackhammermen (concrete); Power drive concrete saws; other power tools.

GROUP 5: Asbestos Abatement Laborers; Toxic and Hazardous Waste Removal Laborers, Dosimeter (any device) monitoring nuclear exposure

---------------------------------------------------------------

```
LABO0002P  06/01/2001
                                    Rates          Fringes
LABORERS (TUNNEL CONSTRUCATION):
 GROUP 1                            26.65           6.22
 GROUP 2                            26.775          6.22
 GROUP 3                            26.875          6.22
 GROUP 4                            27.00           6.22
 GROUP 5                            27.30           6.22
```

     LABORERS CLASSIFICATIONS (TUNNEL)

GROUP 1: Cage tenders; Dumpmen; Flagmen; Signalmen; Top laborers.

GROUP 2: Air hoist operator; Key board operator; concrete
laborer; Grout; Lock tenders (Free Air Side); Steel setters;
Tuggers; Switchmen; Car pusher

GROUP 3: Concrete repairmen; Lock tenders (pressure side); Mortar
men; Muckers; Grout machine operators; Track layers

GROUP 4: Air trac drill operator; Miner; Bricklayer tenders;
Concrete blower operator; Drillers; Dynamiters; Erector operator;

Form men; Jackhammermen; Powerpac; Mining machine operators;
Mucking machine operator; Laser beam operator; Liner plate and
ring setters; Shield drivers; Power knife operator; Welder-
burners; Pipe jacking machine operator; skinners; Maintenance
technician.

GROUP 5: Asbestos abatement laborer; Toxic and hazardous waste
removal laborer; Dosimeter (any device) monitoring nuclear
exposure.

```
COMPRESSED AIR

  0 - 15 POUNDS                     24.35           5.42
 16 - 20 POUNDS                     24.85           5.42
 21 - 26 POUNDS                     25.35           5.42
 27 - 33 POUNDS                     26.35           5.42
 34 - AND OVER                      27.35           5.42

LABORERS (SEWER CONSTRUCTION):
 GROUP 1                            23.35           5.42
 GROUP 2                            23.475          5.42
 GROUP 3                            23.575          5.42
 GROUP 4                            23.70           5.42
 GROUP 5                            24.00           5.42
```

     LABORERS CLASSIFICATIONS (SEWER)

GROUP 1:  Signalmen; Top laborers and All other laborers

GROUP 2:  Concrete laborers and Steel setters

GROUP 3:  Cement carriers; Cement mixers; Concrete repairmen;
Mortar men; Scaffold men; Second Bottom men

GROUP 4:  Air trac drill operator; Bottom men; Bracers-bracing;
Bricklayer tenders; Catch basin diggers; Drainlayers;
dynamiters; Form men; Jackhammermen; Powerpac; Pipelayers;
Rodders; Welder-burners; Well point systems men

GROUP 5:  Asbestos abatement laborer, Toxic and hazardous waste
removal laborer; Dosimeter (any device) monitoring nuclear
exposure
-----------------------------------------------------------------

LABO0225A  06/01/1997
                                 Rates          Fringes
LABORERS (DEMOLITION/WRECKING):

 TOTAL DEMOLITION or dismatling of
  buildings and all structures
  in their entirety:

Total Demolition Laborer         16.05          5.17

Burners, Wallmen, Power Tool
 and Equipment Operator          16.55          5.17

 PARTIAL DEMOLITION Interior or
strip out work - Building is only
partially wrecked and parts torn
down for the purpose of building
additions, alterations, remodeling
or repairing:

 Interior Laborer                22.35          5.17
-----------------------------------------------------------------

MARB0025A  06/01/2001
                                 Rates          Fringes
TILE FINISHER                    23.80          6.20
-----------------------------------------------------------------

MARB0066A  06/01/1998
                                 Rates          Fringes
MARBLE MASON                     26.36          7.45
-----------------------------------------------------------------

* MARB0067A  06/01/2001
                                 Rates          Fringes
TILE SETTERS                     28.42          8.02
-----------------------------------------------------------------

* MARB0067B  06/01/2001
                                 Rates          Fringes
TERRAZZO WORKERS                 27.37          9.35
-----------------------------------------------------------------

MARB0087A  06/01/1999
                                 Rates          Fringes
MARBLE FINISHER                  20.78          7.40
-----------------------------------------------------------------

PAIN0014A  06/01/2000
                                 Rates          Fringes
PAINTERS:
 Painter, Brush; Decorator; and
  Paperhanger                    27.50          8.27
 Drywall Taper                   27.50          8.24
-----------------------------------------------------------------

PAIN0014D  06/01/2000
                                 Rates          Fringes
PAINTERS HEAVY & HIGHWAY:

```
  BRUSH                          27.50          8.27
------------------------------------------------------------

  PAIN0027A  06/01/2001
                                Rates          Fringes
  GLAZIER                        26.80         12.10
------------------------------------------------------------

  PLAS0005B  06/01/2001
                                Rates          Fringes
  PLASTERERS                     28.44          8.41
------------------------------------------------------------

  PLAS0502A  06/01/2001
                                Rates          Fringes
  CEMENT MASONS                  30.00          8.64
------------------------------------------------------------

  PLUM0130B  06/01/2001
                                Rates          Fringes
  PLUMBERS                       33.75          7.53.
------------------------------------------------------------

  PLUM0597C  06/01/2000
                                Rates          Fringes
  PIPEFITTERS                    32.70          7.84
------------------------------------------------------------

  ROOF0011A  06/01/2000
                                Rates          Fringes
  ROOFER                         29.15          5.69
------------------------------------------------------------

  SFIL0281A  06/01/2001
                                Rates          Fringes
  SPRINKLER FITTERS              33.82          7.85
------------------------------------------------------------

  SHEE0073A  06/01/1999
                                Rates          Fringes
  SHEET METAL WORKER             28.56         10.34
------------------------------------------------------------

  SHEE0073B  06/01/1999
                                Rates          Fringes
  SHEET METAL WORKER RESIDENTIAL:

    ALUMINUM GUTTER WORK         15.63         10.34
------------------------------------------------------------

  TEAM0731A  06/01/2001
                                Rates          Fringes
  TRUCK DRIVERS (HEAVY & HIGHWAY):
    2 & 3 Axles                  24.70          6.80 +A+B
    4 Axles                      24.95          6.80 +A+B
    5 Axles                      25.15          6.80 +A+B
    6 Axles                      25.35          6.80 +A+B

  FOOTNOTES FOR TRUCK DRIVERS (HEAVY & HIGHWAY):
  A.  Paid Holidays: New Year's Day, Memorial Day, Independence
      Day, Labor Day, Thanksgiving Day, and Christmas Day.
```

B. 900 straight time hours or more in 1 calendar year for the
same employer shall receive 1 week paid vacation; 3 years
- 2 weeks paid vacation; 10 years - 3 weeks paid vacation;
20 years - 4 weeks paid vacation.
--------------------------------------------------------------

TEAM0731D  06/01/2001

|                           | Rates  | Fringes |
|---------------------------|--------|---------|
| TRUCK DRIVERS (DEMOLITION): |        |         |
| 2 OR 3 Axles              | 24.70  | 6.80    |
| 4 Axles                   | 24.95  | 6.80    |
| 5 Axles                   | 25.15  | 6.80    |
| 6 Axles                   | 25.35  | 6.80    |
--------------------------------------------------------------

TEAM0731E  05/01/1997

|                           | Rates  | Fringes      |
|---------------------------|--------|--------------|
| TRAFFIC SAFETY WORKERS:   |        |              |

Traffic Safety Worker primary duties include but
are not limited to the delivery, maintenance and
pick-up of traffic control devices, the set-up and
installation of traffic signs, pavement markings,
barricades, crash barrels and glare screens,
and traffic control surveillance, the repair and
maintenance of the company's trucks, cars, arrow
boards, message signs, barricade and sign fabrication
equipment                          16.15        108.75/wk+a

FOOTNOTE a:
1. The following paid holidays: New Year's Day; Memorial Day;
Independence Day; Labor Day; Thanksgiving Day; and Christmas Day
provided the employee has earned a vacation the previous year or
have worked thirty-one days in the current year before the
holiday, or have seniority as stated herein; work the scheduled
work day before and the scheduled day after the holiday; work one
day in the holiday week; and work one scheduled work day after
the holiday.
2. Paid vacation is earned the first year of employment, but may
not be taken until after their first anniversary date. One and
two years of employment receive 40 hours of paid vacation; Three
thru nine years of employment receive 80 hours of paid vacation;
Ten thru nineteen years of employment receive 120 hours of paid
vacation; and Twenty years and over receive 160 hours of paid
vacation.
3. Personal time (floating holidays) will be earned on a per
hour worked basis. New employees will earn personal time during
the first year of employment, but may not be take personal time
until after their first anniversary date. Personal time is earned
in the following way: One and two years receive 8 hours of
personal time; Three thru nine years receive sixteen hours of
personal time; and ten years and over receive twenty-four hours
of personal time.
--------------------------------------------------------------

TEAM0786A  06/01/2001

|                                    | Rates  | Fringes |
|------------------------------------|--------|---------|
| TRUCK DRIVERS (BUILDING & RESIDENTIAL): |        |         |
| 2 & 3 Axles                        | 25.025 | d,e,f   |
| 4 Axles                            | 25.275 | d,e,f   |
| 5 Axles                            | 25.475 | d,e,f   |
| 6 Axles                            | 25.675 | d,e,f   |

FOOTNOTES FOR TRUCK DRIVERS (BUILDING & RESIDENTIAL):

    d.  $257.00 per week.
    e.  Paid Holidays:  New Year's Day, Memorial Day, Independence
        Day, Labor Day, Thanksgiving Day, and Christmas Day.
    f.  900 straight time hours or more in 1 calendar year for
        the same employer shall receive 1 week paid vacation;
        3 years - 2 weeks paid vacation; 10 years - 3 weeks
        paid vacation; 20 years - 4 weeks paid vacation.
----------------------------------------------------------------

WELDERS - Receive rate prescribed for craft performing operation
to which welding is incidental.
================================================================

Unlisted classifications needed for work not included within
the scope of the classifications listed may be added after
award only as provided in the labor standards contract clauses
(29 CFR 5.5(a)(1)(v)).
----------------------------------------------------------------
In the listing above, the "SU" designation means that rates
listed under that identifier do not reflect collectively
bargained wage and fringe benefit rates.  Other designations
indicate unions whose rates have been determined to be
prevailing.

        WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter?  This can
be:

* an existing published wage determination
* a survey underlying a wage determination
* a Wage and Hour Division letter setting forth a
  position on a wage determination matter
* a conformance (additional classification and rate)
  ruling

On survey related matters, initial contact, including requests
for summaries of surveys, should be with the Wage and Hour
Regional Office for the area in which the survey was conducted
because those Regional Offices have responsibility for the
Davis-Bacon survey program.  If the response from this initial
contact is not satisfactory, then the process described in 2.)
and 3.) should be followed.


With regard to any other matter not yet ripe for the formal
process described here, initial contact should be with the Branch
of Construction Wage Determinations.  Write to:

        Branch of Construction Wage Determinations
        Wage and Hour Division
        U. S. Department of Labor
        200 Constitution Avenue, N. W.
        Washington, D. C.  20210

2.) If the answer to the question in 1.) is yes, then an
interested party (those affected by the action) can request
review and reconsideration from the Wage and Hour Administrator
(See 29 CFR Part 1.8 and 29 CFR Part 7).  Write to:

        Wage and Hour Administrator
        U.S. Department of Labor
        200 Constitution Avenue, N. W.
        Washington, D. C.  20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

> Administrative Review Board
> U. S. Department of Labor
> 200 Constitution Avenue, N. W.
> Washington, D. C. 20210

4.) All decisions by the Administrative Review Board are final.
     END OF GENERAL DECISION

FOR NON-CONSTRUCTION RELATED CONTRACTS

# CHICAGO TRANSIT AUTHORITY
# INSURANCE REQUIREMENTS

### REQUISITION NUMBER B02OP00503
### SPECIFICATION NUMBER CTA

**These requirements (the "Insurance Requirements") are a part of the contract and specifications. The following requirements apply and must be complied with by the Contractor and its insurers:**

## PART I. INSURANCE

1.  The Contractor must provide the Chicago Transit Authority ("CTA") with certificates of insurance showing the CTA as certificate holder as well as certified copies of all insurance policies listed below in these Insurance Requirements within ten (10) days of the date of the award of the contract. The Contractor shall not commence work under this contract until the Contractor has received written approval of the required insurance by the CTA.

2.  The CTA must be named as an additional insured and certificate holder on the Commercial General Liability, Automobile Liability and Umbrella Liability policies. The policies shall stipulate that the insurance afforded to the CTA as additional insured shall be primary insurance.

3.  The CTA must be the named insured on the Owners Protective Liability and Railroad Protective Insurance when such policies are specified as required by Section 14 hereinbelow.

4.  The Commercial General Liability and Owners Protective Liability, general aggregate limit of liability, if any, must apply on a per location/per project basis by endorsement to the policy.

5.  All policies shall provide that the insurer shall not cancel, terminate, reduce or materially change the insurance afforded by the policy unless 30 days written notice of such cancellation, termination, reduction or change has been mailed to CTA by certified mail. This language must be endorsed to all policies required by these Insurance Requirements. Such notice shall be mailed to the CTA at:

> Chicago Transit Authority
> ATTN: General Manager of Purchasing, Room 700
> Merchandise Mart Plaza
> P.O. Box 3555
> Chicago, IL 60654-0555

> A duplicate copy of any such notice shall also be mailed to:

> Chicago Transit Authority
> ATTN: Manager of Benefits Compliance, Room 750
> Merchandise Mart Plaza
> P.O. Box 3555
> Chicago, IL 60654-0555

6.  All insurance carriers must be acceptable to the CTA. All insurance companies shall have at least a B+ VII POLICY HOLDERS RATING, or better, by the A.M. Best Co., Inc. Insurance companies with lower ratings will not be accepted. All Insurance carriers, with the exception of railroad protective, must be licensed to do business in the State of Illinois.

7.  All such insurance shall specifically include, but not by way of limitation, all statutory or common law claims arising or alleged to arise, against the CTA under the Illinois Structural Work Act.

8.  To the extent permitted by the Contractor's insurance policies required by Section 14 hereinbelow, the Contractor and the Contractor's insurers waive all rights of subrogation against the CTA.

9.  The Contractor expressly agrees that failure to comply with any of these requirements shall constitute a default under the contract.

10. When any required insurance, due to the attainment of a normal expiration date or renewal date, shall expire, Contractor shall supply the CTA with a Certificate of Insurance and an Insurance Policy which shall clearly evidence the continuation of coverage in the same manner, with the same limits of protection and scope of coverage as was provided by the previous policy. All renewal and replacement policies shall: (i) be in form and substance satisfactory to the CTA, (ii) be written by carriers acceptable to the CTA, and (iii) satisfy all requirements of these Insurance Requirements.

11. The parties expressly agree that the payment of monies to the Contractor, or allowing the Contractor to perform work required under the Contract, or any other act, omission, or conduct by the CTA shall not be deemed a waiver of any of the provisions, coverages, clauses, or requirements of these Insurance Requirements.

12. These Insurance Requirements set forth the CTA's minimum acceptable insurance requirements for this contract. If the Contractor desires additional coverages, or higher limits of liability than those set forth in these Insurance Requirements, the Contractor shall be responsible for the acquisition and cost of such additional protection. Such additional insurance coverages and higher limits shall also inure to the benefit of the CTA.

13. Should it be impossible for the Contractor to have the CTA added, as additional insured with primary coverage, to the Contractor's Commercial General Liability, automobile and umbrella policies, as required by these Insurance Requirements, Contractor shall purchase the required coverage for the CTA under a separate policy which must be Primary/Non-Contributory.

14. The Contractor agrees to procure, provide and maintain during the performance of this contract, the insurance listed below with the minimum policy limits specified below:

A.    Workers' Compensation

Coverage A:    Statutory:    In form and in accordance with the laws of the State of Illinois.

Coverage B:    Employers Liability:

| Statutory | Bodily Injury by Accident |
| Statutory | Bodily Injury by Disease, Each Employee |
| Statutory | Bodily Injury by Disease, Policy Limit |

B.    Comprehensive, or Commercial, General Liability C.T.A. must be named as an Additional Insured via (I.S.O. Form B C.G. 2010)

| $2,000,000.00 | General Aggregate (Per Location) |
| $1,000,000.00 | Products/Completed Operations Aggregate |
| $1,000,000.00 | Personal Injury and Advertising Injury |
| $1,000,000.00 | Per Occurrence |

The Commercial General Liability policy shall include, without limitation: (i) Broad Form Contractual Liability, (ii) Products/Completed Operations to be maintained in full force and effect for a period of two (2) years following final completion of the word under the Contract, (iii) Independent Contractors' Protective Liability, (iv) Premises/Operations, including deletion of explosion, collapse and underground (XCU) exclusions, (v) Broad Form Property Damage, including Products/Completed Operations, (vi) Personal Injury Liability, with employee and contractual exclusions deleted, (vii) Severability of Interest and Cross Liability endorsement, (viii) Contractor expressly agrees to waive, and will require its insurer to waive, its rights, benefits and entitlement under the "Other Insurance" clause of its Commercial General Liability policy with respect to the CTA.

**cta**    415.89 (rev. 08/95) Purchasing

C.    Automobile Liability

$1,000,000.00        **Combined Single Limit (Bodily Injury and Property Damage)**

_____        _Uninsured/Underinsured Motorist_

Including Owned, Non-Owned, Hired and Borrowed Vehicles and Equipment

D.      Umbrella Liability

_____N.R._____        Each occurrence and n the aggregate, excess of the underlying policies.

The Umbrella Liability Policy shall specifically identify each of the policies described in A, B and C above on the Schedule of Underlying Coverages, and shall provide coverage at least as broad as each, and every one of the underlying policies.

E.      Owners Protective Liability In leiu of C.T.A. as an Additional  Insured to the C.G.L. via( I.S.O. Form B C.G.2010).

$2,000,000.00        General Aggregate (Per Location)

$1,000,000.00        Per Occurrence

_____        Combined Single Limit (Bodily Injury and Property Damage Per Location)

The definition of designated contractor must be amended to include contractors of every tier.

F.      Builders Risk Insurance

_____N.R._____        Limits of Liability

_____        Maximum Permissible Deductible

The "Completed Value Form" is required on 100% of contract value.

G.      Valuable Papers Insurance

_____N.R._____

H.      Professional Liability

___N. R.___Each Claim   ___N. R.___ Annual Aggregate   ___N. R.___ D e d u c i b l e (M a x i m u m Permissible Deductible)

I.      Other Insurance: **C.T.A. requires a complete an Commercial General liability policy & endorsements to include add. Insured via I.S.O. Form CG2010.**

Performance Bond    _____    _____    _____

_____

**SPECIAL CONDITIONS**

**SPECIFICATION NO. CTA 3159-02A**
**CONTRACT NO. B02OP00503**

PERFORMANCE BOND
None required.

INSURANCE
The Contractor shall furnish Workmen's Compensation, Public Liability and Property Damage and Automobile Public Liability and Property Damage Insurance, in accordance with requirements set forth on the separate sheet bearing this Specification number and entitled, "INSURANCE REQUIREMENTS" attached hereto and made a part thereof.

DELIVERY
Deliveries are to be made to the CTA location designated on each release. Delivery is to be within twenty four (24) hours under regular circumstances and seven (7) hours under emergency circumstances after receipt of a telephone release notice followed by a fax from the CTA. Types of equipment required and rental periods shall be established at the time of each release.
The Contractor shall maintain sufficient inventory of equipment and qualified crew(s) available to fulfill CTA's requirements.

ESTIMATED USAGE
Based on previous history CTA anticipates a twenty four (24) month expenditure of $1,445,000.00. This figure is provided for your information only and in no way represents a commitment by CTA to purchase any specific dollar amount. Releases based on demand will be issued over the duration of this contract.

PROPOSAL PAGE PREPARATION
The Bidder shall state on the Proposal page(s) Company bidding, person to contact, phone number, including emergency number(s), pick-up/delivery flat rate (per each occurrence), hourly straight, overtime (includes Saturdays), and Sunday/Holiday rates, minimum guaranteed hours, forty (40) hours or above rental rate percentage discount per each occurrence, terms of payment and shall state whether his pricing are firm or subject to escalation for the second year of the contract. The bidder shall submit with his proposal literature as may be required to clarify the bid.
If any equipment differs from that suggested herein, bidder shall write in the manufacturer's name and model number on the Bidding Sheet(s) and submit all pertinent data. The Authority reserves the right to disqualify any equipment which, in Authority's opinion alone, will not satisfactorily perform the tasks required of it.
The rejected equipment will be replaced by the Contractor with acceptable equipment within a time limit mutually agreed upon by the CTA and the Contractor at no additional charges to the CTA. The Contractor shall assume all associated costs on rejected equipment.
Bidder shall quote hourly straight, overtime, includes Saturdays, and Sunday/Holiday rate(s) for each piece of equipment, which includes an operator, unless noted otherwise, fuel and insurance, and pick-up/delivery flat rate per occurrence.
Rental period shall end, within two hours, on the date of request by the CTA via telephone followed by a fax. Bidder shall quote hourly rates, on the basis of use during a regular 8-hour work day. Overtime hourly rates, are hours worked in excess of regular hours worked on the basis of use during an 8-hour work day. Regular work hours are 0700 to 1530, Monday through Friday. Note certain equipment does not require operators.

SPECIFICATION INTERPRETATION
The specification is intended to be descriptive but not restrictive. It is solely for the purpose of establishing the type and quality of the product which will meet the approval of the CTA. Whenever brand, manufacturer

SC-1

## SPECIAL CONDITIONS

### SPECIFICATION NO. CTA 3159-02A
### CONTRACT NO. B02OP00503

and product name are indicated in the specification, they are included only for the purpose of establishing identification and a general description of the item. Whenever such names appear, the term "or approved equal" is considered to follow. Any approved alternate from the referenced product specification must be documented by the bidder as to it's compatibility and performance as being "equal to" the referenced item. The CTA retains exclusive right to determine acceptance of alternate proposals.

## BASIS OF CONTRACT AWARD

Award shall be made to the lowest responsive and responsible bidder who meets all terms and conditions of this contract including specification CTA 3159-02A. Bids will be evaluated by the summation of all hourly straight time rates for all listed equipment with operators, (items 1 through 21), plus the summation of all hourly equipment rates only for all listed equipment, (items 22 through 30), plus the summation of all pick-up/delivery flat rates, items 1 through 30.

The above total sum will be multiplied by the listed forty (40) hour or above rental rate percentage discount. This amount will then be subtracted from the foregoing total.

**This contract will not be awarded on a item basis. A "No Bid" for any item will automatically disqualify your bid from contract award consideration.**

## DURATION OF CONTRACT

This Contract shall become effective as soon as a contract is executed and shall continue in effect for a period of twenty-four (24) months from the date of contract execution.

## ESCALATION

CTA encourages bidders to quote prices that are firm for the Contract period. If the bidder cannot offer firm prices, then he shall quote prices with a maximum percentage ceiling on escalation for the second twelve (12) months of the Contract. Bidder shall submit, 30 days prior to any escalation, justification for said price increase.

## PAYMENT

The Contractor shall submit separate invoices for each release. Payment to Contractor will be made upon completion of the rental period or after one (1) month (whichever comes first) for each release. Invoices shall be forwarded to CTA Accounts Payable Department in the Merchandise Mart Chicago. A copy of each invoice shall be forwarded to CTA , Facilities Maintenance, 3927 W. Maypole, Chicago, Il 60624, Attn: Manager, Facilities Maintenance. Payment to Contractor will be made net 30 days after final acceptance of completed work, receipt of Contractor's invoice, or in accordance with the terms of the Contractor's invoice, whichever is most favorable to the Authority. Payment date(s) shall be calculated from receipt of invoice or final acceptance of goods or service, whichever is later. Each invoice must include the CTA release number. **NOTE: Prices and costs not covered by bids cannot be authorized for payment. No allowable restitution will be allowed for equipment warm-up, maintenance or breakdowns.**

## PROMPT PAYMENT TO SUBCONTRACTORS

A.      Prime Contractors are required to pay all subcontractors, both DBE and non-DBE, for all work which the subcontractor has satisfactorily completed, no later than five (5) business days after the prime Contractor received payment from CTA.

B.      In addition, all retainage amounts must be returned by the prime Contractors to the subcontractor no later than fourteen (14) business days after the subcontractor has satisfactorily completed its

**SPECIAL CONDITIONS**

SPECIFICATION NO. CTA 3159-02A
CONTRACT NO. B02OP00503

portion of the contract work, including punch list items, whether or not CTA has paid the prime Contractor.

C.      A delay in or postponement of payment to the subcontractor requires good cause and prior written approval of the Purchasing Agent.

D.      All prime Contractors are required to include, in each subcontract, a clause requiring the use of appropriate arbitration mechanisms to resolve all payment disputes.

E.      CTA will not reimburse prime Contractors for work performed unless and until the prime Contractor ensures that the subcontractors are promptly paid for the work they have performed to date as evidenced by the filing with CTA of lien waivers and canceled checks.

F.      CTA will consider failure to comply with these prompt payment requirements a contract violation which may lead to any remedies permitted under law, including but not limited to, contract debarment.

ACCOUNTING SERVICES
The contract issued to the successful bidder will state the total expenditure authorization on the signed acceptance page. Contractor shall notify Authority in writing when ninety percent (90%) of the total authorization has been expended. Contractor shall not accept any requests for material and/or service in excess of the total contract expenditure authorization unless authorized in writing by the General Manager, Purchasing Department. Contractor shall be liable for any costs incurred as a result of his failure to either notify Authority or accepting requests not authorized by the General Manager, Purchasing Department.

COMPLIANCE, LAWS, REGULATIONS AND CODES
If any part of this Specification shall be, at date of issue, or shall later become, in non-conformity with current or future city, county, state or federal laws and/or codes or regulations because of equipment or requirements specified therein, Chicago Transit Authority shall have the right to negotiate for and accept or reject substitute equipment and/or requirements. In addition, all equipment supplied by the Contractor shall comply with the requirements of all Federal, State and Local regulations, including but not limited to (1) the Occupational Safety and Health Administration and (2) City of Chicago Noise Ordinance. The Contractor shall be liable and responsible for obtaining any permit(s) required to transport equipment over City of Chicago or State of Illinois streets or highways.

TERMINATION FOR CONVENIENCE
The Chicago Transit Authority may terminate this Contract, in whole or in part, without cause, at any time, by written notice to the Contractor whenever the Authority determines that such terminations is in the best interest of the Authority.  Upon receipt of written notice of termination, all services and any other performance hereunder by the Contractor shall cease to the extent specified in the notice of termination. In the event of termination in whole, the Contractor shall prepare a final invoice within thirty (30) days of such termination, reflecting the services actually furnished pursuant to this Contract to the satisfaction of the Authority and for which no previous invoice was submitted to the Authority.

The Contractor shall be paid cost, including closeout costs, and profit for the service performed up to the time of termination.  The Contractor shall promptly submit, in accordance with the terms hereof, a termination claim to the Authority and the parties shall negotiate a termination settlement to be paid to the

**SPECIAL CONDITIONS**

SPECIFICATION NO. CTA 3159-02A
CONTRACT NO. B02OP00503

Contractor. If the Contractor has any property in his possession belonging to the Authority, the Contractor will account for same, and dispose of it in the manner the Authority directs.

ETHICS ORDINANCE
The Contractor agrees to comply with CTA Ordinance No. 89-88, the CTA Ethics Ordinance, the provisions of which are hereby incorporated into this agreement. The Contractor agrees that, as provided by Section 5.3 of the Ethics Ordinance, any contract negotiated, entered into, or performed in violation of the Ethics Ordinance shall be voidable as to the CTA.

ACCESS TO RECORDS
The Contractor shall permit and agree to cooperate with the authorized representatives of the CTA, including, but not limited to, the CTA's Inspector General and Auditors, who may inspect and audit all data and records of the Contractor relating to the Contractor's performance and Subcontractor contracts under this Contract from the date of this Contract through and until the expiration of five years after completion of this Contract.

ADDITIONAL INFORMATION
Bidders requiring additional information shall contact the Procurement Administrator listed on the front page of this Contract Document. Potential bidders requiring additional information from a person or persons listed in the Special Conditions must route their requests through the Procurement Administrator. Potential bidders who contact any Authority personnel other than the Procurement Administrator will be considered in violation of the provisions of the Contract.

**CHICAGO TRANSIT AUTHORITY**

**DETAIL SPECIFICATION
FOR
RENTAL OF HEAVY CONSTRUCTION EQUIPMENT
WITH/WITHOUT OPERATORS**

**SPECIFICATION NO. CTA 3159-02A**

1.  <u>SCOPE</u>

1.1    This specification covers the requirements for the rental of Heavy Construction Equipment with or without operators. The equipment is to be used by the Chicago Transit Authority within the Chicago Metropolitan Area. Equipment to be rented under this specification is listed in the Contract Documents. Rental periods may be irregular, ranging from one day to one week or longer. Operators, if required, will be as called for in the releases against the Contract.

1.2    Whenever brand, manufacturer or product names are indicated in these Contract Documents, they are included only for the purpose of establishing identification and a general description of the item. Wherever such names appear, the term "or approved equal" is considered to follow.

1.3    The Authority will specify the number of pieces of equipment to be in operation at each project location on a day-to-day basis.

1.4    If, in the opinion of the Authority, any equipment or equipment operator is not performing efficiently to the Authority's satisfaction, the Contractor shall take immediate action as called for in Section 2 entitled "Detailed Requirements" of this specification.

2.  <u>DETAILED REQUIREMENTS</u>

2.1    Equipment supplied shall include fuel.

2.2    Equipment shall be delivered to, picked up from and moved between job sites by the Contractor.

2.3    Equipment rented to Chicago Transit Authority shall be in good operating condition. Units whose power plants are not operating properly or units that are in a state of disrepair, will be rejected at the job site.

CTA 3159-02A

2.   <u>DETAILED REQUIREMENTS</u> (contd)

2.4   All equipment furnished by the Contractor shall be in good operating condition and shall be routinely maintained and serviced by the Contractor's personnel during the course of the work. In the event any of the Contractor's equipment breaks down, or is not fully operable, payment shall stop immediately and not be resumed until repairs have been completed or the equipment is replaced.

2.5   In the event the equipment breaks down on the job site, Chicago Transit Authority shall <u>not</u> be billed for the time required to make repairs or for the transfer of the equipment.

2.6   In the event any equipment experiences a major breakdown that necessitates its removal from the site, the Contractor shall provide replacement equipment which can be moved into place at the job site at the same time that the equipment is removed. Pick-up or delivery changes shall not be applicable to replacement of defective equipment.

2.7   Equipment from the Contractor shall be available to the Chicago Transit Authority within twenty-four (24) hours of receipt from the Authority.

2.8   Equipment covered under this specification shall be available for rental twenty-four (24) hours per day, any day of the year.

2.9   Bidder shall specify how CTA will initiate rental proceedings outside of normal business hours.

2.10  At the close of each day's work, equipment may be secured at the Contractor's discretion, on CTA property. Contractor shall, however, maintain full responsibility and liability for his/her equipment at all times.

3.   <u>WORKING CONDITIONS</u>

3.1   The Contractor is advised that the operators, if requested on the release, may be working in close proximity to a 600 Volt electrified operating railroad. <u>AT NO TIME WILL THE CONTRACTOR BE PERMITTED TO INTERFERE WITH CTA OPERATIONS.</u>

3.2   All Contractor's personnel who will be operating equipment on or have reason to be within the CTA's right-of-way, will be required to attend a Rapid Transit Right-of-Way Safety training session at the job site(s).

CTA 3159-02A

3.    <u>WORKING CONDITIONS</u> (contd)

3.3    The Contractor shall endeavor to minimize personnel turnover at the job sites.

3.4    Underground electrical ducts and cables exist in some areas to be excavated. Their locations will be marked whenever possible and the Contractor must exercise extreme caution while working in their immediate vicinity.

4.    <u>RECORD EQUIPMENT RENTALS</u>

4.1    The rental or service ticket of the Contractor shall be uniquely numbered. The ticket shall reflect the rental of one piece of equipment with crew for one (1) 8-hour shift regardless of the number of hours actually worked on that shift or the hauling of one (1) piece of equipment for delivery to the job-site, pick-up from job site or movement between job-sites. The ticket shall also describe the type of equipment rented.

DISTRIBUTION:    Insp. Coordinator    (1)
                        Mgr. Struct. Maint.   (1)

Initial Spec. - 12/11/64
JEV/dsd - 12th Revision — 04/23/02

**PROPOSAL**

**SPECIFICATION NO. CTA 3159-02A**
**CONTRACT NO. B02OP00503**

By execution of this Proposal the undersigned offers, in accordance with the terms of the Contract Documents of which this Proposal is a part, to provide rental of heavy construction equipment with/without operators, as described in these General and Special Conditions and Detail Specification No. CTA 3159-02A, at the prices shown on the following proposal page(s). This Contract shall become effective as soon thereafter as the Contract is executed and will continue in effect for a period of twenty-four (24) months.

Prices quoted shall be firm for the contract duration unless escalation is stated below. Escalation shall be allowed for the second year of the contract only.

Escalation prices with N/A % maximum ceiling on escalation, for the second twelve (12) months of the contract only. All requests for price increases, if any, must give the CTA a written thirty (30) day advance notice before the price increase is to go into effect.

**Note:**
- Bidder shall attach all applicable Labor Agreements covering operator's wage rates and guarantees with regard to work cancellation due to inclement weather, or delay by the authority.
- All rates are to be based on a regular 8-hour work day and a 40-hour work week. Overtime rates are based on time in excess of regular work schedules.
- Regular work hours are 0700 to 1530, Monday through Friday.
- Additional equipment with/without operators not covered under this contract may be required and rented under the same terms and conditions of this contract.
- No restitution will be allowed for equipment warm-up, maintenance or breakdowns.
- **This contract will not be awarded on a item basis. A "No Bid" for any item will automatically disqualify your bid from contract award consideration.**

COMPANY BIDDING: Chicago Bulk Carriers Inc

PERSON TO CONTACT: Michael Ferro  Phone No: 773-650.9000
                                   Emergency (24 hour) Phone No: 312-656.6893
                                   Fax No: 773-843-0700

TERMS:     DISCOUNT: 2 % 10 , 30 DAYS

PROPOSAL

SPECIFICATION NO. CTA 3159-02A
CONTRACT NO. B02OP00503

Bidder shall state guaranteed minimum hours for operators as required by union. Minimum guaranteed hours _____

Forty (40) hours or above rental rate percentage discount __2__ % (Per each occurrence)

| BID ITEM | DESCRIPTION OF EQUIPMENT OFFERED BY BIDDER | Pick-up/delivery Flat rate (Per each occurrence) | EQUIPMENT RATES (with Operators) STRAIGHT TIME(hourly) | EQUIPMENT RATES (with Operators) OVER -TIME(hourly, Includes Saturdays) | EQUIPMENT RATES (with Operators) (hourly, Sundays/Holidays) |
|---|---|---|---|---|---|
| 1 | 12 ton dump truck | $0.00 | $45.00 | $60.00 | $65.00 |
| 2 | 24-ton tractor-dump trailer combination | $0.00 | $48.00 | $63.00 | $68.00 |
| 3 | 40-foot flat bed trailer-tractor combination | $0.00 | $45.00 | $60.00 | $65.00 |
| 4 | 35-ton GVW Low-boy tractor-trailer with 18 foot drop deck | $0.00 | $60.00 | $75.00 | $80.00 |
| 5 | Small motor grader (Equal to John Deere #507A) | $60.00 | $70.00 | $90.00 | $100.00 |
| 6 | Small loader (equal to Case #350) | $60.00 | $52.00 | $72.00 | $102.00 |
| 7 | Small Bulldozer (equal to John Deere #350/3605) | $60.00 | $52.00 | $72.00 | $102.00 |
| 8 | Small rubber tired backhoe with attachments(concrete breaker, bucket, etc.) (Equal to Case JCB#3) | $60.00 | $90.00 | $110.00 | $120.00 |

4

P2

| BID ITEM | DESCRIPTION OF EQUIPMENT OFFERED BY BIDDER | Pick-up/delivery Flat rate (Per each occurrence) | EQUIPMENT RATES (with Operators) STRAIGHT TIME(hourly) | EQUIPMENT RATES (with Operators) OVER-TIME(hourly, includes Saturdays) | EQUIPMENT RATES (with Operators) (hourly, Sundays/Holidays) |
|---|---|---|---|---|---|
| 9 | Medium motor grader (Equal to Caterpillar #12) | $60.00 | $75.00 | $95.00 | $105.00 |
| 10 | Medium rubber tired loader (Equal to John Deere #544) | $60.00 | $65.00 | $85.00 | $95.00 |
| 11 | Medium crawler loader (Equal to Caterpillar #955) | $60.00 | $80.00 | $100.00 | $110.00 |
| 12 | Vibratory Sheepsfoot compactor (Equal to Raygo Ram #45) | $60.00 | $50.00 | $70.00 | $80.00 |
| 13 | Vibratory roller compactor (Equal to Tampo #VT90) | $60.00 | $60.00 | $80.00 | $90.00 |
| 14 | Large motor grader (Equal to Caterpillar #14) | $60.00 | $90.00 | $100.00 | $110.00 |
| 15 | Large crawler loader (Equal to Caterpillar #977) | $60.00 | $90.00 | $100.00 | $110.00 |
| 16 | Large rubber tired loader (Equal to Caterpillar #966B or John Deere #644) | $60.00 | $75.00 | $95.00 | $105.00 |
| 17 | Large crawler backhoe (Equal to Drott #40 or Northwest #25) | $60.00 | $110.00 | $130.00 | $140.00 |
| 18 | Large bulldozer (Equal to Caterpillar #D-8) | $60.00 | $100.00 | $120.00 | $130.00 |
| 19 | Medium crawler backhoe (Equal to Link Belt #58) | $60.00 | $100.00 | $120.00 | $130.00 |
| 20 | Air concrete breaker crawler-mounted (Equal to HO Ram #700 or Case #450) | $60.00 | $70.00 | $90.00 | $100.00 |

| BID ITEM | DESCRIPTION OF EQUIPMENT OFFERED BY BIDDER | Pick-up/delivery Flat rate (Per each occurrence) | EQUIPMENT RATES (with Operators) STRAIGHT TIME(hourly) | EQUIPMENT RATES (with Operators) OVER -TIME(hourly, includes Saturdays) | EQUIPMENT RATES (with Operators) (hourly, Sundays/Holidays) |
|---|---|---|---|---|---|
| 21 | Two (2) small rubber tire loader (Equal to Case JCB #3) | $ 50.00 | $ 71.00 | $ 91.00 | $ 101.00 |

## Equipment without operators

| BID ITEM | DESCRIPTION OF EQUIPMENT OFFERED BY BIDDER | Pick-up/delivery Flat rate (Per each occurrence) | EQUIPMENT RATES ONLY (Hourly) |
|---|---|---|---|
| 22 | 40-foot expandable flat bed tractor-trailer combination | $ 0.00 | $ 25.00 |
| 23 | Twenty (20) Cu. Yd. refuse truck with compactor (Equal to Leach) | $ 0.00 | $ 40.00 |
| 24 | Nineteen (19) ton GVW stake-body truck with hydraulic tailgate | $ 0.00 | $ 35.00 |
| 25 | Nineteen (19) ton GVW van with hydraulic tailgate | $ 0.00 | $ 30.00 |
| 26 | Chipper/shredder, portable (Equal to Vermeer BC625) | $ 50.00 | $ 25.00 |
| 27 | Portable 50 feet conveyor system (Equal to Morgan Conveyor, 50 feet) | $ 50.00 | $ 30.00 |
| 28 | Front End Loader 4yd bucket (Equal to Caterpillar IT28G) | $ 40.00 | $ 70.00 |

P4

| BID ITEM | DESCRIPTION OF EQUIPMENT OFFERED BY BIDDER | Pick-up/delivery Flat rate (Per each occurrence) | EQUIPMENT RATES ONLY (Hourly) |
|---|---|---|---|
| 29 | Skid Steer with trailer (Equal to Case 1845) | $ 50.00 | $ 55.00 |
| 30 | Forty (40) foot flatbed trailer | $ 50.00 | $ 30.00 |

P5



City of Chicago
Richard M. Daley, Mayor

Department of
Procurement Services

David E. Malone
Chief Procurement Officer

City Hall, Room 403
21 North LaSalle Street
Chicago, Illinois 60602-1284
312 744-4900
312 744-2949 (TTY)
http://www.cityofchicago.org

Rhonda L. Vasquez, President
STR Enterprises, Inc.
3619 S. Normal, Suite 2
Chicago, IL 60609

| | |
|---|---|
| Certification Effective: | May 27, 2002 |
| Certification Expires: | May 31, 2007 |
| Annual Certificate Expires: | May 31, 2003 |

Dear Ms. Vasquez:

We are pleased to inform you that **STR Enterprises, Inc.** has been certified as an MBE/DBE/WBE by the City of Chicago. This MBE/DBE/WBE certification, which is valid for five years must be re-validated annually. Your firm's next annual validation is required by May 31, 2003. As a condition of continued certification during this five year period, you must promptly notify the Office of Business Development of any changes in ownership or control of your firm or any other matters or facts affecting your firm's eligibility for certification.

The City may commence actions to remove your firm's eligibility if you fail to notify us of any changes of facts affecting your firm's certification or if your firm otherwise fails to cooperate with the City in any inquiry or investigation. Removal of eligibility procedures may also be commenced if your firm is found to be involved in bidding or contractual irregularities.

Your firm's name will be listed in the City's Directory of Disadvantaged Business Enterprises, Minority Business Enterprises and Women Business Enterprises in the specialty area(s) of:

**Trucking, Hauling and Rental Services**

Your firm's participation on City contracts will be credited only toward MBE/DBE/WBE goals in your area(s) of specialty. While your participation on City contracts is not limited to your specialty, credit toward MBE/DBE/WBE goals will be given only for work done in the specialty category.

Thank you for your continued interest in the City's Minority, Women and Disadvantaged Business Enterprise Programs.

Very truly yours,

Lillie Cooper
Director of Certification

LC/am





## Certification Regarding a Drug Free Workplace

Pursuant to the definitions regarding a Drug Free Workplace provided in the Drug-Free Workplace Act of 1988, the Illinois Drug Free Workplace Act, 30 ILCS 580/1 *et seq.*, the Federal Acquisition Regulation System ("FAR"), Procedures for Transportation Workplace Drug & Alcohol Testing Programs, 49 CFR 40, and Prevention of Alcohol Misuse & Prohibited Drug Use in Transit Operation, 49 CFR 655, Chicago Bulk Carriers Inc ("Contractor") certifies to the best of its knowledge and belief that it and its principals:

1.  Maintain a workplace(s) (i.e. the site(s) for the performance of work done by the Contractor in connection with this contract) safe and free from "controlled substances" as described in the Controlled Substances Act (21 U.S.C. 812) and as further described in regulations 21 CFR 1308.11 – 1308.15.

2.  Have neither been convicted, including entering a plea of 'nolo contendere,' nor had sentence imposed by any judicial body charged with the responsibility to determine violations of Federal or State criminal drug statutes.

3.  Publish and give notice to its employees and sub-contractors that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the Contractor's workplace, and also that actions will be taken against any and all employees and sub-contractors found to be in violation of same.

4.  Provide that all employees engaged in the performance of the contract receive a copy of the above statement, that the employee will abide by the terms of this statement, and that the employee will notify the employer in writing of the employee's conviction no later than five (5) calendar days after such conviction.

5.  Provide for appropriate action against an employee for violation of any and all of these rules and that an employee convicted of drug abuse must satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purposes by Federal, State, or local health or law enforcement or other appropriate agency.

6.  Comply with all drug and alcohol policies, testing programs and reporting requirements set forth in 49 CFR 40 and 49 CFR 655 whenever the Contractor, its employees, or sub-contractor(s) perform one or more of the following functions considered "safety-sensitive", as defined in 49 CFR 655:

    (1)  Operating a revenue service vehicle, including when not in revenue service;
    (2)  Operating a non-revenue service vehicle, when required to be operated by a holder of a Commercial Driver's License;
    (3)  Controlling dispatch or movement of a revenue service vehicle;
    (4)  Maintaining (including repairs, overhaul and rebuilding) a revenue service vehicle or equipment used in revenue service; or
    (5)  Carrying a firearm for security purposes.

7.  Will otherwise comply with all drug and alcohol policies set forth in applicable Federal, State and local laws and regulations, including, but not limited to the Drug-Free Workplace Act of 1988, FAR, Illinois Drug Free Workplace Act, 49 CFR 40 and 49 CFR 655 in such version, prior or subsequent to amendment or revision, as is currently enforced or enforceable at and during the execution and performance of this Contract.

In addition to other remedies, the Contractor's failure to comply with any part of the requirements of the Drug-Free Workplace Act of 1988, FAR, Illinois Drug Free Workplace Act, 49 CFR 40 or 49 CFR 655, may render the Contractor subject to any or all of the following: suspension of payments, termination of contract for default, suspension or debarment.

Michael Feno / Pres.                                    6/25/02
_____                               _____
Signature and Title of Authorized Official              Date
Certificate revised to conform with proposed revised 49 CFR 40  7/2/01

## CERTIFICATION OF PRIMARY PARTICIPANT
## REGARDING DEBARMENT, SUSPENSION, AND OTHER
## RESPONSIBILITY MATTERS

_Chicago Bulk Carriers Inc_ certifies to the best of our knowledge
(company's name)
and belief that it and its principals:

1. Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal department or agency;

2. Have not within a three-year period preceding this proposal been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

3. Are not presently indicted for or otherwise criminally or civilly charged by a government entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (2) of this certification; and

4. Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State, or local) terminated for cause or default.

THE PRIMARY PARTICIPANT (APPLICANT OR POTENTIAL CONTRACTOR FOR A MAJOR THIRD PARTY CONTRACT) _Chicago Bulk Carriers Inc_.
(company name)
CERTIFIES OR AFFIRMS THE TRUTHFULNESS AND ACCURACY OF THE CONTENTS OF THE STATEMENTS SUBMITTED ON OR WITH THIS CERTIFICATION AND UNDERSTANDS THAT THE PROVISIONS OF 31 U.S.C. SECTIONS 3801 _ET SEQ._ ARE APPLICABLE THERETO.

_Michael Jeues - PRESIDENT_
Signature and Title of Authorized Official

If you are unable to certify to any of the statements in this certification, the participant shall attach an explanation to this certification.

ATTACHMENT "B"

### CERTIFICATION OF LOWER TIER PARTICIPANT
### REGARDING DEBARMENT, SUSPENSION, AND OTHER
### RESPONSIBILITY MATTERS

_West Fuels Inc._
(company's name)
, certifies to the best of our knowledge

and belief that it and its principals:

1. Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal department or agency;

2. Have not within a three-year period preceding this proposal been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

3. Are not presently indicted for or otherwise criminally or civilly charged by a government entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (2) of this certification; and

4. Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State, or local) terminated for cause or default.

THE LOWER TIER PARTICIPANT (APPLICANT OR POTENTIAL CONTRACTOR FOR A MAJOR

THIRD PARTY CONTRACT _West Fuels Inc._
(company name)

CERTIFIES OR AFFIRMS THE TRUTHFULNESS AND ACCURACY OF THE CONTENTS OF THE

STATEMENTS SUBMITTED ON OR WITH THIS CERTIFICATION AND UNDERSTANDS THAT

THE PROVISIONS OF 31 U.S.C. SECTIONS 3801 _ET SEQ._ ARE APPLICABLE THERETO.

Signature and Title of Authorized Official

If you are unable to certify to any of the statements in this certification, the participant shall attach an explanation to this certification.

cta  415 88 (03/00) Purchasing



ATTACHMENT "B"

## CERTIFICATION OF LOWER TIER PARTICIPANT REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS

_____ WillBent Inc. _____, certifies to the best of our knowledge
<span style="font-size:smaller">(company's name)</span>
and belief that it and its principals:

1. Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal department or agency;

2. Have not within a three-year period preceding this proposal been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

3. Are not presently indicted for or otherwise criminally or civilly charged by a government entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (2) of this certification; and

4. Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State, or local) terminated for cause or default.

THE LOWER TIER PARTICIPANT (APPLICANT OR POTENTIAL CONTRACTOR FOR A MAJOR
THIRD PARTY CONTRACT) _____ WillBent Inc. _____.
<span style="font-size:smaller">(company name)</span>
CERTIFIES OR AFFIRMS THE TRUTHFULNESS AND ACCURACY OF THE CONTENTS OF THE
STATEMENTS SUBMITTED ON OR WITH THIS CERTIFICATION AND UNDERSTANDS THAT
THE PROVISIONS OF 31 U.S.C. SECTIONS 3801 ET SEQ. ARE APPLICABLE THERETO.

_____
<span style="font-size:smaller">Signature and Title of Authorized Official</span>

If you are unable to certify to any of the statements in this certification, the participant shall attach an explanation to this certification.

**LOBBYING CERTIFICATION**

### Certification for Contracts, Grants, Loans and Cooperative Agreements

The undersigned certifies, to the best of his or her knowledge and belief, that:

(1)    No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2)    If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(3)    The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Executed this ___25^TH___ day of __June__, 19̶9̶ 2002

By: __Chicago Bulk Carriers Inc__
(Type or print name of contractor)

__Michael Ferro__
(Signature of authorized officer)

__President__
(Title of authorized officer)

**PROPOSAL (continued)**

## TO BE EXECUTED BY A CORPORATION

*The undersigned hereby acknowledges having received a full set of* CONTRACT DOCUMENTS (Requirements for Bidding and Instructions to Bidders; General Conditions; Standard Government Requirements; Special Conditions Disadvantaged Business Enterprise Commitment; Special Conditions, if any, issued with the specifications; and all other forms, certificates, and documents issued with the specifications) AND ADDENDA NOS. (none unless indicated here)

NONE

BIDDER MUST INSERT ADDENDA NUMBERS HERE — IF ANY

and the undersigned agrees, if awarded the contract, to perform the contract in accordance with the terms and conditions of the Contract Documents and Addenda, if any, thereto. Notice to the undersigned may be served by mailing to the address hereinafter set forth.

FURTHER, THE UNDERSIGNED, BEING DULY SWORN, DEPOSES AND STATES ON OATH THAT the undersigned has not entered into any agreement with any other bidder or prospective bidder or with any other person, firm or corporation relating to the price or prices named within the undersigned's proposal or any other proposal, nor any agreement or arrangement under which any person, firm or corporation is to refrain from bidding, nor any agreement or arrangement for any act or omission in restraint of free competition among bidders, and has not disclosed to any person, firm or corporation the terms of the undersigned's proposal or the price or prices named herein. As required by Section 33E-11 of the Illinois Criminal Code of 1961, as amended (the "Act"), the undersigned certifies that the undersigned contractor or any agent, partner, employee or officer of the contractor is not barred from contracting with any unit of state or local government as a result of engaging in or being convicted of either bid-rigging in violation of Section 3 of Article 33E or bid-rotating in violation of Section 4 of Article 33E of the Act or any similar offenses of any state or the United States that contain the same elements as the offenses of bid-rigging or bid-rotating.

Name of Corporation: **Chicago Bulk Carriers Inc**
(Print or Type Name of Corporation)

Business Address: **4337 S. Kildare, Chicago, Ill- 60632**
(Print or Type Street, City, State and Zip Code)

BY: **Michael Ferro**
SIGNATURE OF AUTHORIZED OFFICER*

Title of Signatory: **President - Michael Ferro**
(Print or Type)

*NOTE: If signed by any person other than the corporate President or Vice President, a certified copy of a resolution or by-law authorizing such person to sign must accompany this Proposal.

State of **Illinois**

County of **Cook**

Signed and Sworn to before me on:
**June 25th 2002**.

by **Lisa C. Jett**
(name of signatory)

**Lisa C. Jett**

OFFICIAL SEAL
LISA C JETT
NOTARY PUBLIC, STATE OF ILLINOIS

(NOTARIAL SEAL)

IF BIDDER IS A CORPORATION — THIS PAGE MUST BE EXECUTED

PROPOSAL (continued)

## TO BE EXECUTED BY A SOLE PROPRIETOR

The undersigned hereby acknowledges having received a full set of CONTRACT DOCUMENTS (Requirements for Bidding and Instructions to Bidders; General Conditions; Standard Government Requirements; Special Conditions Disadvantaged Business Enterprise Commitment; Special Conditions, if any, issued with the specifications; and all other forms, certificates, and documents issued with the specifications) AND ADDENDA NOS. (none unless indicated here)

BIDDER MUST INSERT ADDENDA NUMBERS HERE — IF ANY

and the undersigned agrees, if awarded the contract, to perform the contract in accordance with the terms and conditions of the Contract Documents and Addenda, if any, thereto. Notice to the undersigned may be served by mailing to the address hereinafter set forth.

FURTHER, THE UNDERSIGNED, BEING DULY SWORN, DEPOSES AND STATES ON OATH THAT the undersigned has not entered into any agreement with any other bidder or prospective bidder or with any other person, firm or corporation relating to the price or prices named within the undersigned's proposal or any other proposal, nor any agreement or arrangement under which any person, firm or corporation is to refrain from bidding, nor any agreement or arrangement for any act or omission in restraint of free competition among bidders, and has not disclosed to any person, firm or corporation the terms of the undersigned's proposal or the price or prices named herein. As required by Section 33E-11 of the Illinois Criminal Code of 1961, as amended (the "Act"), the undersigned certifies that the undersigned contractor or any agent, partner, employee or officer of the contractor is not barred from contracting with any unit of state or local government as a result of engaging in or being convicted of either bid-rigging in violation of Section 3 of Article 33E or bid-rotating in violation of Section 4 of Article 33E of the Act or any similar offenses of any state or the United States that contain the same elements as the offenses of bid-rigging or bid-rotating.

Signature of Bidder: _____
(Signature of Bidder)

Name of Bidder: _____
(Print or Type)

Business Address: _____
(Print or Type Street Address)

_____
(Print or Type City, State and Zip Code)

State of _____

County of _____

Signed and Sworn to before me on:

_____

by _____
(name of signatory)

_____
(Signature of Notary Public)

(NOTARIAL SEAL)

IF BIDDER IS A SOLE PROPRIETOR — THIS PAGE MUST BE EXECUTED

**PROPOSAL (continued)**

## TO BE EXECUTED BY PARTNERSHIP OR JOINT VENTURE

The undersigned hereby acknowledges having received a full set of CONTRACT DOCUMENTS (Requirements for Bidding and Instructions to Bidders; General Conditions; Standard Government Requirements; Special Conditions Disadvantaged Business Enterprise Commitment; Special Conditions, if any, issued with the specifications; and all other forms, certificates, and documents issued with the specifications) AND ADDENDA NOS. (none unless indicated here)

> BIDDER MUST INSERT ADDENDA NUMBERS HERE — IF ANY

and the undersigned agrees, if awarded the contract, to perform the contract in accordance with the terms and conditions of the Contract Documents and Addenda, if any, thereto. Notice to the undersigned may be served by mailing to the address hereinafter set forth.

FURTHER, THE UNDERSIGNED, BEING DULY SWORN, DEPOSES AND STATES ON OATH THAT the undersigned has not entered into any agreement with any other bidder or prospective bidder or with any other person, firm or corporation relating to the price or prices named within the undersigned's proposal or any other proposal, nor any agreement or arrangement under which any person, firm or corporation is to refrain from bidding, nor any agreement or arrangement for any act or omission in restraint of free competition among bidders, and has not disclosed to any person, firm or corporation the terms of the undersigned's proposal or the price or prices named herein. As required by Section 33E-11 of the Illinois Criminal Code of 1961, as amended (the "Act"), the undersigned certifies that the undersigned contractor or any agent, partner, employee or officer of the contractor is not barred from contracting with any unit of state or local government as a result of engaging in or being convicted of either bid-rigging in violation of Section 3 of Article 33E or bid-rotating in violation of Section 4 of Article 33E of the Act or any similar offenses of any state or the United States that contain the same elements as the offenses of bid-rigging or bid-rotating.

*Firm Name:* _____

(Print or Type Name of Firm)

*Business Address:* _____

(Print or Type Street Address)

_____

(Print or Type City, State and Zip Code)

**BY SIGNATURE(S):** _____

*All Partners or Joint Venturers of the Firm must sign this bid unless one Partner or Joint Venturer is authorized to sign for the Partnership or Joint Venture.*

(Partner)

_____

(Partner)

_____

(Partner)

_____

(Partner)

_____

(Partner)

State of _____

County of _____

Signed and Sworn to before me on:

_____

by _____

(name of signatory)

_____

(Signature of Notary Public)

(NOTARIAL SEAL)

IF BIDDER IS A PARTNERSHIP OR JOINT VENTURE — THIS PAGE MUST BE EXECUTED

## DISCLOSURE OF OWNERSHIP

All businesses submitting proposals are required to complete the appropriate portion of this form. If more space is needed attach additional pages. In signing and submitting its proposal, of which this Disclosure of Ownership form is a part, the business certifies that the information submitted on this Disclosure of Ownership form is correct as of the date of the submittal of the proposal.

1.  **IF THE BUSINESS IS A CORPORATION**, check this box ☒ and complete:
    If the shares of the Corporation are not listed on the New York Stock Exchange or any regional exchange, list the name of each person who possesses either nominal or beneficial ownership or 5% or more of the Corporation's stock (list below). If none, type or print "NONE" in space below.

    Is the Corporation listed on the New York Stock Exchange?  ☐ Yes  ☒ No

    If the corporation is listed on an exchange other than the New York Stock Exchange, the name of the exchange is _N/A_

    | TYPED OR PRINTED NAME | % INTEREST |
    |---|---|
    | Michael FERRO | 100% |
    |  |  |
    |  |  |
    |  |  |

2.  **IF THE BUSINESS IS A PARTNERSHIP**, check this box ☐ and complete:
    The name of each general, limited or individual partner entitled to receive 5% or more of the profit derived from partnership activities (list below). If none, type or print "NONE" in space below.

    | TYPED OR PRINTED NAME | % INTEREST |
    |---|---|
    |  |  |
    |  |  |
    |  |  |
    |  |  |

3.  **IF THE BUSINESS IS A SOLE PROPRIETORSHIP**, check this box ☐ and complete:
    The name of each person other than the owner entitled to receive 5% or more of the profits derived from the activities of the business (list below). If none, type or print "NONE" in space below.

    | TYPED OR PRINTED NAME | % INTEREST |
    |---|---|
    |  |  |
    |  |  |
    |  |  |
    |  |  |

**DISCLOSURE — TO BE COMPLETED BY ALL BIDDERS**

06/19/02  08:31 FAX 773 847 1407          WILL RENT                                    ☑001

# WILLRENT INC.

## FAX TRANSMITTAL SHEET

DATE: _6-19-02_____   FROM: _Lisa_____
                                         WILL RENT INC.

TO: _Lisa_____   FAX #: _(773) 843-0700_
_Ferro Const._____

RE: _____Schedule C_____

NUMBER OF PAGES (INCLUDING COVER SHEET): _3_____

REMARKS:

_____

_____Thanks!_____

_____Lisa_____

_____

_____* Originals are in the mail._____

_____

_____

_____

THANK YOU,

3228 SOUTH WOOD STREET   •   CHICAGO, IL 60608   •   PHONE 773.847.7255   •   FAX 773.847.1407

RECEIVED

08/19/02  08:31 FAX 773 347 1407        WILL RENT                          ☑002

Schedule C:
**LETTER OF INTENT FROM DBE TO PERFORM AS
SUBCONTRACTOR, SUPPLIER AND/OR CONSULTANT**
*Bidder's or Proposer's failure to submit this form with their bid
will result in their bid being rejected in its entirety*

Name of Project/Contract: _____

Requisition No.: B020P00503

Job Order No.: NONE

From: Will-Rent Inc
(Name of DBE Firm)

To: Chicago Bulk Carriers Inc and the Chicago Transit Authority
(Name of Prime Contractor)

The DBE status of the undersigned is confirmed by the attached Letter of Certification from the Chicago Transit Authority dated ___ n/a ___ . (If proposing to perform as a DBE/non-DBE Joint Venture, then Letter of Certification from DBE venturer is attached along with completed Schedule B and joint venture agreement)

The undersigned is prepared to provide the following described services or supply the following described goods in con-nection with the above named project/contract:

| Pay Item No./Description | Quantity/Unit Price | Total |
|---|---|---|
| Rental of skid steers, loader backhoes & attachments, or any type of equipment to meet the required goal | | $385,500.00 |

Sub (or Grand) Total: $ 385,500.00

Partial Pay Items. (For any of the above items that are partial pay items, specifically describe the work and subcontract dollar amount):

Grand Total: $_____

If more space is needed to fully describe the DBE firm's (or DBE/non-DBE joint venture's) proposed scope of work and/or payment schedule, attach additional sheets.

cta  715.04 (rev 11/89) DBE Program and Contract Compliance                    (front)


RECEIVED
BY ___        | DATE

06/19/02  08:32 FAX 773 847 1407        WILL RENT                              ☑ 003

Schedule C:
**LETTER OF INTENT FROM DBE**

**Sub-Contracting Levels**

_____ 0 ____% of the dollar value of the DBE's subcontract will be sublet to non-DBE contractors.

_____ 0 ____% of the dollar value of the DBE's subcontract will be sublet to DBE contractors.

**NOTICE: IF DBE WILL NOT BE SUB-SUBCONTRACTING ANY OF THE WORK DESCRIBED IN THIS SCHEDULE, A ZERO (0) MUST BE SHOWN IN EACH BLANK ABOVE.**

**NOTICE: IF MORE THAN TEN PERCENT (10%) OF THE VALUE OF THE DBE's SCOPE OF WORK WILL BE SUBLET, A BRIEF EXPLANATION AND DESCRIPTION OF THE WORK TO BE SUBLET MUST BE ATTACHED TO THIS SCHEDULE.**

The undersigned will enter into a formal written agreement for the above work with you as a Prime Contractor, conditioned upon your execution of a contract with the Chicago Transit Authority, and will do so within (5) five working days of your receipt of a signed contract from the Chicago Transit Authority.

**NOTICE: THIS SCHEDULE (AND ACCOMPANYING ATTACHMENTS TO BE SUBMITTED IN TRIPLICATE. ORIGINAL SIGNATURES REQUIRED ON ALL THREE (3) COPIES.**

_Lisa Donegan_
(Signature of Owner, President or Authorized Agent of DBE)

Lisa Donegan / Office Mgr.
Name/Title (Print)

6·19·02
Date

(773) 847.7255
Phone

**If proposing to perform as a DBE/non-DBE Joint Venture:**

_____
(Signature of Owner, President or Authorized Agent of non-DBE)

_____
Name/Title (Print)

_____
Date

_____
Phone

cta   F15.04 (Rev. 11/99) DBE Program and Contract Compliance                    Page0)


RECEIVED
BY | DATE
6·19·02

06/18/02  14:15 FAX 773 847 1407       WILL RENT                              ☑001



## FAX TRANSMITTAL SHEET

DATE: 6/18/02 _____ FROM:  **JULIE MARTINES**
                                        **WILL RENT INC.**

TO: _Dino_____ FAX #:   773-843-0700

_Dino Conste._____

RE: _____

### NUMBER OF PAGES (INCLUDING COVER SHEET): ~~5~~ 5

REMARKS: _Dino— Mike needs to sign the_
_Schedule D, DBE Utilization Plan not_
_me._
_There should be a second page to_
_the Schedule C that I need to sign_
_but you did not include this page?_
_Please send & Mike sign ASAP_

_Thanks,_

_Julie_

THANK YOU,

_Julie_

**JULIE MARTINES**

_____
3228 SOUTH WOOD STREET   •   CHICAGO, IL 60608   •   PHONE 773.847.7255   •   FAX 773.847.1407



08/18/02  14:16 FAX 773 847 1407      WILL RENT                                     ☑005



# Chicago Transit Authority

Merchandise Mart Plaza, P.O. Box 3555
Chicago, Illinois 60654
(312) 664-7200

September 12, 2001

Ms. Julie McKevitt
Will Rent, Inc. (1746)
3228 S. Wood St.
Chicago, Il 60608

Dear Ms. McKevitt:

The Chicago Transit Authority's DBE/EEO Programs/Contract Compliance
Department has received your application for certification as a
Disadvantaged Business Enterprise (DBE). This application was
processed in accordance with Department of Transportation Regulation
49 CFR, Part 26.

The result of our review of your submission is that your company is
hereby RECERTIFIED as a DBE eligible to participate in Chicago
Transit Authority contracts financed by the U. S. Department of
Transportation and other CTA contracts and it will be listed in our
directory as follows:

> RENTAL & SERVICE OF CONSTRUCTION
> EQUIPMENT (CREDIT: 100%)
> CONSTRUCTION EQUIPMENT SALES
> (CREDIT: 60%)
> (773) 847-7255

The DBE certification of your firm is valid for three (3) years from
the date of this letter and will be reviewed on an annual basis to
determine if any changes have occurred in the firm's circumstances
impacting continued eligibility. It is the obligation of your firm
to submit a *No Change Affidavit* prior to your next anniversary date
of certification. Additionally, it is your obligation to promptly
notify CTA's DBE/EEO Programs/Contract Compliance Department when any
changes occur in the firm's circumstances affecting its ability to
meet size, disadvantaged status, ownership, and/or control
requirements for eligibility.

Should you have any questions, please don't hesitate to contact me or
any member of my staff. We look forward to a mutually successful
relationship with your company.

Sincerely,

Pamela B. Reevers
General Manager
DBE/EEO Programs
Compliance Department

xc: DUS



RECEIVED

06/18/02  14:16 FAX 773 847 1407        WILL RENT                              Ø004

ATTACHMENT "B"

**CERTIFICATION OF LOWER TIER PARTICIPANT
REGARDING DEBARMENT, SUSPENSION, AND OTHER
RESPONSIBILITY MATTERS**

_____Will Rent Inc_____, certifies to the best of our knowledge
(company's name)

and belief that it and its principals:

1. Are not presently debarred, suspended, proposed for debarment, declared ineligible, or
voluntarily excluded from covered transactions by any Federal department or agency;

2. Have not within a three-year period preceding this proposal been convicted of or had a civil
judgment rendered against them for commission of fraud or a criminal offense in connection
with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transac-
tion or contract under a public transaction; violation of Federal or State antitrust statutes or com-
mission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making
false statements, or receiving stolen property;

3. Are not presently indicted for or otherwise criminally or civilly charged by a government entity
(Federal, State, or local) with commission of any of the offenses enumerated in paragraph (2)
of this certification; and

4. Have not within a three-year period preceding this application/proposal had one or more public
transactions (Federal, State, or local) terminated for cause or default.

THE LOWER TIER PARTICIPANT (APPLICANT OR POTENTIAL CONTRACTOR FOR A MAJOR

THIRD PARTY CONTRACT) _____Will Rent Inc._____
(company name)

CERTIFIES OR AFFIRMS THE TRUTHFULNESS AND ACCURACY OF THE CONTENTS OF THE

STATEMENTS SUBMITTED ON OR WITH THIS CERTIFICATION AND UNDERSTANDS THAT

THE PROVISIONS OF 31 U.S.C. SECTIONS 3801 *ET SEQ.* ARE APPLICABLE THERETO.

_____
Signature and Title of Authorized Official

If you are unable to certify to any of the statements in this certification, the participant shall attach an
explanation to this certification.

cta   415 86 (20/SCI Purchasing)

**RECEIVED**
BY          DATE
6-19-02

06/18/02  14:15 FAX 773 847 1407        WILL RENT                                    ☒003

Schedule C:
**LETTER OF INTENT FROM DBE TO PERFORM AS
SUBCONTRACTOR, SUPPLIER AND/OR CONSULTANT**
*Bidder's or Proposer's failure to submit this form with their bid
will result in their bid being rejected in its entirety*

Name of Project/Contract: _____

Requisition No.: B02OP00503

Job Order No.: None

From: Will-Rent Inc
      (Name of DBE Firm)

To: Chicago Bulk Carriers Inc and the Chicago Transit Authority
    (Name of Prime Contractor)

The DBE status of the undersigned is confirmed by the attached Letter of Certification from the Chicago Transit Authority
dated _____ 2/01 _____. (If proposing to perform as a DBE/non-DBE Joint Venture, then Letter of Certification from
DBE venturer is attached along with completed Schedule B and joint venture agreement)

The undersigned is prepared to provide the following described services or supply the following described goods in con-
nection with the above named project/contract:

| Pay Item No./Description | Quantity/Unit Price | Total |
|---|---|---|
| Rental of skid steers, loader backhoes | | |
| + attachments, or any type of equipment | $385,500°° | |
| to meet the required goal | | |
| | | |
| | | |
| | | |

Sub (or Grand) Total: $ 385,500°°

Partial Pay Items. (For any of the above items that are partial pay items, specifically describe the work and subcontract
dollar amount):

Grand Total: $ _____

If more space is needed to fully describe the DBE firm's (or DBE/non-DBE joint venture's) proposed scope of work and/or
payment schedule, attach additional sheets.

cta  715-04 (rev. 11/00) DBE Program and Contract Compliance                              07041


RECEIVED
BY ____ / ____ DATE



# CHICAGO BULK CARRIERS, INC.
**4337 SOUTH KILDARE AVENUE ~ CHICAGO, ILLINOIS 60632**
**Phone 773-927-0900 ~ Fax 773-843-0700**

## <u>FAXCOVER</u>

June 28, 2002

COMPANY; C.T.A.

**ATTENTION; CHRISTINE MURPHY**

FAX NUMBER; 312-396-8516

**FROM; MICHAEL FERRO**

TOTAL PAGES INCLUDING THIS COVER SHEET; 6

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CONTACT US AT
773-927-0900.

**\*\*\*\*\*\*\*\*\*\* CONFIDENTIALITY \*\*\*\*\*\*\*\*\*\***
THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE
USE OF THE INDIVIDUAL NAMED ABOVE. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY
NOTIFY US BY PHONE AT (773)-927-0900.

MESSAGE;

IF YOU NEED ANY ADDITIONAL INFORMATION PLEASE CONTACT ME. THANK
YOU FOR YOUR HELP.

Friday, June 28, 2002 * 12:05:04 PM



# CHICAGO BULK CARRIERS INC.
### 4337 SOUTH KILDARE AVENUE #6 ~ CHICAGO, ILLINOIS 60632
### Phone 773-927-0900 ~ Fax 773-843-0700

June 28, 2002

C.T.A.
MERCHANDISE MART PLAZA
P.O. BOX-3555
CHICAGO,ILLINOIS 60654-0555

ATTN.: CHRISTINE MURPHY  DBE DEPARTMENT
312-664-7200  EXT-4354
312-396-8515

RE; REQ. # B02OP00503

AS PER OUR PHONE CONVERSATION TODAY ON HOW WE INTEND TO USE WEST
FUELS FOR THE ABOVE CONTRACT IT WILL BE HANDLED AS FOLLOWS. AS YOU
ARE AWARE THE ABOVE CONTRACT IS FOR HEAVY EQUIPMENT RENTAL. A FUEL
TANK WILL BE INSTALLED AT OUR LOCATION TO BE USED ONLY FOR
EQUIPMENT THAT IS RENTED OUT ON THIS CONTRACT. EVERY TIME A PIECE OF
EQUIPMENT IS REQUESTED BY THE CTA IT WILL BE SENT OUT WITH A FULL
TANK OF FUEL AS IN THE SPECIFICATIONS. AT THAT TIME ALL FUEL THAT IS
USED SHALL BE TIME STAMPED, JOB LOCATION THAT IT IS TO BE DELIVERED
TO, DATE, GALLONS USED AND EQUIPMENT NAME AND NUMBER. WHEN THE
CTA AUDITS THE RECORDS WE WILL HAVE DATES, GALLONS USED, EQUIPMENT
NUMBERS AND LOCATIONS USED TO MATCH WITH INVOICES. ALSO WHEN A
MACHINE IS ON SITE FOR MORE THEN 8 HOURS WEST FUELS WILL DELIVER TO
THAT SITE FUEL DIRECT FROM THEIR TANKERS INTO THE MACHINES WHICH
WILL ALSO HAVE ALL OF THE SAME INFORMATION ON EACH TICKET. WHEN WE
TALKED I DID NOT KNOW IF YOU NEEDED A BREAKDOWN OF HOW WE INTEND
TO MEET THE DOLLAR AMOUNT ($80,000.00). WITH A CONTRACT OF THIS
AMOUNT AND EVERY ITEM HAS AN ENGINE THAT RUNS ON DIESEL FUEL IT WILL
NOT TAKE LONG TO MEET  AND EXCEED THE $40,000.00 PER YEAR AMOUNT. BUT
IF YOU NEED A DETAILED BREAKDOWN JUST LET ME KNOW AND I WILL SEND IT
OVER TO YOU. THANK YOU. IF YOU NEED ANY OTHER INFORMATION PLEASE DO
NOT HESITATE TO CONTACT ME.

MICHAEL FERRO/PRESIDENT
CHICAGO BULK CARRIERS INC.

CBC-DBE-LETTER-1.wpsFriday, June 28, 2002

06/19/2002 07:54 7084880091 WEST FUELS PAGE 02

Schedule C:
**LETTER OF INTENT FROM DBE TO PERFORM AS
SUBCONTRACTOR, SUPPLIER AND/OR CONSULTANT**
*Bidder's or Proposer's failure to submit this form with their bid
will result in their bid being rejected in its entirety*

Name of Project/Contract: _____

Requisition No.: **B020 P00503**

Job Order No.: **NONE**

From: **WEST FUELS INC** _____
(Name of DBE Firm)

To: **Chicago BULK CARRIER Inc** and the Chicago Transit Authority
(Name of Prime Contractor)

The DBE status of the undersigned is confirmed by the attached Letter of Certification from the Chicago Transit Authority
dated **4/29/02** . (If proposing to perform as a DBE/non-DBE joint venture, then Letter of Certification from
DBE venturer is attached along with completed Schedule B and joint venture agreement)

The undersigned is prepared to provide the following described services or supply the following described goods in connection with the above named project/contract:

| Pay Item No./Description | Quantity/Unit Price | Total |
|---|---|---|
| Supply Fuel & Oil to Machines and TRKS as needed for contract for 2 years | | - 80,000.00 |
| | Use - 60% of value | |
| | Sub (or Grand) Total: $ | 48,000.00 |

Partial Pay Items. (For any of the above items that are partial pay items, specifically describe the work and subcontract dollar amount):

_____
_____
_____
_____

Grand Total: $ **48,000.00**

If more space is needed to fully describe the DBE firm's (or DBE/non-DBE joint venture's) proposed scope of work and/or payment schedule, attach additional sheets.

cta 733-04 (rev 11/99) DBE Program and Contract Compliance Print

06/19/2002  07:54   7084080091         WEST FUELS                    PAGE  03

ATTACHMENT "B"

## CERTIFICATION OF LOWER TIER PARTICIPANT
## REGARDING DEBARMENT, SUSPENSION, AND OTHER
## RESPONSIBILITY MATTERS

_West Fuels Inc._ , certifies to the best of our knowledge
_(company's name)_

and belief that it and its principals:

1. Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal department or agency.

2. Have not within a three-year period preceding this proposal been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

3. Are not presently indicted for or otherwise criminally or civilly charged by a government entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (2) of this certification; and

4. Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State, or local) terminated for cause or default.

THE LOWER TIER PARTICIPANT (APPLICANT OR POTENTIAL CONTRACTOR FOR A MAJOR

THIRD PARTY CONTRACT)  _West Fuels Inc._ .
                        _(company name)_

CERTIFIES OR AFFIRMS THE TRUTHFULNESS AND ACCURACY OF THE CONTENTS OF THE

STATEMENTS SUBMITTED ON OR WITH THIS CERTIFICATION AND UNDERSTANDS THAT

THE PROVISIONS OF 31 U.S.C. SECTIONS 3801 ET SEQ. ARE APPLICABLE THERETO.

_Signature and Title of Authorized Official_

If you are unable to certify to any of the statements in this certification, the participant shall attach an explanation to this certification.

cta  113 ae (03/00) PU-ORBIMS

Schedule C:
**LETTER OF INTENT FROM DBE**

**Sub-Contracting Levels**

_____ *O* _____ % of the dollar value of the DBE's subcontract will be sublet to non-DBE contractors.

_____ *O* _____ % of the dollar value of the DBE's subcontract will be sublet to DBE contractors.

**NOTICE: IF DBE WILL NOT BE SUB-SUBCONTRACTING ANY OF THE WORK DESCRIBED IN THIS SCHEDULE, A ZERO (0) MUST BE SHOWN IN EACH BLANK ABOVE.**

**NOTICE: IF MORE THAN TEN PERCENT (10%) OF THE VALUE OF THE DBE's SCOPE OF WORK WILL BE SUBLET, A BRIEF EXPLANATION AND DESCRIPTION OF THE WORK TO BE SUBLET MUST BE ATTACHED TO THIS SCHEDULE.**

The undersigned will enter into a formal written agreement for the above work with you as a Prime Contractor, conditioned upon your execution of a contract with the Chicago Transit Authority, and will do so within (5) five working days of your receipt of a signed contract from the Chicago Transit Authority.

**NOTICE: THIS SCHEDULE (AND ACCOMPANYING ATTACHMENTS TO BE SUBMITTED IN TRIPLICATE. ORIGINAL SIGNATURES REQUIRED ON ALL THREE (3) COPIES.**

_Deborah Stange_
(Signature of Owner, President or Authorized Agent of DBE)

_Deborah Stange / President_
Name/Title (Print)

_6/19/02_
Date

_708/246-4800_
Phone

**If proposing to perform as a DBE/non-DBE Joint Venture:**

_____
(Signature of Owner, President or Authorized Agent of non-DBE)

_____
Name/Title (Print)

_____
Date

_____
Phone

**ta** f15 04 rev 11/89) DBE Program and Contract Compliance                         (back)

# EXHIBIT D



# NAUTILUS INSURANCE COMPANY

### A Stock Company

## COMMERCIAL LINES POLICY

**THIS POLICY IS NOT OBTAINED PRIMARILY FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.**

THIS POLICY CONSISTS OF:

- Declarations;
- Common Policy Conditions; and
- One or more Coverage Parts.  A Coverage Part consists of:

   - One or more Coverage Forms; and
   - Applicable Forms and Endorsements.

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

_____
Secretary

_____
President and CEO

7273 E. Butherus Drive     Scottsdale, Arizona 85260     Telephone (480) 951-0905     Facsimile (480) 951-9730



*A BERKLEY COMPANY*sm

S944J (01/02)

### COMMERCIAL LINES POLICY - COMMON POLICY DECLARATIONS
# NAUTILUS INSURANCE COMPANY
Scottsdale, Arizona

**Transaction Type: Renewal**

Renewal of Policy # NC197850-01

Rewrite of Policy #

Cross Ref. Policy #

Inspection Ordered:

⌐ Yes  ⌧ No

**Policy No. NC375330**

**Notice to Policyholders**

This contract is issued, pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.

**Named Insured and Mailing Address**
(No., Street, Town or City, County, State, Zip Code)

CHICAGO BULK CARRIERS, INC.
DBA ILLINOIS DISPOSAL COMPANY
12100 S MARSHFIELD
CALUMET PARK          IL 60827-

**Agent and Mailing Address     Agency No.** 01211-00
(No., Street, Town or City, County, State, Zip Code)

The Jack Nebel Companies
1242 W. Northwest Highway
Palatine, IL 60067

NO FLAT CANCELLATION

**Policy Period:** From 10/01/2004 to 10/01/2005 at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** REMOVAL OF CONSTRUCTION DEBRIS                    **Tax State** IL

**Form of Business:** ☐ Individual  ☐ Joint Venture  ☐ Partnership  ☒ Organization (Other than Partnership or Joint Venture)

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY,
WE AGREE WITH YOU TO PROVIDE THE INSURANCE STATED IN THIS POLICY.

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | |
|---|---|
| | **PREMIUM** |
| Commercial General Liability Coverage Part | $ 2,162.00 |
| | $ |
| | $ |
| | $ |
| | $ |

| Tax & Fee Schedule | | | |
|---|---|---|---|
| SURPLUS LINES TAX | $ 76.00 | TOTAL ADVANCE PREMIUM | $ 2,162.00 |
| STAMPING FEE | 6.00 | Minimum & Deposit | |
| | | TOTAL TAXES & FEES | $ 82.00 |
| | | **TOTAL** | $ 2,244.00 |

Form(s) and Endorsement(s) made a part of this policy at time of issue:
**Refer to S902 Schedule of Forms and Endorsements.**

THE JACK NEBEL COMPANIES
535
Countersigned: Palatine, IL          By _____
        10/25/2004  CN          
            GEK          Countersignature of Authorized Representative, whichever is applicable

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

S944 (08/03)                    **HOME OFFICE**

## NAUTILUS INSURANCE COMPANY

Policy Number: **NC375330**

Insured: CHICAGO BULK CARRIERS, INC.
DBA ILLINOIS DISPOSAL COMPANY

## SCHEDULE OF FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| S944J | (01/02) | Nautilus Policy Jacket |
| IL0017 | (11/98) | Common Policy Conditions |
| IL0021 | (07/02) | Nuclear Energy Liab Exclusion |
| S013 | (12/00) | Minimum Earned Premium Endt |
| S020 | (04/03) | Service of Suit |
| S150 | (07/03) | CGL Coverage Part Declarations |
| CG0001 | (10/01) | Comml General Liability Cvg Fo |
| CG2160 | (09/98) | Excl-Y2K Computer-Other Relate |
| CG2169 | (01/02) | War or Terrorism Exclusion |
| S001 | (07/04) | Amendment of Premium Condition |
| S006 | (09/03) | Excl - Classification Limitati |
| S007 | (01/98) | Contractual Liability Limitati |
| S022 | (09/03) | Ded Liab Ins - Incl Cost & Exp |
| S038 | (05/04) | Amendment of Liquor Liab Excl |
| S051 | (09/03) | Additional Exclusions & Conds |
| S114 | (04/97) | Additional Insured Endorsement |
| S261 | (08/03) | Asbestos Exclusion |
| S262 | (08/03) | Silica Exclusion |

All Other Forms and Endorsements of this Policy Remain Unchanged.

## SCHEDULE OF FORMS AND ENDORSEMENTS (Continued)

**MISCELLANEOUS FORMS APPLICABLE:**

All Other Forms and Endorsements of this Policy Remain Unchanged.

S902 (12/98) Page 2 of 2

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

 Copyright, Insurance Services Office, Inc.,  1998     □

IL 00 21 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

  © ISO Properties, Inc., 2001   □

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**NAUTILUS INSURANCE COMPANY**

POLICY NUMBER: **NC375330**                                            ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## MINIMUM EARNED PREMIUM ENDORSEMENT

If this insurance is cancelled at your request, there will be a minimum earned premium retained by us of

$ _____  or _____ 25 _____ % of the premium for this insurance, whichever is greater.

If a policy fee, inspection fee or expense constant is applicable to this policy, the fee(s) will be fully earned and no refund of fees will be made.

All other Terms and Conditions of this Policy remain unchanged.

S 013 (12/00)

# NAUTILUS INSURANCE COMPANY

ENDORSEMENT

# SERVICE OF SUIT

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the Statute, or his successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action,"suit" or proceeding instituted by or on behalf of you or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

It is further agreed that service of process in such "suit" may be made upon Michael Kilgas, or his nominee of the Company at 7273 East Butherus Drive, Scottsdale, Arizona 85260 and that in any "suit" instituted against any one of them upon this policy, we will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

It is agreed that in any state requiring a standard form of policy, insurance hereunder on values or properties in such state shall attach and cover in accordance with the terms and conditions of such standard form.

S020  (04/03)

# NAUTILUS INSURANCE COMPANY
# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

POLICY NUMBER: **NC375330**
☐ Extension of Declarations is attached.     Effective Date: 10/01/2004   12:01 A.M. Standard Time

| LIMITS OF INSURANCE | ☐ If box is checked, refer to form S132 for Limits of Insurance. |
|---|---|

| | | |
|---|---|---|
| General Aggregate Limit (Other Than Products/Completed Operations) | $ 2,000,000 | |
| Products/Completed Operations Aggregate Limit | $ INCLUDED | |
| Personal and Advertising Injury Limit | $ 1,000,000 | Any One Person Or Organization |
| Each Occurrence Limit | $ 1,000,000 | |
| Damage To Premises Rented To You Limit | $ 100,000 | Any One Premises |
| Medical Expense Limit | $ 5,000 | Any One Person |

## RETROACTIVE DATE (CG 00 02 ONLY)

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" which occurs before the Retroactive Date, if any, shown here: _____ (Enter Date or "NONE" if no Retroactive Date applies)

## BUSINESS DESCRIPTION AND LOCATION OF PREMISES

BUSINESS DESCRIPTION: REMOVAL OF CONSTRUCTION DEBRIS
LOCATION OF ALL PREMISES YOU OWN, RENT, OR OCCUPY:   ☒ Location address is same as mailing address.
1. 12100 S MARSHFIELD       CALUMET PARK     IL 60827-
2.     -
    Additional locations (if any) will be shown on form S170.
LOCATION OF JOB SITE (If Designated Projects are to be Scheduled):
    -
    -

| CODE # -   CLASSIFICATION | * | PREMIUM BASIS | RATE PR/CO | RATE All Other | ADVANCE PREMIUM |
|---|---|---|---|---|---|
| 91629 - Debris Removal - construction site | P+ | 33,500 | 9.753 | | 327 |
| | | | | 47.311 | 1,585 |
| 49950 - ADDITIONAL INSURED FORM S114 | T | 1 | INCLUDED | | INCLUDED |
| | | EACH | | 250.000 | 250 MP |
| - | | | | | |
| - | | | | | |

**\* PREMIUM BASIS SYMBOLS**   **✚ = Products/Completed Operations are subject to the General Aggregate Limit**
   **a** = Area (per 1,000 sq. ft. of area)     **o** = Total Operating Expenses     **s** = Gross Sales (per $1,000 of Gross Sales)
   **c** = Total Cost (per $1,000 of Payroll)    (per $1,000 Total Operating Expenditures)    **t** = See Classification
   **m** = Admissions (per 1,000 Admissions)    **p** = Payroll (per $1,000 of Payroll)     **u** = Units (per unit)

| | PREMIUM FOR THIS COVERAGE PART $ | 2,162 |
|---|---|---|

## FORMS AND ENDORSEMENTS (other than applicable Forms and Endorsements shown elsewhere in the policy)

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
**Refer to S902 Schedule of Forms and Endorsements**

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.
S150 (07/03)     Copyright ISO Properties, Inc., 2000

COMMERCIAL GENERAL LIABILITY
CG 00 01 10 01

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© ISO Properties, Inc., 2000

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

        (i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

        (ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

        (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

    (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

    (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

        (i) Any insured; or

        (ii) Any person or organization for whom you may be legally responsible; or

    (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

        (i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

        (ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

        (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. **War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

j. **Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance ; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l. **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m. **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n. **Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

## COVERAGE C MEDICAL PAYMENTS

1. **Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

We will not pay expenses for "bodily injury":

a. **Any Insured**

To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while taking part in athletics.

f. **Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

Excluded under Coverage **A**.

h. **War**

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

 © ISO Properties, Inc., 2000

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      (1) "Bodily injury" or "personal and advertising injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) "Property damage" to property:

         (a) Owned, occupied or used by,

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

   b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage **C**;

   b. Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

© ISO Properties, Inc., 2000

**b.** If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

© ISO Properties, Inc.,  2000                       □

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in a. above;

      (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

 © ISO Properties, Inc., 2000

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

      (1) Equipment designed primarily for:

         (a) Snow removal;

         (b) Road maintenance, but not construction or resurfacing; or

         (c) Street cleaning;

      (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

© ISO Properties, Inc., 2000

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

      (1) Products that are still in your physical possession; or

      (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

         (a) When all of the work called for in your contract has been completed.

         (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

         (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   b. Does not include "bodily injury" or "property damage" arising out of:

      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

      (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

      (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

   For the purposes of this insurance, electronic data is not tangible property.

   As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

© ISO Properties, Inc., 2000

**b.** Includes

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    **(2)** The providing of or failure to provide warnings or instructions.

© ISO Properties, Inc., 2000

COMMERCIAL GENERAL LIABILITY
CG 21 60 09 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" (or "personal and advertising injury" if defined as such in your policy) arising directly or indirectly out of:

**a.** Any actual or alleged failure, malfunction or inadequacy of:

  **(1)** Any of the following, whether belonging to any insured or to others:

   **(a)** Computer hardware, including microprocessors;

   **(b)** Computer application software;

   **(c)** Computer operating systems and related software;

   **(d)** Computer networks;

   **(e)** Microprocessors (computer chips) not part of any computer system; or

   **(f)** Any other computerized or electronic equipment or components; or

  **(2)** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **2.a.(1)** of this endorsement

due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

**b.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **2.a.** of this endorsement.

COMMERCIAL GENERAL LIABILITY
CG 21 69 01 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAR OR TERRORISM EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **i.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**i. War Or Terrorism**

"Bodily injury" or "property damage" arising, directly or indirectly, out of:

(1) War, including undeclared or civil war; or

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these; or

(4) "Terrorism", including any action taken in hindering or defending against an actual or expected incident of "terrorism"

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

However, with respect to "terrorism", this exclusion only applies if one or more of the following are attributable to an incident of "terrorism":

(1) The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions ; or

(2) Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

(a) Physical injury that involves a substantial risk of death; or

(b) Protracted and obvious physical disfigurement; or

(c) Protracted loss of or impairment of the function of a bodily member or organ; or

(3) The "terrorism" involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

(4) The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

(5) Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials.

Paragraphs **(1)** and **(2)**, immediately preceding, describe the thresholds used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether the Terrorism Exclusion will apply to that incident. When the Terrorism Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Part.

In the event of any incident of "terrorism" that is not subject to the Terrorism Exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

Multiple incidents of "terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**B.** The following exclusion is added to Paragraph **2.,** **Exclusions** of **Section I – Coverage B –** **Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**War Or Terrorism**

"Personal and advertising injury" arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these; or

**(4)** "Terrorism", including any action taken in hindering or defending against an actual or expected incident of "terrorism"

regardless of any other cause or event that contributes concurrently or in any sequence to the injury.

However, with respect to "terrorism", this exclusion only applies if one or more of the following are attributable to an incident of "terrorism":

**(1)** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions ; or

**(2)** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**(a)** Physical injury that involves a substantial risk of death; or

**(b)** Protracted and obvious physical disfigurement; or

**(c)** Protracted loss of or impairment of the function of a bodily member or organ; or

**(3)** The "terrorism" involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**(4)** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

© ISO Properties, Inc., 2001

**(5)** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials.

Paragraphs **(1)** and **(2)**, immediately preceding, describe the thresholds used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether the Terrorism Exclusion will apply to that incident. When the Terrorism Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Part.

In the event of any incident of "terrorism" that is not subject to the Terrorism Exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

Multiple incidents of "terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** Exclusion **h.** under Paragraph **2., Exclusions** of **Section I – Coverage C – Medical Payments** does not apply.

**D.** The following definition is added to the **Definitions** Section:

"Terrorism" means activities against persons, organizations or property of any nature:

1. That involve the following or preparation for the following:

    **a.** Use or threat of force or violence; or

    **b.** Commission or threat of a dangerous act; or

    **c.** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

2. When one or both of the following applies:

    **a.** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

    **b.** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

## NAUTILUS INSURANCE COMPANY

POLICY NUMBER: **NC375330**                                      **LIABILITY ENDORSEMENT**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF PREMIUM CONDITIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART

The Premium Audit Condition under **SECTION IV - CONDITIONS** is **replaced** by the following:

**Premium Audit**

  **a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

    The advance premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

    The rates for each classification shown in the Declarations are multiplied by the estimated premium bases of that classification for the term to determine the advance premium. We may conduct an audit of your books to determine the actual premium bases developed during the policy period. The premium bases used are payroll, admissions, gross sales, total cost, area, each exposure unit, units or total operating expenditures and are defined in accordance with our rules and the following additional definitions:

    **(1) Payroll** (premium basis symbol **p**): Remuneration paid to "employees", including but not limited to:

      **(a)** Money or substitutes for money; commissions; bonuses; overtime; payments to statutory insurance or pension plans; profit sharing or incentive plans; pay for holidays, vacation or sickness; and fees paid to employment agencies for temporary personnel provided to you.

      **(b)** If your operations consist of a number of separate operations classified individually in the Declarations, the payroll will be allocated to each classification where you have maintained records for each separate operation. Any such operation for which separate records are **not** maintained by you shall be assigned to the highest rated classification.

      **(c)** For premium computation purposes, the payroll of executive officers, individual insureds and co-partners is subject to a minimum annual payroll per person of:



      (If no entry is made, the minimum payroll as established by our rating rules will apply.)

    The rates apply per $1,000 of Payroll.

    **(2) Admissions** (premium basis symbol **m**): The total number of persons, other than your "employees", admitted to the insured event or to events conducted on the premises whether on paid admissions, tickets, complimentary tickets or passes.

    The rates apply per 1,000 Admissions.

    **(3) Gross Sales** (premium basis symbol **s**): The gross amount charged by you, your concessionaires or by others trading under your name for:

      **(a)** All goods or products, sold or distributed;

      **(b)** Operations performed during the policy period; and

      **(c)** Rentals; or

      **(d)** Dues or fees.

    The rates apply per $1,000 of Gross Sales.

(4) **Total Cost** (premium basis symbol **c**):  The total cost of all work let or sublet in connection with each specific project including:

   (a) The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work; or

   (b) All fees, bonuses or commissions made, paid or due.

   The rates apply per $1,000 of Total Cost.

(5) **Area** (premium basis symbol **a**):  The total number of square feet of floor space at the insured premises.

   The rates apply per 1,000 square feet of Area.

(6) **Each** (premium basis symbol **t**):  This basis of premium involves units of exposure, and the quantity comprising each unit of exposure is indicated in the Declarations, such as "per person".

   The rates apply per each unit of exposure.

(7) **Units** (premium basis symbol **u**):  A single room or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone.

   The rates apply per Unit.

(8) **Total Operating Expenditures** (premium basis symbol **o**):  Total expenditures (including grants, entitlements and shared revenue) without regard to source of revenue during the policy period including accounts payable.

   The rates apply per $1,000 of Total Operating Expenditures.

**b.** Premium shown in this Coverage Part as advance premium is a minimum and deposit premium.  At the close of each audit period, we will compute the earned premium for that period.  If the earned premium is greater than the advance premium paid, an audit premium is due.  Audit premiums are due and payable on notice to the first Named Insured.  Failure to pay the audit premium(s) due will subject this policy, and/or any in force policy of yours, to cancellation for non-payment of premium.

If the policy is canceled prior to the expiration date, we will retain the earned premium developed by an audit of your books for the period the policy was in force or the earned premium developed by multiplying the advance premium by the applicable pro-rata or short-rate factor, whichever is greater.

If the total earned premium for the policy period is less than the advance premium, such advance premium is the minimum premium for the policy period indicated and is not subject to further adjustment.

**c.** The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.  Failure to supply such records upon request will be deemed a breach of condition and subject this policy, and/or any in force policy of yours, to cancellation for breach of conditions.

**d.** We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

All other terms and conditions of this policy remain unchanged.

## NAUTILUS INSURANCE COMPANY

**LIABILITY ENDORSEMENT**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCLUSION - CLASSIFICATION LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is **added** to Paragraph **2. Exclusions** of **SECTION I - COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY, COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY** and **COVERAGE C - MEDICAL PAYMENTS:**

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments for operations that are not classified or shown in the Commercial General Liability Coverage Part Declarations, its endorsements or supplements.

All other terms and conditions of this policy remain unchanged.

S006  (09/03)          Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## NAUTILUS INSURANCE COMPANY

LIABILITY ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CONTRACTUAL LIABILITY LIMITATION
### (Limited Form)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the DEFINITIONS section is **replaced** by the following:

"Insured Contract" means any written:

1. Contract for a lease of premises.  However, that portion of the contract for a lease of premises that indemnifies any person or organization for "property damage" to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

2. Sidetrack agreement;

3. Easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

4. Obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

5. Elevator maintenance agreement; or

6. That part of any other contract or agreement pertaining to your business (including indemnification of a municipality in connection with work performed for a municipality) under which you assume tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

An "insured contract" does not include that part of any contract or agreement:

1. That indemnifies any person or organization for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

2. That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    (a) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

    (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

3. Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection or engineering services;

4. That indemnifies any person or organization for "property damage" to premises rented or loaned to you;

5. That indemnifies any person or organization for "bodily injury" or "property damage" arising from an "occurrence" caused by the sole negligence of said person or organization; or

6. That indemnifies any person or organization for "bodily injury" or "property damage" arising from ownership, maintenance or use of any aircraft.

All other Terms and Conditions of this Insurance remain unchanged.

S 007 (01/98)

## NAUTILUS INSURANCE COMPANY

POLICY NUMBER: **NC375330**                                              **LIABILITY ENDORSEMENT**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DEDUCTIBLE LIABILITY INSURANCE
### (Including Costs and Expenses)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Amount of Deductible |
|---|---|
| Bodily Injury Liability (including Costs and Expenses) | $ 500 per claim |
| Property Damage Liability (including Costs and Expenses) | $ 500 per claim |

1.  Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on the insured's behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages. The limits of insurance applicable to each "occurrence" for such coverages will be reduced by the amount of such deductible. Aggregate limits for such coverages shall not be reduced by the application of such deductible.

2.  The deductible amounts stated are on a **PER CLAIM BASIS.** The deductible amount applies:
    a.  Under the Bodily Injury Liability, to all damages because of "bodily injury" sustained by any one person; or
    b.  Under the Property Damage Liability, to all damages because of "property damage" sustained by any one person or organization;
    as a result of any one "occurrence".

3.  The deductible amounts stated in the Schedule above applies toward investigation, adjustment and legal expenses incurred in the handling and investigation of each claim, whether or not payment is made to the claimant, compromise settlement is reached or the claim is denied.

4.  The terms of this insurance, including those with respect to:
    a.  Our right and duty to defend "suits" seeking those damages; and
    b.  Your duties in the event of an "occurrence", claim or "suit",
    apply regardless of the application of the deductible.

5.  We may, at our sole election and option, either:
    a.  Pay any part or all of the deductible amount to effect settlement of any claim or "suit" and upon notification of the action taken, you will promptly reimburse us for such part of the deductible amount as has been paid by us; or
    b.  Upon our receipt of notice of any claim or at any time thereafter, request you to pay and deposit with us all or any part of the deductible amount, to be held and applied according to the terms of this policy.

All other terms and conditions of this policy remain unchanged.

S022 (09/03)                    Includes copyrighted material of Insurance Services Offices, Inc., with its permission.

**NAUTILUS INSURANCE COMPANY**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMENDMENT OF LIQUOR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

Exclusion **c., Liquor Liability,** in Paragraph **2., Exclusions** of **Section I - Coverages - Bodily Injury and Property Damage Liability** is **replaced** by the following:

This insurance does not apply to:

**c.  Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you:

**(1)** Manufacture, sell or distribute alcoholic beverages;

**(2)** Serve or furnish alcoholic beverages for a charge where the activity:

**(a)** Requires a license; and/or

**(b)** Is for the purpose of financial gain or livelihood;

**(3)** Serve or furnish alcoholic beverages without a charge, if a license is required for such activity; or

**(4)** Are an owner or lessor of premises used for such purposes.

All other terms and conditions of this policy remain unchanged.

S038  (05/04)

## NAUTILUS INSURANCE COMPANY

LIABILITY ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL EXCLUSIONS AND CONDITIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## TOTAL POLLUTION EXCLUSION ENDORSEMENT

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury and Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f.  Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

CG 21 49 09 99

(2) Any loss, cost or expense arising out of any:

  (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

  (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

## EXCLUSION - PUNITIVE OR EXEMPLARY DAMAGES

The following is **added** to EXCLUSIONS:

This insurance does not apply to a claim of or indemnification for punitive or exemplary damages.  If a "suit" shall have been brought against you for a claim within the coverage provided under the policy, seeking both compensatory and punitive or exemplary damages, then we will afford a defense for such action.  We shall not have an obligation to pay for any costs, interest or damages attributable to punitive or exemplary damages.

S017 (01/98)

## LIMITATION - OTHER INSURANCE

That portion of sub-paragraph **4b. Excess Insurance (4.b.(1)(d)** in CG0001 or **4.b.(1)(e)** in CG0002) under **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** that provides Excess Insurance if the loss arises out of the maintenance or use of aircraft, "autos" or watercraft is **deleted.**

S073  (08/03)

## NOTICE TO POLICYHOLDERS

This insurance does not provide coverage as required by Environmental Protection Agency (EPA) 40 CFR Parts 280 and 281 for underground storage tanks nor any coverage under CERCLA or similar State or Federal Environmental Act(s).

This policy Excludes all Coverage for Pollution.

S005  (02/95)

## EMPLOYMENT-RELATED PRACTICES EXCLUSION

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

CG 21 47 07 98

## AMENDATORY ENDORSEMENT - EMPLOYEE EXCLUSION

Exclusion **e. Employer's Liability** of Paragraph **2. Exclusions** under **SECTION I - COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is **replaced** by the following:

  **e. Employer's Liability**

  "Bodily injury" to:

  (1) An "employee" of the insured arising out of and in the course of:

    (a) Employment by the insured; or

    (b) Performing duties related to the conduct of the insured's business; or

  (2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

  This exclusion applies:

  (1) Whether the insured may be liable as an employer or in any other capacity; and

  (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

As respects this endorsement only, the definition of "Employee" in DEFINITIONS is **replaced** by the following:

  **"Employee"** shall include, but is not limited to, any person or persons hired by, loaned to, leased to, contracted for, or volunteering services to the insured, whether or not paid by the insured.

S127 (08/03)

## EXCLUSION - MICROORGANISMS, BIOLOGICAL ORGANISMS, BIOAEROSOLS OR ORGANIC CONTAMINANTS

The following exclusion is added to EXCLUSIONS:

This insurance does not apply to:

1. Liability, injury or damage of any kind, including but not limited to "bodily injury", "property damage", or "personal and advertising injury" arising out of, related to, caused by or in any way connected with the exposure to, presence of, formation of, existence of or actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any microorganisms, biological organisms, bioaerosols or organic contaminants, including but not limited to mold, mildew, fungus, spores, yeast or other toxins, mycotoxins, allergens, infectious agents, wet or dry rot or rust, or any materials containing them at any time, regardless of the cause of growth, proliferation or secretion.

2. Any loss, cost or expense arising out of any:

   a. Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of microorganisms, biological organisms, bioaerosols or organic contaminants, including but not limited to mold, mildew, fungus, spores, yeast, or other toxins, mycotoxins, allergens, infectious agents, wet or dry rot or rust, or any materials containing them at any time, regardless of the cause of growth, proliferation or secretion; or

   b. Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of microorganisms, biological organisms, bioaerosols or organic contaminants, including but not limited to mold, mildew, fungus, spores, yeast, or other toxins, mycotoxins, allergens, infectious agents, wet or dry rot or rust, or any materials containing them at any time, regardless of the cause of growth, proliferation or secretion.

We shall have no duty to investigate, defend or indemnify any insured against any loss, claim, "suit" or other proceeding alleging injury or damage of any kind, including but not limited to "bodily injury", "property damage", or "personal and advertising injury" to which this endorsement applies.

S233 (08/01)

All other terms and conditions of this policy remain unchanged.

## NAUTILUS INSURANCE COMPANY

POLICY NUMBER: **NC375330**

LIABILITY ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

Name of Person or Organization:

Premium $    250

CHICAGO TRANSIT AUTHORITY

Address:
PO BOX 3555
CHICAGO                IL 60654- 0555

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule and only for liability arising out of your negligence and only for occurrences or coverages not otherwise excluded in the policy to which this endorsement applies.

Your policy is primary in the event of an occurrence caused by your sole negligence as respects the job described below: (MUST BE COMPLETED)

Job Description:

Address:

All other Terms and Conditions of this Insurance remain unchanged.

S114 (04/97)

**NAUTILUS INSURANCE COMPANY**

LIABILITY ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ASBESTOS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**A.** The following is added to Paragraph **2.**, Exclusions of both **Section I - Coverage A - Bodily Injury And Property Damage Liability,** and **Section I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to:

**Asbestos**

1. "Bodily injury", "property damage", "personal and advertising injury" or "reduction in value" related to the actual, alleged, or threatened presence of, or exposure to "asbestos" in any form, or to harmful substances emanating from "asbestos". This includes ingestion, inhalation, absorption, contact with, existence or presence of, or exposure to "asbestos".  Such injury from or exposure to  "asbestos" also includes, but is not limited to:

   **a.** The existence, installation, storage, handling or transportation of "asbestos";

   **b.** The removal, abatement or containment of "asbestos" from any structures, materials, goods, products, or manufacturing process;

   **c.** The disposal of "asbestos";

   **d.** Any structures, manufacturing processes, or products containing "asbestos";

   **e.** Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage; or

   **f.** Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above.

2. Any loss, cost or expense, including, but not limited to payment for investigation or defense, fines, penalties and other costs or expenses, arising out of any:

   **a.** Claim, "suit", demand, judgment, obligation, order, request, settlement, or statutory or regulatory requirement that any insured or any other person or entity test for, monitor, clean up, remove, contain, mitigate, treat, neutralize, remediate, or dispose of, or in any way respond to, or assess the actual or alleged effects of "asbestos"; or

   **b.** Claim, "suit", demand, judgment, obligation, request, or settlement due to any actual, alleged, or threatened injury or damage from "asbestos" or testing for, monitoring, cleaning up, removing, containing, mitigating, treating, neutralizing, remediating, or disposing of, or in any way responding to or assessing the actual or alleged effects of, "asbestos" by any insured or by any other person or entity; or

   **c.** Claim, "suit", demand, judgment, obligation, or request to investigate which would not have occurred, in whole or in part, but for the actual or alleged presence of or exposure to "asbestos".

   This exclusion applies regardless of who manufactured, produced, installed, used, owned, sold, distributed, handled, stored or controlled the "asbestos".

**B.** The following exclusion is added to Paragraph **2.**, Exclusions, of **Coverage C Medical Payments**:

We will not pay expenses for "bodily injury":

**Asbestos**

Due to the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of or presence of, "asbestos" in any form.

**C.** The following definitions are added to the **Definitions** Section:

"Asbestos" means any type or form of asbestos, asbestos fibers, asbestos products, or asbestos materials, including any products, goods, or materials containing asbestos or asbestos fibers, products or materials and any gases, vapors, scents or by-products produced or released by asbestos.

"Reduction in value" means any claim, demand or "suit" that alleges diminution, impairment or devaluation of property.

## NAUTILUS INSURANCE COMPANY

**LIABILITY ENDORSEMENT**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# SILICA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM<br>
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY FORM<br>
PRODUCTS/COMPLETED OPERATIONS COVERAGE FORM

**A.** The following is added to Paragraph **2.**, Exclusions of both **Section I - Coverage A - Bodily Injury And Property Damage Liability,** and **Section I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to:

**Silica**

1. "Bodily injury", "property damage", or "personal and advertising injury" related to the actual, alleged, or threatened presence of or exposure to "silica" in any form, or to harmful substances emanating from "silica". This includes the use of, consumption of, ingestion of, inhalation of, absorption of, contact with, existence of, presence of, proliferation of, discharge of, dispersal of, seepage of, migration of, release of, escape of, or exposure to "silica".  Such injury from or exposure to "silica" also includes, but is not limited to:

   **a.** The existence, storage, handling or transportation of "silica";

   **b.** The removal, abatement or containment of "silica" from any structures, materials, goods, products, or manufacturing process;

   **c.** The disposal of "silica";

   **d.** Any structures, manufacturing processes, or products containing "silica";

   **e.** Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage;

   **f.** Any product manufactured, sold, handled or distributed by or on behalf of the insured which contains "silica"; or

   **g.** Any supervision, instructions, recommendations, warranties (express or implied), warnings or advice given or which should have been given.

2. Any loss, cost or expense including, but not limited to, payment for investigation or defense, fines, penalties, interest and other costs or expenses, arising out of any:

   **a.** Claim, "suit", demand, judgment, obligation, order, request, settlement, or statutory or regulatory requirement that any insured or any other person or entity test for, monitor, clean up, remove, contain, mitigate, treat, neutralize, remediate, or dispose of, or in any way respond to, or assess the actual or alleged effects of "silica"; or

   **b.** Claim, "suit", demand, judgment, obligation, request, or settlement due to any actual, alleged, or threatened injury or damage from "silica" or testing for, monitoring, cleaning up, removing, containing, mitigating, treating, neutralizing, remediating, or disposing of, or in any way responding to or assessing the actual or alleged effects of, "silica" by any insured or by any other person or entity; or

   **c.** Claim, "suit", demand, judgment, obligation, or request to investigate which would not have occurred, in whole or in part, but for the actual or alleged presence of or exposure to "silica".

This exclusion applies regardless of who produced, installed, used, owned, sold, distributed, handled, stored or controlled the "silica".

**B.** The following exclusion is added to Paragraph **2.**, Exclusions, of **Coverage C Medical Payments**:

We will not pay expenses for "bodily injury":

**Silica**

Due to the actual, alleged or threatened consumption of, inhalation of, ingestion of, absorption of, contact with, exposure to, existence of or presence of, "silica" in any form.

**C.** The following definition is added to the **DEFINITIONS** Section:

"Silica" means the mineral, silicon dioxide, and any type or form of it including, but not limited to, silica-containing products, goods, fibers or materials, silica dust, fine particulate dust of siliceous or silicic minerals, and any gases, vapors, scents or by-products produced or released by silica, silica dust or silica-containing products, goods, fibers or materials.  Siliceous or silicic minerals include, but are not limited to, sand, quartz, slate, granite and flint.